## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

_____

G.H., a minor, by and through his parent
and legal guardian, GREGORY HENRY;
R.L., a minor, by and through her parent
and legal guardian, ANGEL CARTER;          Case No.:
B.W., a minor, by and through her parent
and legal guardian, LEROI LUZUNARIS;
on behalf of themselves and all persons
similarly situated,

        Plaintiffs,

v.

SIMONE MARSTILLER, in her official
capacity as Secretary of the Florida
Department of Juvenile Justice; and the
FLORIDA DEPARTMENT OF JUVENILE
JUSTICE, an agency of the State of Florida,

        Defendant.
_____

## CLASS ACTION
## COMPLAINT

## PRELIMINARY STATEMENT

1.     Subjecting children to solitary confinement and depriving them of

even minimal meaningful social interaction can cause trauma, depression, and

anxiety, increase the risk of suicide and self-harm, and permanently interfere with

children's development. Despite these well-known risks of serious harm, the

Florida Department of Juvenile Justice (DJJ) isolates thousands of children in solitary confinement every year. The risk of harm for children begins immediately when they are isolated in solitary confinement.

2.      Solitary confinement is unnecessary, unproductive, and can be permanently damaging to the individuals subjected to it. A national consensus is emerging that solitary confinement poses a risk of harm for anyone, but is especially harmful for children, who are still developing physically, psychologically, and socially. For children with mental illness, developmental disabilities, or histories of trauma, the risk of harm from isolation is even greater. Among other authorities, the U.S. Department of Justice, the American Medical Association, the American Academy of Child and Adolescent Psychiatry, and the National Commission on Correctional Health Care have recognized that solitary confinement is harmful and should be eliminated for children.

3.      The named Plaintiffs, and the class they seek to represent, are, or will be, subject to solitary confinement, in one of the 21 DJJ-operated secure detention centers (Secure Detention) throughout the state. They bring this action to address the violations of their rights.

4.      DJJ, through policy and practice, subjects children to solitary confinement, often the same child repeatedly, without any time limit, to manage their behavior as a first response to any situation. In solitary, children spend hours

or days behind locked steel doors in tiny cells. DJJ denies them access to outdoor recreation and schooling, and deprives them of normal human interactions. Children have nothing to do while in solitary confinement but cry, sit idly, bang on the door, yell to try to get the staff's attention, or sleep. DJJ requires them to eat in their tiny cells next to toilets smelling of, and contaminated by, human waste. The cumulative effect of these deprivations in isolation presents a substantial risk of serious harm to these children, all of whom are vulnerable due to their continuing development.

5.     DJJ subjects children with mental illness, who have engaged in self-harming behaviors, or are at risk for suicide, to solitary confinement despite their heightened risk for harm. DJJ fails to provide a mental health examination prior to confinement or meaningful mental health treatment during confinement to prevent the onset or exacerbation of mental illness and reduce the risk of suicide. DJJ's failure to provide even these basic mental health services is especially troubling considering the strong correlation between isolation and the risk of suicide in juvenile detention: fifty percent (50%) of youth who committed suicide in juvenile facilities were in isolation for behavioral sanctions at the time of their death. DJJ is not only aware of this risk of serious harm to children, it has actually studied it, yet still refuses to take appropriate and necessary actions to prevent it.

6.     Depriving a child of meaningful social interaction, programming, or mental stimulation is harmful and counterproductive to the goals of ensuring the safety and security of juvenile facilities. For these reasons, there is a national trend among juvenile and correctional entities to eliminate or dramatically reduce disciplinary or punitive isolation for juveniles and, instead, use more appropriate techniques for managing behavior. These entities use very brief, short-term separation of a youth from others, if at all, and only as a last resort when other options fail to de-escalate situations which pose an acute immediate risk of physical harm to the youth or others. During these brief separations, youth receive mental health services, access to basic necessities, programming, and procedural safeguards such as individualized assessments, supervisory approvals, and reviews. Despite the national shift away from using solitary confinement based on a consensus among scientific, medical, and mental health professionals about the psychological and physiological risks of serious harm, DJJ has ignored these risks and continues to subject children in secure detention centers to frequent and repeated solitary confinement.

7.     Defendant Simone Marstiller is aware of and has deliberately disregarded the substantial risk of harm to the rights of Plaintiffs, and other similarly situated children, by authorizing and subjecting them to illegal conditions of confinement, including a policy and practice of using harmful solitary

confinement in violation of the right to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. Defendants Simone Marstiller and DJJ have also acted, and are acting, under color of state law to discriminate against Plaintiffs and Class Members with disabilities in violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

8.      Plaintiffs, on behalf of themselves and the class they seek to represent (hereafter collectively "Plaintiffs"), bring this action to redress the violations of their civil, statutory, and constitutional rights by Defendants while acting under color of state law. Plaintiffs challenge Defendants' statewide policy and practice of using solitary confinement in Secure Detention where children are isolated from others in a locked cell with no meaningful social interaction, environmental stimulation, outdoor recreation, schooling, or property. Without judicial intervention, these children will continue to suffer from the physical and psychological harm from solitary confinement. Plaintiffs seek declaratory and injunctive relief requiring Defendants to cease the challenged unlawful policies and practices.

## JURISDICTION AND VENUE

9.      Plaintiffs' claims for relief are predicated upon 42 U.S.C. § 1983 which authorizes actions to redress the deprivation, under color of state law, of

rights, privileges, and immunities secured by the Constitution and laws of the United States; the Eighth and Fourteenth Amendments to the United States Constitution; the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, *et seq*.; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

10. This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) & (4).

11. Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, 2202, and 42 U.S.C. § 1983 for injury to their rights under the Fourteenth and Eighth Amendments to the United States Constitution.

## **VENUE**

12. Venue is proper in the Northern District of Florida under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims brought by Plaintiffs and the class have occurred in this District and Defendants are located in this District.

## **PARTIES**

**PLAINTIFFS:**

### *Plaintiff G.H.*

13. Plaintiff G.H. is a 13-year old African-American child who lives in Orange City, Florida with his parents. He is in Secure Detention at the Volusia

Regional Juvenile Detention Center (Volusia JDC). He appears in this action through his parent and legal guardian, Gregory Henry.

14.     G.H. has been diagnosed with an emotional behavioral disorder. Prior to his placement in Secure Detention, G.H. received intensive therapy at the Florida Palms Academy in Miami, a community-based Statewide In-Patient Psychiatric Program (SIPP) that provides services to children with emotional and behavioral needs. He has also received Exceptional Student Education (ESE) services for students with disabilities. His disability interferes with his ability to learn and think. As a result of his disabilities, he experiences depression, anxiety which makes it difficult to breathe, and thoughts about self-harm.

15.     DJJ has repeatedly isolated G.H. in solitary confinement at the Volusia JDC. While in current custody in Secure Detention, DJJ has locked G.H. in solitary confinement once for approximately three days for horseplay with a friend and a second time for over two days for fighting with other children. In isolation, G.H. became increasingly anxious and depressed, causing him to bang on the cell door and flood the cell. In response to these disability-related behaviors, DJJ kept G.H. in solitary confinement.

16.     During a previous time in Secure Detention, DJJ isolated G.H. in solitary confinement for one day for fighting with another child.

17.     Each time that DJJ locked G.H. in solitary confinement, it was horrible. DJJ took all of his personal property and left him in an empty room. He had no one to talk to and nothing to do. DJJ prohibited him from going to school and did not provide him with education services in his cell. DJJ also prohibited him from going outside or to recreation. DJJ even forced him to eat in his drab, dirty cell. Typically, the only interactions that he had with staff were when they asked him through the cell door whether he had eaten his food. As a result of these deprivations and conditions, G.H. began to feel depressed and angry almost immediately after DJJ isolated him.

18.     During one of the recent confinement periods, the trauma that G.H. experienced caused him to wrap his pants around his neck to choke himself. Instead of providing a meaningful mental health intervention, DJJ's sole response was to send a detention staff person to open his door, take the pants from around G.H.'s neck, briefly talk to him, and then leave. After the detention staff person left, G.H. wrapped his pants around his neck again to choke himself. He got a funny feeling in his heart, chest, neck, and face and got scared, so he stopped. DJJ never provided any mental health treatment in response to this self-harming behavior.

19.     Defendants' solitary confinement policies and practices caused G.H. to display symptoms and harm that are consistent with those experts identify

8

among people in solitary confinement. He engaged in acts of self-harm while in solitary confinement by wrapping his pants around his neck and choking himself. G.H. felt like he was going to die. He became paranoid. G.H. had difficulty sleeping and thought he was having a seizure while he was sleeping even though he does not get seizures. His back and neck also hurt because DJJ would not give him a mat to lie down on during the day; instead, he lay on a hard concrete slab in the cell.

20.   Defendants subject G.H. to a substantial risk of serious harm by isolating him in confinement, including by causing him to engage in serious self-injury, placing him at risk for suicide, exacerbating his psychiatric disability, and causing him to experience further trauma. By isolating him in solitary confinement, Defendants also subject G.H. to disability discrimination by failing to modify their policies and procedures to accommodate his disability; by denying him equal access to programs, services, and activities, including recreation, education, and healthcare because of his disability; and by failing to house him in the most integrated setting to meet his needs.

21.   G.H. reasonably fears that he will be subject to solitary confinement again at the Volusia JDC if he is not granted injunctive relief because Defendants have repeatedly subjected G.H. and other children to solitary confinement.

### Plaintiff R.L.

22.     Plaintiff R.L. is a 13-year old African-American child who lives in Jacksonville, Florida. She is in Secure Detention at the Duval Regional Juvenile Detention Center (Duval JDC). She appears in this action through her parent and legal guardian, Angel Carter.

23.     Prior to her placement in Secure Detention, R.L. received Exceptional Student Education services through the P.R.I.D.E. Academy program in the Duval County Public Schools which provides emotional and behavioral support for students with disabilities. Recently, R.L. spent several months at a SIPP for children at Daniel Kids in Jacksonville which provides intensive residential treatment for children exhibiting severe symptoms of mental and emotional distress. R.L. has been involuntarily hospitalized in a Baker Act facility[1] several times. She has been diagnosed with bipolar disorder, post-traumatic stress disorder, major depressive disorder, conduct disorder, and intermittent explosive disorder, and takes psychiatric medications. Her disabilities interfere with her ability to concentrate, learn, interact with others, and think. As a result of her disabilities, she has frequent mood changes and it is difficult for her to regulate impulsive behaviors, maintain self-control, and respond appropriately to conflict with others.

---

[1] *See* § 394.467, Fla. Stat. (2019).

24.     DJJ isolated R.L. in solitary confinement at the Duval JDC at least two times. On August 27, 2019, DJJ put R.L. into confinement for approximately six hours after another child punched her in the face. DJJ kept R.L. in confinement even after she filed a grievance asking not to be put in confinement and told DJJ that isolating her made her anxiety worse and would put her at risk of harm because of her psychiatric disability. R.L. cried in confinement – she was emotional, upset, and asked to be let out. She was not released from confinement until hours later. In November 2017, DJJ isolated R.L. in confinement for approximately eight hours for peeling the paint off the wall in her cell.

25.     While isolated in solitary confinement, R.L. had nothing to do and no one to talk to. She just sat there or cried. The confinement cell was nasty, smelly, soiled with old human feces, and defaced by writing on the wall. While she was in confinement, DJJ did not allow her to attend school or receive education services. DJJ did not allow her to go to recreation. She had to eat in the confinement cell after all the other children ate. DJJ did not let her have any personal property. She was only allowed a mat at night to sleep on. Each time she was put in isolation, she had no idea what time it was or when she would get out. DJJ failed to evaluate her mental status before placing her in confinement to determine what accommodations and services she may have needed to prevent harm. DJJ has knowledge of her extensive mental health needs.

11

26.     Defendants' solitary confinement policies and practices caused R.L. to display symptoms and harm that are consistent with those experts identify among people in solitary confinement. She was depressed because she could not talk to her mother. She felt more anxious and found it difficult to sleep. She felt upset and trapped. She felt alone and angry. The trauma of solitary confinement made her disability related psychiatric symptoms worse.

27.     Defendants subject R.L. to a substantial risk of serious harm by isolating her in confinement, including by exacerbating the symptoms of her mental illness and causing her to experience further trauma. By isolating her in solitary confinement, Defendants also subject her to disability discrimination by failing to modify their policies and procedures to accommodate R.L.'s disability; by denying her equal access to programs, services, and activities, including recreation, education, and healthcare because of her disability; and by failing to house her in the most integrated setting to meet her needs.

28.     R.L. reasonably fears that she will be subject to solitary confinement again at the Duval JDC if she is not granted injunctive relief because Defendants have repeatedly subjected R.L. and other children to solitary confinement.

### Plaintiff B.W.

29.     Plaintiff B.W. is an African-American girl who lives in Jacksonville, Florida. She turned 16 years old while in Secure Detention at the Duval JDC. She appears in this action through her parent and legal guardian, Leroi Luzunaris.

30.     B.W. has been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and prescribed Adderall. DJJ diagnosed B.W. as needing to see an eye doctor for an exam and glasses to correct impaired vision in both eyes with significantly impaired vision in her left eye. Her disabilities interfere with her ability to concentrate, think, and see.

31.     DJJ determined that B.W. was pregnant while she was in Secure Detention at the Duval JDC in June 2019 based on a pregnancy test. She is currently approximately 13-14 weeks into her pregnancy.

32.     In July 2019, while DJJ was aware that she was pregnant, DJJ isolated B.W. in solitary confinement. She was initially told that she would be put into isolation because she was pregnant, but then put in confinement because she did not go to school. No mental health professionals or medical staff evaluated B.W. during her time in solitary confinement or after. She remained isolated in confinement for several hours. Defendants subjected B.W. to a substantial risk of serious harm by isolating her in confinement, including while she was pregnant and more vulnerable to physical and mental harm such as miscarriage, birth

13

complications, or aggravated pregnancy-related symptoms caused by the trauma of solitary confinement.

33.    DJJ has repeatedly isolated B.W. in confinement at least 11 times while she has been in Secure Detention for periods ranging from several hours to three days. In 2018, while B.W. was in Secure Detention at the Duval JDC, DJJ isolated B.W. in solitary confinement two times for fighting with other children – once for three days and a second time for one day. In 2018, DJJ also repeatedly isolated her four other times in confinement for periods including one day, over seven hours, five hours, and almost eight hours. She was put in isolation for reasons such as arguments with other children, cursing at staff, and running. In 2017, DJJ isolated B.W. in confinement four times for periods ranging from one day to eight hours for fighting with another child, arguing with other children, and after another child punched her and spit on her.

34.    Each time that DJJ isolated B.W. in solitary confinement, the cells were disgusting and dirty. There was human feces smeared on the wall. There were bugs and flies in the room. DJJ did not allow her to have a mat or blanket during the day. She was only allowed out of solitary confinement for a few minutes a day to shower after everyone else. She had to eat in her cell. The only time DJJ staff opened the door was to give her food or take her to shower. While in confinement,

B.W. felt vulnerable, powerless, and miserable. No staff told her how long she would be in solitary confinement or when she would get out.

35.    Defendants' solitary confinement policies and practices caused B.W. to display symptoms and harm that are consistent with those experts identify among people in solitary confinement. She felt alone, missed her family, and cried. She felt distressed, uneasy, and worried because she was locked in a cell for days and did not know when she would get out. She could not socialize with other people. While she was pregnant, the smell and filthy conditions of the room made her feel sick and nauseated.

36.    Defendants subject B.W. to a substantial risk of serious harm by isolating her in confinement and depriving her of social interaction, environmental stimulation, and exercise. By isolating B.W. in solitary confinement, Defendants also subject her to disability discrimination by failing to modify their policies and procedures to accommodate her disability and by denying her equal access to programs, services, and activities, including recreation, education, and healthcare because of her disability; and by failing to house her in the most integrated setting to meet her needs.

37.    B.W. reasonably fears that she will be subject to solitary confinement again at the Duval JDC if she is not granted injunctive relief because Defendants have repeatedly subjected B.W. and other children to solitary confinement.

38.     Plaintiffs sue through their parents and legal guardians who are adult citizens of the State of Florida.

**DEFENDANTS:**

39.     Defendant Simone Marstiller (Marstiller) is the Secretary of the Florida Department of Juvenile Justice. She was appointed DJJ Secretary in January 2019 and is sued in her official capacity. As DJJ Secretary, she is responsible for "planning, coordinating, and managing the delivery of all programs and services within the juvenile justice continuum," which includes all detention centers and related programs and facilities, community-based residential programs, non-residential programs, and all delinquency institutions funded by the department. § 20.316(1)(b), Fla. Stat. (2019). Secretary Marstiller is required to "[e]nsure that juvenile justice continuum programs and services are implemented according to legislative intent; state and federal laws, rules and regulations; statewide program standards; and performance objectives," "establish program policies and rules," and "coordinate staff development and training." §§ 20.316(c)(1), (4) & (6), Fla. Stat. Secretary Marstiller has the final authority to take any necessary corrective action concerning a DJJ program or provider. *See* § 985.632(5)(f)(2), Fla. Stat.

40.     At all times relevant to this Complaint, Defendant Marstiller was acting under color of state law.

41.     Defendant Florida Department of Juvenile Justice is the principal administrative unit within the executive branch of the State of Florida responsible for planning, developing, coordinating, and administering the juvenile justice continuum of comprehensive services and programs statewide for the prevention, early intervention, control, and rehabilitative treatment of delinquent behavior. §§ 20.03(2); 985.601. Defendant DJJ is an instrumentality of the State of Florida.

42.     Defendant DJJ receives federal financial assistance.

## FACTUAL ALLEGATIONS

### *Secure Detention in the Department of Juvenile Justice*

43.     The Florida juvenile justice system is operationally and philosophically distinct from the adult criminal justice system. The juvenile system manages youth under a strategy of redirection and rehabilitation, rather than punishment. *See* § 985.02(3), Fla. Stat. Florida's juvenile system focuses on a rehabilitative model of treatment designed to effect positive behavioral change.

44.     There are 21 juvenile secure detention centers (Secure Detention) operated by DJJ in Florida. Secure Detention is a physically restrictive facility that houses children pending adjudication, disposition, or placement, or pursuant to court order. Fla. Admin. Code. R. 63G-2.014(58). Children taken into custody by law enforcement are screened by DJJ using a standardized Detention Risk Assessment Instrument (DRAI) to determine if they should be placed into Secure

17

Detention. Secure Detention is used for youth who are held pursuant to a court order or charge of violating the law following an assessment that less restrictive alternatives are not appropriate. § 985.255, Fla. Stat. While a child's time in Secure Detention can vary from days to weeks, Florida law requires that a child adjudicated delinquent and awaiting placement in a DJJ program must remain in Secure Detention until that placement occurs. § 985.27, Fla. Stat.

45.     According to DJJ, in Fiscal Year (FY) 2017-18, there were 14,010 youth placed into DJJ Secure Detention statewide.[2] Approximately 5,314 of these children were 15 years old or younger. The majority, 54%, were Black, 15% were Hispanic, and 30% were White. *Id.*

46.     During FY 2017-18, the average daily population in DJJ Secure Detention was 1,057 youth. *Id.* The statewide average length of stay for a child in Secure Detention was 14 days. *Id.*

**Solitary Confinement in DJJ Detention Centers**

47.     Solitary confinement is defined by the National Commission on Correctional Health Care as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals."[3] Defendants call this practice

---

[2] *See* Florida Department of Juvenile Justice, *Comprehensive Accountability Report*, at 3, (2018), http://www.djj.state.fl.us/docs/car-reports/(2017-18-car)-detention-(mg).pdf?sfvrsn=2 (last visited September 4, 2019).

[3] Nat'l Comm'n on Corr. Health Care, *Solitary Confinement (Isolation)*, (Apr. 2016), https://www.ncchc.org/filebin/Positions/Solitary-Confinement-Isolation.pdf (last visited September 4, 2019).

"behavioral confinement" or "confinement," but DJJ's policy and practice is
solitary confinement: children are isolated from others in a locked room for an
indefinite period of time with no meaningful social interaction or environmental
stimulation. *See* Fla. Admin. Code. R. 63G-2.022(1) & (4).

48.     Under DJJ's policy and practice, children in Secure Detention are
subjected to solitary confinement for hours or days at a time. Although DJJ's
Secure Detention Facility Operating Procedures impose a limit on confinement of
72 hours (for non-medical reasons), in practice, DJJ regularly exceeds this time
limit. When children go into solitary confinement, they have no idea if, or when,
they are getting out.

49.     DJJ, through policy and practice, also subjects many children to
repeated periods of solitary confinement, increasing the length of time that they
cumulatively spend in isolation. Although research shows that isolating children in
solitary confinement can exacerbate the agitation and behavior that led to solitary
confinement in the first place, DJJ responds to these behaviors with additional
repeated stays in confinement, creating a vicious cycle. The same children may
also have been put in solitary confinement one or more times during previous stays
in Secure Detention. For example, Plaintiff G.H. has been isolated in solitary
confinement three times for a total of six days. Plaintiff B.W. has spent eight days
(cumulatively) in solitary confinement during multiple separate incidents. This

repeated exposure to solitary confinement only compounds the risk of harm for children.

50.    DJJ's policy and practice is to isolate children in solitary confinement for any reason, including for minor misbehavior such as talking back to staff, using a computer, not following directions, or cursing. Horseplay and cursing were the bases for Plaintiff G.H. and B.W.'s confinement. DJJ also put Plaintiff B.W. in solitary confinement for failing to attend school. DJJ put Plaintiff R.L. in solitary confinement for peeling paint off her cell wall. This low threshold results in a shocking number of children subjected to solitary confinement in Secure Detention.

51.    DJJ's own data demonstrates that it isolates thousands of children in Secure Detention in solitary confinement each year for many hours or days at a time. For example, over a recent 11-month period, DJJ isolated 4,310 children in confinement for a total of 11,738 times. Children in some jurisdictions are spending up to 107 hours (i.e., over 4 days) at a time in isolation. The statewide average length of time in solitary confinement is 45 hours, with many detention centers isolating hundreds of children for at least 24 hours. Based on the average number of youth in Secure Detention in a year, approximately 30% of children are isolated in solitary confinement at some point during their time in custody. The result of DJJ's policies and practices is that thousands of children in DJJ's care are

subject to a substantial risk of serious harm from cumulatively spending extensive periods of time isolated in confinement.

52.     Defendants isolated each of the named Plaintiffs in solitary confinement in Secure Detention, some of them repeatedly, for periods ranging from several hours to days at a time, pursuant to the policies and practices as described herein.

***Deprivations and Conditions in Solitary Confinement in DJJ Detention Centers***

53.     DJJ subjects children to solitary confinement by either locking them in the cells they typically live in or by placing them in separate confinement cells for the duration of the confinement period. No matter where solitary confinement takes place, the deprivations and conditions are similar.

54.     Once isolated, children cannot come out of their tiny cells except to shower for a few minutes each day. DJJ also ensures that there is nothing for the children to do for the duration of their confinement. DJJ does not permit them to go to school or receive education services. There is no recreation or programming and no access to phones, radios, or televisions. Children cannot have any personal property or writing materials.

55.     While in confinement, DJJ prohibits normal human contact. The only way children can speak to someone is by banging on their cell door to try to attract the attention of staff, or by yelling loudly so staff or another child may hear them.

21

Staff will often just attempt to communicate with a child through the solid metal door rather than opening the door to talk to a child face-to-face and hear the child clearly.

56.     These deprivations of normal social interactions and environmental stimulation are exacerbated by the austere and decrepit conditions inside the cells. Many of the DJJ-operated detention centers are old, dirty, decaying buildings suffering from age and disrepair that is magnified when locked around-the-clock in a tiny cell. The paint on the walls is peeling off. There is graffiti on the cell walls. DJJ has failed to maintain the plumbing which causes toilets to back up and flood the cells. Even when not backed up, the toilets reek of human waste. Some cells have gnats, ants, or bugs that bite children. DJJ requires children to eat alone in their cells in these conditions.

57.     The cells where DJJ isolates children are small and cramped spaces. The only fixtures are a toilet, sink, and concrete slab to sit or lay on. DJJ regularly refuses to provide children with a mat for the concrete slab until nighttime. DJJ refuses to turn off the lights in the cells, leaving children under fluorescent lights 24 hours a day. The cells have a large solid metal door with a window that is difficult to see through unless staff is standing directly in front of the cell. In many cells, there is no window to the outside allowing children to see the sun or sky.

*Devastating Effects of Isolation in DJJ Detention Facilities*

58.     Children subjected to confinement in Secure Detention experience insomnia, depression, hallucinations, agitation, anger, fear, distress, anxiety, sadness, mistrust, and feelings of hopelessness and abandonment. Children begin to experience these effects almost immediately and they only worsen with time in solitary confinement. Children are at risk of permanent damage from the harms of solitary confinement.

59.     Within minutes of isolation in Secure Detention, harms will often begin to manifest in obvious symptoms of pain and suffering. Some children will cry out, loudly bang on and repeatedly kick the metal door and scream to be let out. Some children withdraw from their surroundings and try to cope, alone, with negative or depressive thoughts while they sit and listen to other children scream. For example, Plaintiff R.L. felt more anxious because she was trapped in isolation, cried, and could not sleep. Plaintiff G.H. flooded the solitary confinement cell and banged on the door because he felt anxious and depressed. Other children smear their feces on the walls of the confinement cells.

60.     Defendants know there is a serious risk of harm for children in solitary confinement, including new and worsening mental illness symptoms, self-harming behaviors, and suicide, but do not, in practice, implement any policies to eliminate this risk of harm. For example, DJJ does not have a policy to exclude

children with mental illness or who are at a heightened risk of suicide or self-harm from solitary confinement. DJJ placed Plaintiff G.H. in solitary confinement even though he was a suicide risk and actually tried to choke himself by tying his pants around his neck while in solitary. After a detention staff person observed this behavior, DJJ kept G.H. in solitary confinement, where he tied his pants around his neck and tried to choke himself again.

61.     DJJ, through policy and practice, does not provide an assessment by a mental health professional before it subjects a child with mental illness to solitary confinement. DJJ also fails to regularly provide a mental health status examination by a qualified professional within one hour after confinement begins and at regular intervals as long as a child is in solitary confinement despite a scant Facility Operating Procedure requiring a licensed mental health professional to "review the status" of children in solitary confinement every 24 hours. DJJ also fails to provide mental health treatment for children in solitary confinement; effective monitoring for signs and symptoms of suicide in solitary confinement; examination or treatment after release from solitary confinement to address any lasting effects; or meaningful mental health interventions and de-escalation services in response to obvious signs of suffering and pain. So, DJJ conducted no mental health evaluation of R.L. before placing her in solitary confinement even though it was aware of her bipolar disorder and major depressive disorder. Likewise, mental health staff failed

24

to effectively intervene with respect to G.H.'s attempts to choke himself in confinement. As a result of DJJ's failure to develop and implement adequate policies and procedures recognized by experts as necessary to eliminate the known risk of harm, the named Plaintiffs and members of the class are suffering from the damaging effects that mirror those reported in the research about children subjected to solitary confinement.

**Well Known Risks of Harm of Solitary Confinement for Juveniles**

62.     Medical, psychiatric, and scientific professionals agree that solitary confinement is harmful to both adults and children. These experts agree that children isolated in solitary confinement are more susceptible to harm because they are still developing socially, psychologically, and neurologically.

63.     The risk of harm from solitary confinement has been well-recognized by the Supreme Court, including over a century ago:

> [People subject to isolation] fell, after even a short confinement into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.

*In re Medley*, 134 U.S. 160, 168 (1890).  More recently, the Supreme Court noted in 2015 that prolonged isolation "exacts a terrible price," including "common side-effects … [of] anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors." *Davis v. Ayala*, 135 S.Ct. 2187, 2210 (Kennedy,

J., concurring) (citing Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325 (2006)).

64.     The psychological harms of solitary for adults have been widely documented by experts. Solitary confinement can exacerbate mental illness or bring about symptoms in people with no prior diagnosis. These psychological harms include: anxiety, depression, insomnia, confusion, withdrawal, emotional flatness, cognitive disturbances, hallucinations, paranoia, psychosis, and suicidality.[4] These effects start to manifest within hours or days of isolation, worsening with time and causing permanent damage to individuals, especially those who linger in isolation for extended periods. For some, solitary confinement "can be as clinically distressing as physical torture."[5]

65.     Experts also recognize a substantial risk of harm for pregnant women in solitary confinement. They cannot receive the exercise and movement that they need to maintain a healthy pregnancy. Common pre-existing feelings of stress and depression are exacerbated which increase the risk of miscarriage and birth complications.

---

[4]  Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQ., at 124, 130-131 (2003), https://journals.sagepub.com/doi/abs/10.1177/0011128702239239 (last visited September 4, 2019).
[5]  Jeffrey Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. AM. ACAD. PSYCHIATRY & L. 104 (2010), http://jaapl.org/content/jaapl/38/1/104.full.pdf  (last visited September 4, 2019).

66.     Children suffer from a heightened risk of psychological and physical harm from solitary confinement. Based on knowledge of the brain development and the impact of adverse childhood experiences on the physical, mental, and behavioral health of children and adolescents, the American Academy of Child and Adolescent Psychiatry has asserted that children subjected to solitary confinement in the criminal justice system are at particular risk for these adverse reactions.

67.     The substantial risk of serious harm to children is also established through a well-recognized national study by the Department of Justice's Office of Juvenile Justice and Delinquency Prevention concerning the correlation between juvenile suicide and confinement in a locked room in Secure Detention. The study found that half of youth who committed suicide in juvenile facilities were in isolation at the time of their death and more than 60% percent of young people who committed suicide in detention while in confinement had a history of being held in isolation.[6] Of the children placed in solitary confinement in secure detention centers, 40% of suicides occurred within the first 72 hours.[7]

68.     Researchers have also found that when juvenile correctional officials promote policies that isolate youth from their peers, alienate them, and deny them

_____

[6] Lindsay Hayes, *Juvenile Suicide in Confinement, A National Survey, Office of Juvenile Justice Delinquency and Prevention*, (2009), at vii., https://www.ncjrs.gov/pdffiles1/ojjdp/213691.pdf  (last visited September 4, 2019).
[7] *Id.*

social integration, children are exposed to higher rates of suicidal behavior.[8] This evidence demonstrates a substantial risk of serious harm that can be fatal for children exposed to solitary confinement for even short periods of time. Despite this known risk of serious harm, DJJ subjects children who have attempted suicide or engaged in self-injury to solitary confinement in Secure Detention. In Plaintiff G.H.'s case, DJJ continued to keep him in solitary confinement after observing him trying to choke himself.

69.     Medical research on the adolescent brain explains why children are more vulnerable to risk of harm, including long-term effects.[9] Psychologically, children are different from adults, making their time spent in isolation even more difficult and the developmental, psychological, and physical damage more comprehensive and lasting.[10] They experience time differently – a day to a child feels longer than a day to an adult – and have a greater need for social stimulation. *Id.* In adolescents, the connections between the frontal lobe and the mid-brain have

---

[8] *Id.* at 27.

[9] The broad consensus among the scientific and professional community about the psychological vulnerability of children, which places them at an increased risk of harm, has been emphasized and recognized in decisions of the Supreme Court  *See Graham v. Florida*, 560 U.S. 48, 68-69 (2010) (juveniles cannot be sentenced to life without parole for non-homicide offenses relying on "developments in psychology and brain science continue to show fundamental differences between juveniles and adult minds[,]"); *see also Roper v. Simmons*, 543 U.S. 551, 573-74 (2005) (finding that the vulnerabilities and differences between juveniles and adults means that the death penalty cannot be imposed against juveniles); *Miller v. Alabama*, 132 S. Ct. 2455, 2467 (internal quotations and citations omitted) (youth "is more than a chronological fact . . . it is a moment and condition of life when a person may be most susceptible to influence and to psychological damage.").

[10]  Nat'l Comm'n on Corr. Health Care, *Solitary Confinement (Isolation)*, supra note 3.

not fully developed. As a result, trauma to children can cause permanent changes in brain development and create a higher risk of developing psychiatric conditions like paranoia and anxiety.[11]

70.     The risk of harm to children from solitary confinement, including for suicide, is also increased by the disproportionately high incidence of preexisting mental illness among children involved in the juvenile justice system. Many children who come into contact with the juvenile justice system have diagnosed, or undiagnosed, mental illness or have been receiving special education services prior to placement in Secure Detention. National data indicates that up to 75% of children in the juvenile justice system meet the criteria for a mental health disorder.[12] DJJ estimates that over 65% of youth under the agency's care have a mental illness or substance abuse issue.[13]

71.     For children with pre-existing mental illness, the serious psychological harm caused by solitary confinement is even more devastating. The combination of the lack of any meaningful activity or normal social contact and the stressors of living in a dilapidated, filthy, and loud housing area for extended periods results in a heightened risk of worsening mental health symptoms for

---

[11]  National Child Traumatic Stress Network, Justice Consortium Attorney Workgroup Subcommittee, *Trauma-Informed Legal Advocacy: A Resource for Juvenile Defense Attorneys*, (2018), at 3-4, https://www.nctsn.org/resources/trauma-informed-legal-advocacy-a-resource-for-juvenile-defense-attorneys (last visited September 4, 2019).

[12]  Lee A. Underwood & Aryssa Washington, *Mental Illness and Juvenile Offenders*, 13 INT'L J. ENVTL. RES. PUB. HEALTH, at 1, 3, (2016).

[13]  *See* http://www.djj.state.fl.us/services/health (last visited September 4, 2019).

children. When children engage in behaviors that are a manifestation of their

disabilities, such as yelling or striking their cell doors with their hands, heads, or

bodies, DJJ penalizes these children by adding more time in solitary confinement.

Plaintiff G.H. continued to be held in solitary confinement after he banged on his

cell door and flooded his cell – behaviors that were related to his disabilities. These

actions by DJJ only add to the danger for youth with mental illness, such as G.H.

and R.L., who have an increased risk for suicide.

72.     A substantial number of children exposed to solitary confinement are

at further risk of harm because they also suffer from trauma. This trauma can

include physical or sexual abuse; being a victim of or witnessing violence; loss of

family members to death, imprisonment, or abandonment; or a child's removal

from the home through the dependency system or due to arrest.[14] Children in the

juvenile justice system have much higher rates of Adverse Childhood Experiences

(ACEs) such as witnessing or being a victim of violence.[15] A recent study shows

that 50% of youth in Florida's juvenile justice system report four or more ACEs.[16]

The use of solitary confinement places these children at risk for magnifying

---

[14]  Burrell, S., *Trauma and the Environment of Care in Juvenile Justice Institutions*, at 1 (2013), https://ylc.org/wp-content/uploads/2018/11/jj_trauma_brief_environofcare_burrell_final.pdf  (last visited September 4, 2019).

[15]  Finkel, E., *Florida Study Confirms Link Between Juvenile Offenders, ACEs; Rates Much Higher Than CDC's ACE Study*, (2014), https://acestoohigh.com/2014/08/20/florida-study-confirms-link-between-juvenile-offenders-aces-rates-much-higher-than-cdcs-ace-study/ (last visited September 4, 2019).

[16]  *Id.*

existing trauma; evidence shows that this can have serious long-term harmful impacts on health and well-being.[17]

73.    Recognizing children's greater vulnerability to harm, numerous psychiatric, medical, scientific, correctional, and legal authorities support the elimination of solitary confinement for juveniles. The American Academy of Child and Adolescent Psychiatry, the American Medical Association, the National Commission on Correctional Health Care, the American Public Health Association, and the Council of Juvenile Correctional Administrators have called for juvenile and adult correctional facilities to stop the use of solitary confinement of children. These authorities articulate how juveniles' particular vulnerabilities expose them to a risk of adverse reactions from isolation.

74.    The Council of Juvenile Correctional Administrators, for example, opposes the use of solitary confinement for juveniles based on research that shows that placing detained youth in isolation has "negative public safety consequences, does not reduce violence  and likely increases recidivism. Subjecting developing adolescents to isolation can cause permanent psychological damage and multiple studies suggest it is highly correlated with suicide. [] Solitary confinement is the most harmful and extreme form of isolation and has damaging impacts."[18]

---

[17]  Nat'l Comm'n on Corr. Health Care, *Solitary Confinement (Isolation)*, supra note 3.
[18]  Council of Juvenile Correctional Administrators, *Toolkit: Reducing the Use of Isolation*, at 7, (March 2015),

75.     In concluding that solitary confinement should be banned for juveniles, in 2012, the United States Attorney General's National Task Force on Children Exposed to Violence concluded, "Nowhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement," including increased vulnerability to suicide.[19] In 2016, the United States Department of Justice ended the practice of using solitary confinement for juveniles in all federal prisons because of the growing consensus of the risk of harm for children.[20]

76.     Human rights organizations and authorities also recognize the harms of solitary confinement for juveniles and advocate for an end to the practice. The World Health Organization[21] and the United Nations have recognized that solitary confinement is particularly harmful to a child's psychological well-being and cognitive development.[22] In a 2015 report, the United Nations Special Rapporteur

---

http://dcfs.nv.gov/uploadedFiles/dcfsnvgov/content/Programs/JJS/CJCA%20Toolkit%20Reducing%20the%20use%20of%20Isolation.pdf (last visited September 4, 2019).

[19] *Report of the Attorney General's National Task Force on Children Exposed to Violence*, at 178 (Dec. 12, 2012), https://www.justice.gov/defendingchildhood/cev-rpt-full.pdf (last visited September 4, 2019).

[20] *See* Fact Sheet: Department of Justice Review of Solitary Confinement, (Jan. 25, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/01/25/fact-sheet-department-justice-review-solitary-confinement (last visited September 4, 2019).

[21] *Prisons and Health, The World Health Organization* Ch. 6 (S. Enggist, L. Moller, G. Galea, C. Udesen, eds., 2014), http://www.euro.who.int/__data/assets/pdf_file/0005/249188/Prisons-and-Health.pdf?ua=1 (last visited September 4, 2019).

[22] *See* U.N. Convention on the Rights of the Child, opened for signature Nov. 20, 1989, 1577 U.N.T.S. 3 (entered into force Sept. 2, 1990) ("CRC"); U.N. Guidelines for the Prevention of Juvenile Delinquency, G.A. Res. 45/112, Annex, 45 U.N. GAOR Supp. (No. 49A), U.N. Doc.

on Torture condemned the solitary confinement of children *for any duration* as torture and acknowledged the high risk of mental illness and higher rates of suicide and self-harm for juveniles in solitary confinement.[23]

77.     Many state correctional systems also recognize the substantial risk of harm to juveniles caused by solitary confinement and have voluntarily implemented measures to eliminate its use. At least 29 states have prohibited juvenile detention facilities from using disciplinary isolation, or any isolation for juveniles.[24] Five states – New York, New Jersey, North Carolina, Nebraska, and New Mexico – have also banned solitary confinement for juveniles in their state prison systems.[25]

_____

A/45/49, at 201 (Dec. 14, 1990) ("The Riyadh Guidelines"); U.N. Rules for the Protection of Juveniles Deprived of their Liberty, G.A. Res. 45/113, Annex, 45 U.N. GAOR Supp. (No. 49A), U.N. Doc. A/45/49, ¶ 67 (Dec. 14, 1990) ("The Beijing Rules") ("[a]ll disciplinary measures constituting cruel, inhuman or degrading treatment shall be strictly prohibited, including corporal punishment, placement in a dark cell, closed or solitary confinement or any other punishment that may compromise the physical or mental health of the juvenile concerned.").

[23] *Interim Rep. of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/66/268, at ¶ 77 (Aug. 5, 2011), http://solitaryconfinement.org/uploads/SpecRapTortureAug2011.pdf (last visited September 4, 2019).

[24] *See* Lowenstein Sandler LLP & Lowenstein Center for the Public Interest, *51 Jurisdiction Survey of Juvenile Solitary Confinement Rules in Juvenile Justice Systems*, (July 2016), https://www.lowenstein.com/media/2825/51-jurisdiction-survey-of-juvenile-solitary-confinement-rules-72616.pdf, (last visited September 4, 2019).

[25] *See Peoples, et al. v. Fischer*, Docket No. 11-cv-2694 (S.D.N.Y.), at ECF No. 137-1, https://www.clearinghouse.net/chDocs/public/PC-NY-0062-0011.pdf (last visited September 4, 2019); *see also* Act 314, 218th Leg., Assembly No. 314 (N.J. 2019), at 2-3, https://www.njleg.state.nj.us/2018/Bills/A0500/314_R1.PDF, (last visited July 24, 2019); Blythe, Anne, *N.C. Prisons Halt Solitary Confinement for Inmates 17 and Younger*, The News & Observer, June 15, 2016, https://www.newsobserver.com/news/local/crime/article84025297.html (last visited July 24, 2019); L.B. 686, 2019 Leg., 106th Session, (Neb. 2019), at 7, https://nebraskalegislature.gov/FloorDocs/106/PDF/Slip/LB686.pdf, (last visited September 4,

78.     Despite this national trend to eliminate the solitary confinement of children, Defendants continue to use this dangerous and inhumane method on children entrusted to the care of DJJ for redirection and rehabilitation.

79.     It is clear that putting children in solitary confinement poses a risk of serious and long-term psychological and physiological harm. The prevailing medical, scientific, professional, and correctional authorities demonstrate that it violates contemporary standards of decency in a civilized society to expose children in Secure Detention to such a risk.

***No Legitimate Penological Purpose Supports the Use of Solitary Confinement***

80.     There is no legitimate penological purpose that supports DJJ's policy and practice of subjecting children to solitary confinement in Secure Detention given the established substantial risk of serious harm and the other available options to address the behavioral needs of children. Solitary confinement is not only harmful to children, it does not reduce future misbehavior.

81.     DJJ does not use solitary confinement in Secure Detention sparingly as a last resort to respond to immediate serious threats of physical harm by children to themselves or others. Rather, DJJ uses solitary confinement for any or no reason. In practice, DJJ subjects children to solitary confinement in Secure

---

2019); and H.B. 364, 54th Leg., 1st Session, (N.M. 2019), at 2, https://www.nmlegis.gov/Sessions/19%20Regular/final/HB0364.pdf, (last visited September 4, 2019).

Detention for minor issues, including talking back to staff, using a computer without authorization during school testing, not following staff directions, horseplay, or cursing. Indeed, Defendants have routinely subjected the named Plaintiffs and members of the class to solitary confinement in circumstances that do not present a "volatile situation" in which a "youth's sudden or unforeseen onset of behavior imminent and substantially threatens the physical safety of others or himself." Fla. Admin. Code. R. 63G-2.014(7).

82.    DJJ, through unwritten policy and practice, subjects children to solitary confinement for periods of time (i.e., hours or days) that exceed any legitimate penological goal or need to address behaviors that "imminently" threaten their safety or the safety of others as described in written DJJ policies. For example, DJJ subjects children to solitary confinement for hours or days after a physical altercation and after they are calm and demonstrating positive behavior. Defendants know that children are isolated in solitary confinement in circumstances that lack any legitimate penological justification based on, *inter alia*, their review of confinement data and the required notifications to the Assistant Secretary to isolate a child in confinement beyond 24 or 72 hours.

83.    The statewide average length of solitary confinement for Secure Detention centers is 45 hours, with many detention centers confining children much longer. This exceeds the amount of time that would be arguably permissible

even for behaviors that could pose an imminent physical threat to self or others. Instead, DJJ's solitary confinement times for children extend well past the purported threat have subsided, including for the named Plaintiffs.

84.    DJJ's policy and practice for solitary confinement in detention is contrary to well established juvenile detention and correctional standards. Instead of isolating children for prolonged periods as Defendants do, many other correctional systems that have addressed the harms posed by the solitary confinement of juveniles have reformed their practices. These states use confinement, if at all, only as a last resort after de-escalation techniques and behavior interventions have been exhausted by trained individuals; and only for the shortest duration possible, with strict time limits, to remedy a specific, immediate and serious threat to an individual or other's physical safety. Confinement is never used as punishment. They provide programming and services to avoid the use of confinement; ensure that staff are appropriately trained in the use of verbal de-escalation, restorative justice, and behavior intervention techniques and that these are used and exhausted to defuse situations; require approvals for initial and continued confinement placement; consistently provide mental health and medical assessments, services, and oversight by qualified professionals before and during confinement; and require confinement use to be recorded, reviewed, and analyzed.

85.    DJJ recognizes that standards such as behavior interventions, prohibiting isolation for children at risk for suicide, and using conflict resolution strategies, should be used; DJJ, in fact, uses some of these in its post-adjudication residential program policy concerning room restriction. *See* Fla. Admin. Code. R. 63E-7.009. This policy, however, does not apply to Plaintiffs in Secure Detention.

86.    There is also no legitimate penological justification for DJJ's policy and practice of denying children access to basic human needs while in solitary confinement. DJJ deprives children in solitary confinement of: required daily educational instruction; outdoor recreation; reading and writing materials; a clean cell free from the smell or presence of human waste; and normal human interactions.

### *Defendant Marstiller is Deliberately Indifferent to the Serious Risk of Harm*

87.    Defendant Marstiller has known of and disregarded a substantial risk to Plaintiffs' health and safety posed by the use of solitary confinement in DJJ Secure Detention. Defendant Marstiller has failed to stop subjecting children to solitary confinement in detention despite the knowledge of the risk of physical and psychological harm to children.

88.    Defendant Marstiller has been repeatedly warned about, but failed to eliminate, the risks of harm to children from solitary confinement. For example, in February 2011, a lawsuit was brought against the DJJ Secretary by a class of

children with mental illness and developmental disabilities who were adjudicated

delinquent and in DJJ custody at the North Florida Youth Development Center[26] in

*J.B. v. Walters*, Case No. 11-83-RH-WCS (N.D. Fla.).

89.   The allegations in *J.B. v. Walters* included, *inter alia*, that the DJJ

Secretary subjected youth to an unconstitutional policy, pattern, and practice of the

punitive use of isolation and restraints. *Id.* The Complaint alleged that DJJ was

subjecting children diagnosed with serious mental illness, trauma, learning

disabilities, intellectual disabilities, and who had engaged in acts of self-injury or

attempted suicide to a risk of harm by placing them in punitive isolation in

dangerous conditions. *Id.* Through that litigation, the DJJ Secretary was

specifically informed that, "Isolation is contraindicated for adolescents with

developmental disabilities, mental illness and self-harming behaviors." *Id.*, Doc. 1

(Complaint), ¶¶ 66-70. In response to this litigation, the DJJ Secretary and the

agency made a decision to close the institution, and amend its rules to eliminate the

use of solitary confinement in residential programs (i.e., post-adjudication). They

deliberately chose not to eliminate the use of solitary confinement in Secure

Detention.

---

[26] This program was referred to as the North Florida Youth Development Center by DJJ. It was comprised of two DJJ residential facilities adjacent to each other on the same campus: the Arthur G. Dozier School for Boys and the Jackson Juvenile Offender Correctional Center.

90.     On December 1, 2011, the U.S. Department of Justice Civil Rights

Division (DOJ) also sent the DJJ Secretary (and DJJ) a findings letter following its

investigation of the North Florida Youth Development Center, concluding that

"youth were subject to lengthy and unnecessary isolation," youth with mental

health needs or at risk for suicide were in danger and improperly subjected to

solitary confinement, and youth confined in the isolation units did not consistently

receive required services, such as education materials, regular mental health

evaluations, or daily large muscle exercise. Findings Letter, at 4, 17-18.[27]

91.     Defendant Marstiller's knowledge of the risk of harm to children is

apparent in the differences in DJJ's written policies concerning what forms of

isolation are permissible in DJJ residential post-adjudication programs compared to

Secure Detention. Defendants amended DJJ's administrative rules several years

ago to explicitly prohibit the use of punitive isolation in residential programs.

Defendants only authorize the limited use of controlled observation as an

immediate short-term crisis intervention when non-physical interventions are not

effective, and in response to "sudden or unforeseen onset of behavior that

substantially threatens the physical safety of others and compromises security."

Fla. Admin. Code R. 63E-7.002(20). Defendant Marstiller authorizes, approves,

---

[27] *See* U.S. Dep't of Justice, Civil Rights Division, *Investigation of the Arthur G. Dozier School for Boys and the Jackson Juvenile Offender Center, Marianna, Fla.*, (Dec. 1, 2011), https://www.justice.gov/sites/default/files/crt/legacy/2011/12/02/dozier_findltr_12-1-11.pdf (last visited September 4, 2019).

ratifies, and oversees these DJJ policies, practices, and procedures. *See* §

20.316(1)(c), Fla. Stat. *see also* §§ 120.54 (2) & (3), Fla. Stat.

92.     Similarly, in DJJ residential programs, Defendants explicitly prohibit

isolation or solitary confinement behind a closed door. They only authorize "room

restriction" as part of a behavior management system. Even then, room restriction

cannot be used for children at risk for suicide, cannot exceed four hours, requires

supervisor approval, requires conflict and behavior intervention by staff, happens

in a child's room with the door open, and requires children to get all services and

programming during this brief time separation. *See* Fla. Admin. Code. R. 63E-

7.009(4).

93.     Despite the elimination of solitary confinement in DJJ's residential

programs, Defendants have refused to eliminate solitary confinement in Secure

Detention for the same children. As a result, under DJJ's policies and practices,

children who purportedly must be isolated and deprived of education, outdoor

recreation, writing or reading materials, social stimulation, and normal human

interactions suddenly and arbitrarily no longer require such measures days or

weeks later after they are placed in a DJJ residential program.

94.     Defendants review the data maintained by DJJ concerning the use of

solitary confinement in DJJ-operated secure detention centers. This includes, at a

minimum, all records kept of any confinement, and notifications to the Assistant

40

Secretary for Detention Services of any confinement placements permitted beyond 24 hours or the need for any confinement hearing if a child is held in solitary beyond 72 hours. Fla. Admin. Code. 63G-2.022(e) & (h).

95.     Defendants were also warned of the risk of harm to children subject to solitary confinement in detention through the following: several letters or emails from counsel with Florida Legal Services since September 2018 behalf of youth subject to solitary confinement who had engaged in self-harm and were at risk for suicide; grievances filed by children, including Plaintiffs, asking to be removed from solitary confinement or not placed in confinement again because they posed no imminent physical risk of harm to themselves or others but were instead at risk of harm in confinement; their own knowledge of children with mental health conditions or physical injuries like broken or sprained arms, children who have attempted suicide by wrapping sheets around their neck, and children who have cut themselves with pencils or other objects, all of whom were still placed in solitary confinement; and the DJJ Secretary's trip to the Missouri Youth Services Authority to learn about the "Missouri Model" of juvenile justice which eliminated the practice of juvenile solitary confinement.

***Defendants' Policies and Practices Discriminate Against Children with Disabilities***

96.     DJJ, through its policies and practices, discriminates against children with disabilities in its use of solitary confinement in Secure Detention. It fails to

reasonably modify its solitary confinement policies and procedures when needed to avoid discrimination on the basis of disability. It fails to ensure that children with disabilities in solitary confinement have access to, are permitted to participate in, and are not denied the benefits of programs, services, and activities because of their disabilities. It fails to ensure that children with disabilities in isolation are housed in the most integrated setting appropriate to their needs.

97.    DJJ fails to reasonably modify its solitary confinement policies and procedures to ensure that children with disabilities are not placed in solitary confinement, or have their time extended, because of their disabilities. For example, children with psychiatric or developmental disabilities have difficulty regulating their behaviors or respond erratically or inappropriately to conflict, stress, trauma, staff, and other youth. For example, Plaintiffs R.L. and G.H., because of their disabilities, do not have effective coping skills to manage the conditions and conflicts inherent in Secure Detention and often react to stressful situations with emotional outbursts and impulsive behaviors. Some children also have a hard time understanding facility rules or directions. DJJ fails to identify or recognize behavior as disability related and provide the accommodations, supports and services that these children need. Instead, DJJ responds by labeling this as misbehavior and sends them, including Plaintiffs, to, or extends their time in, solitary confinement.

98.     DJJ also fails to modify its policies and procedures while children with disabilities are in solitary confinement. This includes failing to offer adequate out-of-cell time, social interaction, environmental stimulation, mental health treatment, recreation, and school services to prevent mental health symptoms from becoming worse. As a result, many children with psychiatric and developmental disabilities in isolation experience further harm and engage in self-harm such as banging or punching the doors or concrete walls or, in the case of G.H., tying his pants around his neck.

99.     DJJ has failed to adopt policies and procedures to ensure that children with disabilities are housed in the most integrated setting appropriate to meet their needs, which cannot be met in solitary confinement. DJJ subjects children with psychiatric and developmental disabilities, including Plaintiffs, to solitary confinement when they engage in nonconforming behaviors due to their disabilities, instead of housing them in settings where they can receive treatment and services that they need to live safely and with others. For example, children diagnosed with Attention Deficit Hyperactivity Disorder, including Plaintiff B.W., may exhibit impulsive behavior such as fighting with peers or being unable to focus on or be attentive to staff directions. Rather than developing a system with reasonable accommodations that positively reinforces preferred behaviors or uses

mental health services to intervene, re-direct, and de-escalate situations, DJJ punishes these children, including Plaintiff B.W., with solitary confinement.

100.   The unnecessary placement of children with disabilities in solitary confinement perpetuates unwarranted assumptions and stereotypes that they are incapable of participating in and benefiting from services, activities, and programs. Such placement also causes harm by severely limiting their independence and daily activities, including social contacts, educational advancement, and healthcare.

101.   Other juvenile justice systems have safely integrated children with disabilities into their general population by providing adequate therapeutic and programmatic services. DJJ fails to develop and implement such policies and practices.

## CLASS ACTION ALLEGATIONS

*Plaintiff Class Definition*

102.   Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), (b)(1) and (b)(2).

103.   Plaintiffs seek to represent a class consisting of children who are, or will be, in custody in a DJJ-operated secure detention center and subject to solitary confinement.

*Plaintiff Class Meets Fed. R. Civ. P. 23 Requirements*

## Numerosity: Fed. R. Civ. P. 23(a)(1)

104.   The class is so numerous that joinder of all members is impracticable. Fed. Civ. P. 23(a)(1). The class is fluid, as children regularly enter and leave the class as a result of DJJ's policies and practices, but it includes, at a minimum, hundreds of class members who are subject to confinement by DJJ on any given day. Due to DJJ's policies and practices, all class members are at substantial risk of harm.

## Commonality: Fed. R. Civ. P. 23(a)(2)

105.   There are questions of law and fact common to the members of the class, including but not limited to:

- whether Defendants' policies and practices regarding solitary confinement constitute cruel and unusual punishment proscribed by the Eighth and Fourteenth Amendments to the United States Constitution;

- whether Defendant Marstiller has been deliberately indifferent to the serious risk of mental and physical harm of class members; and

- whether there is no legitimate penological purpose for Defendants' policies and practices regarding solitary confinement.

Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

## Typicality: Fed. R. Civ. P. 23(a)(3)

106.   The claims of the Plaintiffs are typical of those of the Plaintiff Class, as their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the class' claims.

## Adequacy: Fed. R. Civ. P. 23(a)(4)

107.   Plaintiffs are capable of fairly and adequately protecting the interests of the Plaintiff Class because Plaintiffs do not have any interests antagonistic to the class. Plaintiffs, as well as the Plaintiff Class members, seek to enjoin the unlawful acts and omissions of Defendants. Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

## Fed. R. Civ. P. 23(b)(1)(A) and (B)

108.   This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of class members is several thousand children and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn, would establish incompatible standards of conduct for DJJ. In addition, the prosecution of separate actions by individual members could result in adjudications with respect to individual

members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

## Fed. R. Civ. P. 23(b)(2)

109.   This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because DJJ's policies, practices, actions, and omissions that form the basis of this Complaint are common to and apply generally to all members of the class, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the class. Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. All state-wide confinement policies are centrally promulgated, disseminated, and enforced from the central headquarters of DJJ. The injunctive and declaratory relief sought is appropriate and will apply to all members of the Plaintiff class.

### *Disability Subclass Definition*

110.   Plaintiffs bring this action on behalf of themselves and, pursuant to Rule 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of all qualified children with disabilities as that term is defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B), who are, or will be, in custody in a DJJ-operated secure detention center and subject to solitary confinement (disability subclass).

*Disability Subclass Meets Fed. R. Civ. P. 23 Requirements*

**Numerosity: Fed. R. Civ. P. 23(a)(1)**

111.   The subclass is so numerous that joinder of all members is impracticable. The class is fluid, as children with disabilities regularly enter and leave the class as a result of DJJ's confinement policies and practices. The exact number of subclass members is unknown, but members are identifiable using records maintained by DJJ in the ordinary course of business. On information and belief, there are at least several hundred subclass members. Due to DJJ's solitary confinement policies and practices, all members of the subclass are at risk of suffering from discrimination.

**Commonality: Fed. R. Civ. P. 23(a)(2)**

112.   There are questions of law and fact common to the members of the subclass, including whether DJJ violates the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. DJJ is expected to raise common defenses to these claims, including denying that its actions violate the law.

**Typicality: Fed. R. Civ. P. 23(a)(3)**

113.   The claims of Plaintiffs are typical of those of the disability subclass, as their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the class' claims.

## Adequacy: Fed. R. Civ. P. 23(a)(4)

114.   Plaintiffs are capable of fairly and adequately protecting the interests of the disability subclass because they do not have any interests antagonistic to the subclass. Plaintiffs and the disability subclass members seek to enjoin the unlawful acts and omissions of DJJ. Plaintiffs are represented by counsel experienced in civil rights litigation, prisoner's rights litigation, and complex class action litigation.

## Fed. R. Civ. P. 23(b)(1)(A) and (B)

115.   Since the number of the disability subclass is approximately several thousand children, prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for DJJ. In addition, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

## Fed. R. Civ. P. 23(b)(2)

116.   This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because DJJ's policies, practices, actions, and omissions that form the basis of this Complaint are common to and apply generally to all members of the subclass, and the injunctive and declaratory relief sought is appropriate and will

apply to all members of the subclass. Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. All state-wide confinement policies are centrally promulgated, disseminated, and enforced from the central headquarters of DJJ. The injunctive and declaratory relief sought is appropriate and will apply to all members of the disability subclass.

## CLAIMS FOR RELIEF

### COUNT I
**(All Plaintiffs and the Plaintiff Class v. Defendant Marstiller)**
*42 U.S.C. § 1983; Fourteenth Amendment*

117.   Paragraphs 1 through 116 are incorporated herein as if fully set forth.

118.   Through the policies and practices described herein, Defendant Marstiller subjects all Plaintiffs and the Plaintiff Class to a substantial risk of serious harm and deprives Plaintiffs and the Class of the minimal civilized measure of life's necessities and human dignity through the excessive and inappropriate use of solitary confinement. These policies and practices are inconsistent with evolving standards of decency in a civilized society. Defendant Marstiller has caused the wanton infliction of pain upon Plaintiffs and the Plaintiff Class.

119.   There is no legitimate penological purpose for Defendant Marstiller's solitary confinement policies, practices, and procedures as authorized,

implemented, and enforced, and they amount to the unnecessary and wanton infliction of pain.

120.   These policies have been and continue to be implemented by Defendant Marstiller and her agents, officials, employees, and all persons acting in concert under the color of state law, in their official capacity, and are the direct and proximate cause of the Plaintiffs' and the Plaintiff Class's ongoing deprivation of rights secured under the Fourteenth Amendment to the United States Constitution.

121.   Defendant Marstiller has been and is aware of all deprivations complained of herein and has condoned, or been deliberately indifferent, to such conduct. Defendant also has been and is aware of the substantial risk of harm caused by these deprivations and has done nothing to alleviate this risk of harm. It should be obvious to Defendant Marstiller, and to any reasonable person, that the conditions imposed on Plaintiffs and the Class cause tremendous mental anguish, physical harm, suffering, and pain to such individuals.

122.   Plaintiffs have suffered harm and will continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate cause of Defendant's violation of their rights under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

123.   These harms will continue unless enjoined by this Court.

## COUNT II
### (All Plaintiffs and the Plaintiff Class v. Defendant Marstiller)
### *42 U.S.C. § 1983; Eighth Amendment*

124.    Paragraphs 1 through 116 are incorporated herein as if fully set forth.

125.    Through the policies and practices described herein, Defendant Marstiller subjects all Plaintiffs and the Plaintiff Class to a substantial risk of serious harm and deprives Plaintiffs and the Class of the minimal civilized measure of life's necessities and human dignity through the excessive and inappropriate use of solitary confinement. These policies and procedures are inconsistent with evolving standards of decency in a civilized society. Defendant Marstiller has caused the wanton infliction of pain upon Plaintiffs and the Plaintiff Class.

126.    There is no legitimate penological purpose for Defendant Marstiller's solitary confinement policies, practices, and procedures as authorized, implemented and enforced, and they amount to the unnecessary and wanton infliction of pain.

127.    These policies have been and continue to be implemented by Defendant Marstiller and her agents, officials, employees, and all persons acting in concert under the color of state law, in their official capacity, and are the direct and proximate cause of the Plaintiffs' and the Plaintiff Class's ongoing deprivation of rights secured under the Eighth Amendment to the United States Constitution.

128.    Defendant Marstiller has been and is aware of all deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct. Defendant also has been and is aware of the substantial risk of harm caused by these deprivations and has done nothing to alleviate or reduce this risk of harm. It should be obvious to Defendant Marstiller, and to any reasonable person, that the conditions imposed on Plaintiffs and the Class cause tremendous mental anguish, physical harm, suffering, and pain to such individuals.

129.    Plaintiffs have suffered harm and will continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate cause of Defendant's violation of their rights under the Eighth Amendment to the United States Constitution and 42 U.S.C. § 1983.

130.    These harms will continue unless enjoined by this Court.

## COUNT III
**(All Plaintiffs and the Disability Subclass v. Defendant DJJ)**
*Americans with Disabilities Act*

131.    Paragraphs 1 through 116 are incorporated herein as if fully set forth.

132.    Plaintiffs and other Disability Subclass members are qualified individuals with disabilities as defined in the Americans with Disabilities (ADA). They have impairments that substantially limit one or more major life activities, they have records of such impairments, or they are regarded as having such impairments. All children in the Disability Subclass meet the essential eligibility

53

requirements for the receipt of services of the participation in programs and activities provided by Defendants. 42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

133.   Plaintiffs and other Disability Subclass members are qualified to participate in the services, programs, activities, and benefits provided to children in DJJ custody within the meaning of Title II of the ADA.

134.   Defendant DJJ is a public entity as defined under 42 U.S.C. § 12131(1)(A) and it has an affirmative duty to create policies and procedures to prevent discrimination based on disability.

135.   Defendant DJJ violates the ADA by failing to ensure that children with disabilities have access to, are permitted to participate in, and are not denied the benefits of programs, services, and activities provided by Defendant DJJ. 42 U.S.C. § 12132; 28 C.F.R. § 35.152(b)(1).

136.   Defendant DJJ violates the ADA by failing to make "reasonable modifications to policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability…" 28 C.F.R. § 35.130(b)(7).

137.   Defendant DJJ discriminates against "qualified individual[s] with a disability" within the meaning of the ADA by administering programs and services for children with disabilities in a manner that denies them the opportunities to

receive services in the most integrated setting appropriate to their needs. 28 C.F.R. § 35.152(b)(2).

138.   As a result of Defendant DJJ's policies and practices regarding individuals with disabilities, Plaintiffs and the Disability Subclass are unnecessarily placed and retained in solitary confinement due to their disabilities; are denied equal access to activities, programs, and services for which they are otherwise qualified; and are denied the opportunity to receive services in the most integrated setting appropriate to their needs.

139.   As a direct and proximate cause of these actions and omissions, Plaintiffs and the Disability Subclass have suffered and continued to suffer from harm and violation of their ADA rights. These harms will continue unless enjoined by this Court.

## COUNT IV
**(All Plaintiffs and the Disability Subclass v. Defendant DJJ)**
***Section 504 of the Rehabilitation Act***

140.   Paragraphs 1 through 116 are incorporated herein as if fully set forth.

141.   Plaintiffs and other Disability Subclass members are qualified individuals with disabilities as defined in Section 504 of the Rehabilitation Act. 29 U.S.C. §§ 705(20) & 794.

142.   Plaintiffs and other Disability Subclass members are qualified to participate in the services, programs, activities, and benefits provided to children in DJJ custody within the meaning of Section 504 of the Rehabilitation Act.

143.   Defendant DJJ excludes Plaintiffs and the Disability Subclass from participation in and denies them the benefits of programs or activities, by reason of their disabilities. 29 U.S.C. § 794(a); 28 C.F.R. § 42.503(a).

144.   Defendant DJJ discriminates against "qualified individual[s] with a disability" within the meaning of the Rehabilitation Act by administering programs and services for children with disabilities in a manner that denies them the opportunities to receive services in the most integrated setting appropriate to their needs. 29 U.S.C. § 794; 45 C.F.R. § 84.4(b)(2).

145.   Defendant DJJ denies Plaintiffs and the Disability Subclass the opportunity afforded others to participate in programs or activities. 28 C.F.R. § 42.503(b)(1).

146.   Defendant DJJ utilizes criteria or methods of administration that either purposely, or in effect, discriminate on the basis of handicap and defeat or substantially impair accomplishment of the objectives of Defendant DJJ's programs or activities with respect to handicapped persons. 28 U.S.C. § 42.503(b)(3).

147.   Defendant DJJ violates Section 504 of the Rehabilitation Act by failing to reasonably accommodate children with disabilities in its facilities, programs, activities, and services.

148.   As a result of Defendant DJJ's discrimination and failure to provide reasonable accommodations, Plaintiffs and members of the Disability Subclass do not have equal access to DJJ's activities, programs, and services for which they are otherwise qualified.

149.   As a direct and proximate cause of these policies and practices, Plaintiffs and the Disability Subclass have suffered and continue to suffer harm and violation of their rights under Section 504 of the Rehabilitation Act. These harms will continue unless enjoined by this Court.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and the class and disability subclass they seek to represent, respectfully request that this Court:

A.     Assume jurisdiction;

B.     Permit the Plaintiffs to proceed using pseudonyms;

C.     Declare this suit is maintainable as a class action pursuant to Rules 23(a) and 23(b)(1) and (2) of the Federal Rule of Civil Procedure;

D.     Adjudge and declare that the conditions, acts, omission, policies, and practices of Defendants and their agents, officials, and employees are in violation

of the rights of Plaintiffs and the class and subclass they represent under the Eighth and Fourteenth Amendments to the U.S. Constitution;

E.      Permanently enjoin Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, from continuing the unlawful acts, conditions, and practices described in this Complaint;

F.      Order Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm described herein;

G.      Retain jurisdiction over Defendants until such time as the Court is satisfied that the unlawful policies, practices, acts, and omissions complained of herein no longer exist and will not recur;

H.      Award Plaintiffs, pursuant to 29 U.S.C. § 794, 42 U.S.C. §§ 1988, 12205, and 12133, the costs of this suit and reasonable attorneys' fees and litigation expenses; and

I.      Grant such other and further relief and this Court deems just and proper.

Dated: September 4, 2019                          Respectfully submitted,

                                        By:   s/ Andrea Costello
                                              Andrea Costello
                                              Fla. Bar No. 0532991
                                              Christopher M. Jones

Fla. Bar No. 994642
Jennifer Painter
Fla. Bar No. 110966
Florida Legal Services
122 E. Colonial Drive, Suite 100
Orlando, FL 32801
Telephone: (407) 801-0332 (direct)
andrea@floridalegal.org
christopher@floridalegal.org
jennifer.painter@floridalegal.org

Kelly Knapp
Fla. Bar No. 1011018
Leonard J. Laurenceau
Fla. Bar No. 106987
Southern Poverty Law Center
4770 Biscayne Blvd., Suite 760
Miami, FL 33137
Telephone: (786) 347-2056
kelly.knapp@splcenter.org
leo.laurenceau@splcenter.org

Shalini Goel Agarwal
Fla. Bar No. 90843
Southern Poverty Law Center
106 East College Ave., #1010
Tallahassee, FL 32302
Telephone: (850) 521-3024
shalini.agarwal@splcenter.org

Lisa Graybill*
Texas Bar No. 24054454
Southern Poverty Law Center
201 St. Charles Avenue, Suite 2000
New Orleans, LA 70170
Telephone: (334) 549-0498
lisa.graybill@splcenter.org

Dante P. Trevisani
Fla. Bar No. 72912
Laura A. Ferro
Fla. Bar No. 1015841
Florida Justice Institute, Inc.
100 S.E. 2nd St., Ste 3750
Miami, FL 33131
Telephone: (305) 358-2081
dtrevisani@floridajusticeinstitute.org
lferro@floridajusticeinstitute.org

*Pro hac vice* application
forthcoming

**Attorneys for Plaintiffs**