# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

_____

G.H., a minor, by and through his
parent and legal guardian, GREGORY
HENRY; R.L., a minor, by and through          Case No.: 4:19-cv-431-RH-MJF
her parent and legal guardian, ANGEL
CARTER; B.W., a minor, by and through
her parent and legal guardian, LEROI
LUZUNARIS; on behalf of themselves
and all persons similarly situated,

                    Plaintiffs,

v.

JOSEFINA TAMAYO, in her official
capacity as Acting Secretary of the
Florida Department of Juvenile Justice;
and the FLORIDA DEPARTMENT OF
JUVENILE JUSTICE, an agency of
the State of Florida,

                    Defendants.

_____

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
## WITH INCORPORATED MEMORANDUM OF LAW

## INTRODUCTION

This case arises from the systemic unconstitutional and discriminatory

statewide policy and practice of solitary confinement used by Defendants Josefina

Tamayo (Tamayo), Acting Secretary of the Florida Department of Juvenile Justice

(DJJ), and DJJ in all 21 state-operated secure detention centers. Defendants' statewide policy and practice is to isolate children in solitary confinement, often the same child repeatedly, for hours or days at a time, with no time limit in locked cells alone, without meaningful social interaction, environmental stimulation, outdoor recreation, educational instruction, access to personal property, or adequate sanitation. Defendants' policy and practice causes Plaintiffs, G.H. and R.L. (Plaintiffs), and approximately ████ children a year,[1] to be isolated in solitary confinement in conditions which pose a substantial risk of serious harm to their health and safety because of their continuing social, psychological, and physiological development.

Defendants have been, and continue to be, deliberately indifferent to this risk to children entrusted to their care. Defendants' actions violate the Eighth and Fourteenth Amendments to the United States Constitution. Defendant DJJ also discriminates against children with disabilities through this same policy and practice by failing to have a system to provide reasonable accommodations for all children subject to confinement in violation of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* (ADA) and Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 794, *et seq.*

---

[1] Pursuant to ECF No. 52, Plaintiffs have, in an abundance of caution, redacted summary information related to the confinement data. Other information is redacted pursuant to ECF No. 36. An unredacted motion will be filed under seal.

2

Plaintiffs G.H. and R.L. (Plaintiffs) seek to represent (1) a class of: children who are, or will be, in custody in a DJJ-operated secure detention center and subject to solitary confinement; and (2) a subclass of: all qualified children with disabilities as that term is defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B), who are, or will be, in custody in a DJJ-operated secure detention center and subject to solitary confinement.

This case is not about what happened to an individual child in solitary confinement. Plaintiffs seek only declaratory and injunctive relief to remedy Defendants' statewide solitary confinement policy and practice which results in a systemic risk of harm and disability discrimination for them, the class, and subclass. The systemic legal and factual issues here warrant class certification.

## STATEMENT OF FACTS

### I.      Defendants Authorize and Use a Statewide Policy and Practice of Solitary Confinement in Secure Detention Facilities

Defendants Tamayo and DJJ (Defendants) control, operate, and oversee a secure detention system of 21 facilities.[2] These facilities are physically restrictive and children, generally ranging in age from eight to twenty-one, are detained pending adjudication, disposition, placement, or pursuant to court order. *See id.*; *see also* Fla. Admin. Code R. 63G-2.014(58). DJJ's mandate is to manage children

---

[2] *See* Florida Department of Juvenile Justice, Comprehensive Accountability Report, (2019), available at: http://www.djj.state.fl.us/docs/car-reports/final-(2018-19-car)-detention.pdf?sfvrsn=2 (last visited April 18, 2021).

under a strategy of redirection and rehabilitation rather than punishment. *See* §
985.02(3), Fla. Stat. (2020).

Defendants operate a large secure juvenile detention system with children
regularly moving in and out. For example, statewide in the 2018-19 Fiscal Year,
22,462 children were admitted to detention; the average daily population was
1,067; and these children spent an average of 14 days in detention.[3] Florida law
requires any child adjudicated delinquent and awaiting placement in a DJJ program
to remain in secure detention until that placement occurs; children can wait weeks
or months. *See* § 985.27, Fla. Stat.

Defendants' written policies governing secure detention are centralized and
statewide.[4] Fla. Admin. Code. R. 63G-2.022(1)-(5), 63M, and 63N; and Exhibit
(Ex.) 1. Pursuant to DJJ's written policy, Defendants' use of "behavioral
confinement" at all detention centers is only authorized as "an immediate, short-
term, crisis management strategy for use during situations in which one or more
youth's behavior imminently and substantially threatens the physical safety of
others or compromises security." *Id.* at 63G-2.022(3)(a).[5] However, Defendants'

---

[3]   *See supra*, n.1.

[4]   Defendants' complete statewide Facility Operating Procedures for all secure detention centers,
available at: http://www.djj.state.fl.us/services/detention/facility-operating-procedure (last visited April
26, 2021).

[5]   DJJ Facility Operating Procedure 3.03 states behavioral confinement is only "intended as an
immediate, short-term, crisis management strategy for use during *volatile* situations in which one or more
youth's behavior imminently and substantially threatens the physical safety of others and compromises
security." (emphasis added). Ex.1. This is the same policy as in rule.

policy and practice is to isolate children (often the same child repeatedly) in solitary confinement with no firm upper time limit, in locked cells without meaningful social interaction, environmental stimulation, outdoor recreation, schooling, access to personal property, or adequate sanitation, including for minor misbehavior. *See* ECF 2 ¶¶ 48-57; *see also* Fla. Admin. Code. R. 63G-2.022(3) and (4); Ex. 1; Ex. 2; Ex. 3, ¶¶ 5-8 (Declaration of R.L.); Ex. 4, ¶¶ 8-10 (Declaration of G.H.).

Defendants written policy calls this "behavioral confinement" or "confinement," but DJJ's policy and practice is what experts refer to as "solitary confinement," where children are isolated from others in a locked room for an indefinite period of time with no meaningful social interaction or environmental stimulation. *See* Fla. Admin. Code. R. 63G-2.022(3); *see also* Nat'l Comm'n on Corr. Health Care, *Solitary Confinement (Isolation)*, (April 2016) (solitary confinement is commonly defined as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals.");[6] and Ex. 5, ¶ 17 (Declaration of Louis J. Kraus, M.D.).

Defendants' statewide solitary confinement policy and practice results in ███████ putative class members subject to solitary confinement each year. *See* Ex. 2. Defendants' policy and practice does not restrict the number of times a child

---

[6] Available at: https://www.ncchc.org/solitary-confinement (last visited April 18, 2021).

can be confined, has no time limit between confinements, and no limit on the cumulative amount of time a child spends in solitary confinement. *See id.*; *see also* Fla. Admin. Code R. 63G-2.002; Exs. 1-2; Ex. 3, ¶ 19; Ex. 4, ¶ 8.[7] As a result, the ████████████████████████████████████████████████████████. Ex. 2.

| Year | Children Subject to Confinement | Number of Times Confinement Used |
|------|--------------------------------|----------------------------------|
| ██ | ██ | ██ |
| ██ | ██ | ██ |
| ██ | ██ | ██ |
| ██ | ██ | ██ |
| ██ | ██ | ██ |
| ██ | ██ | ██ |
| ██ | ██ | ██ |

This is still the case even under Defendants' recently changed written policy which permits confinement (including repeated confinement) in single periods of up to 48-hours. Ex. 2. The revised policy appears to set no limit on 24-hour extensions of confinement.

---

[7] Defendants revised their secure detention administrative rules on November 22, 2021, but their continued use of solitary confinement results in a substantial risk of serious harm to children.

[8] Defendants recognize that their 2019-20 data was impacted by COVID-19. "With COVID-19 related shutdowns and school closings throughout the state, the number of arrests during FY 2019-2020 was abnormally low." *See* http://www.djj.state.fl.us/research/reports/reports-and-data/interactive-data-reports/delinquency-profile/delinquency-profile-dashboard (last visited April 26, 2021). Accordingly, the number of children who were subject to solitary confinement in detention may be artificially and inaccurately low due to the pandemic.

Defendants' (unwritten) policy and widespread practice is not to use confinement sparingly or as a last resort when a child's behavior "imminently and substantially threatens the physical safety of others or compromises security." Fla. Admin. Code R. 63G-2.002(3). Rather, statewide, Defendants subject children to confinement ███████████████ not even meeting their own written standard. Ex. 5, ¶ 33. For example, class members are subject to solitary confinement for reasons that include ████████████████████████████████████ ████████████████████████████. *See* Ex. 6, ¶ 4 (Declaration of Rachel Ortiz); *see also* Ex. 3, ¶ 5; Ex. 4, ¶ 8. Defendants' policy and practice is to continue to isolate children in solitary confinement where there is no imminent or substantial threat to safety or security; this is demonstrated where ████████████████████████████████████████ ████████████████████████████. Ex. 7 (confinement reports).

## II.   Defendants' Statewide Solitary Confinement Policy and Practice Poses a Substantial Risk of Serious Harm to All Children in Secure Detention

Defendants' statewide solitary confinement policy and practice poses a substantial risk of serious harm for all children in secure detention. Ex. 5. ¶¶ 27-38. Since children, as a group, are still developing socially, psychologically, and neurologically, they are at a heightened risk of psychological and physical harm,

including lasting permanent damage, from solitary confinement. *See* Ex. 5, ¶¶ 18-20. This risk includes post-traumatic stress disorder, major depression, anxiety, paranoia, self-harm, suicide, insomnia, agitation, sadness, mistrust, and feelings of hopelessness and abandonment.[9] *Id.*, ¶ 19. Plaintiffs G.H. and R.L. experienced

████████████████████████████████████████████████████. Ex. 3, ¶¶ 9, 12; Ex. 4, ¶¶ 10-12; Ex. 5, ¶ 37.

    Medical research on the adolescent brain explains why children are more vulnerable to the risk of harm from solitary confinement, including its long-term effects. Ex. 5, ¶ 22. Psychologically, children are different from adults, making their time spent in isolation even more difficult and the developmental, psychological, and physical damage more comprehensive and lasting.[10] They experience time differently – a day to a child feels longer than a day to an adult – and have a greater need for social stimulation. Ex. 5, ¶ 25. Based on knowledge of the brain development and the impact of adverse childhood experiences on the physical, mental, and behavioral health of children and adolescents, experts agree that children subject to solitary confinement in the criminal justice system are at particular risk for adverse reactions. Ex. 5, ¶ 26.

---

    [9] DJJ has been aware of these findings and used them in suicide prevention trainings for detention staff and in attempts to reduce their use of confinement. *See* Ex. 8 (MARST 9576-9578).

    [10] *See* Nat'l Comm'n on Corr. Health Care, Solitary Confinement (Isolation), supra note 3; *see also* Ex. 5, ¶¶ 18-20.

Researchers have also found that when juvenile correctional officials promote policies that isolate youth from their peers, alienate them, and deny them social integration, children are exposed to higher rates of suicidal behavior.[11] There is a high correlation between juvenile suicide and the use of solitary confinement in detention. *Id.* This evidence demonstrates a substantial risk of serious harm that can be fatal for children exposed to solitary confinement for even short periods of time. Ex. 5, ¶ 25. Despite this known risk of serious harm, DJJ's policy subjects children to solitary confinement in secure detention who have attempted suicide or engaged in self-injury and, therefore, are at an elevated suicide risk. *See* Ex. 5, ¶ 32; Ex. 3, ¶ 9; Ex. 4, ¶ 11; Ex. 9 (Central Communication Center reports). Defendants kept Plaintiffs R.L. and G.H. in solitary confinement ███████████ ███████████████████████████████████████████████████████████████████████ Ex. 4, ¶ 11; Ex. 3,, ¶ 9.

The risk of harm to children from solitary confinement, including for suicide, is amplified by the disproportionately high incidence of preexisting mental illness among children involved in the juvenile justice system. Ex. 5, ¶¶ 29-30. The prevalence rate for mental illness for these youth is estimated between 60-75%.[12] Ex. 5, ¶ 23. Defendants' policies only require mental health to see a child in

---

[11] *Id.* at 27; *see also* Ex. 5, ¶ 20.

[12] *See* The Florida Department of Juvenile Justice and Juvenile Justice and Delinquency Prevention State Advisory Group, 2019 State of Florida Three-Year Plan, at 20, http://www.djj.state.fl.us/docs/bc-landing-page/2019-state-3-year-plan.pdf?sfvrsn=0 (last visited April 19, 2021).

confinement if isolation exceeds 24-hours, and then only "as soon as reasonably possible."[13] Even assuming this occurs, it is inadequate to ameliorate the risk of harm. Ex. 5, ¶ 31.

A substantial number of children exposed to solitary confinement are at further risk of harm because they also suffer from trauma[14] Ex. 5, ¶ 23. Children in the juvenile justice system have much higher rates of Adverse Childhood Experiences (ACEs).[15] Defendants' solitary confinement policy places these children at risk for magnifying existing trauma; evidence shows that this can have serious long-term harmful impacts on health and well-being.[16] Ex. 5, ¶ 19.

All children's health and safety is at risk from solitary confinement, but for those children who may have even more vulnerability, Defendants do not categorically exclude them from confinement. This includes children that Defendants identify at risk for suicide or self-harm, or who have a serious mental illness, a physical disability, a developmental disability, or are pregnant. *See* Fla.

---

[13]   Although DJJ policy allows confined youth access to mental health care "as needed," it does not require any mental health evaluation before subjecting a child to solitary confinement or within the first 24-hours of confinement. Fla. Admin. Code. R. 63G-2.022(3)(d)(4)(a); and FOP 3.03.

[14]   Burrell, S., Trauma and the Environment of Care in Juvenile Justice Institutions, at 1 (2013), https://ylc.org/wp-content/uploads/2018/11/jj_trauma_brief_environofcare_burrell_final.pdf  (last visited April 26, 2021).

[15]   *Id.*

[16]   *See* Nat'l Comm'n on Corr. Health Care, Solitary Confinement (Isolation), supra note 3; *see also* Ex. 5, ¶ 28-29.

Admin. Code R. 63G. When Defendants amended their rules they consciously disregarded this change.[17] *Id.*; Ex. 10.

Recognizing all children's greater vulnerability to harm, numerous psychiatric, medical, scientific, correctional, and legal authorities support the elimination of solitary confinement for juveniles. Ex. 5, ¶ 26. These authorities articulate how juveniles' particular vulnerabilities expose them to a risk of adverse reactions from isolation. *See id.*

### III. DJJ's Statewide Solitary Confinement Policy and Practice Subjects Children to Conditions That Have the Cumulative Effect of Depriving Them of Basic Human Needs

Pursuant to their statewide solitary confinement policy and practice, Defendants subject all children in secure detention to the same dehumanizing conditions in isolation. These include a lack of: normal social interaction and human contact, access to recreation, educational instruction, environmental stimulation, sanitation, and personal property. Fla. Admin. Code R. 63G-2.002(3)(a); Ex. 3, ¶¶ 6-8; Ex. 4, ¶¶ 8-10. These conditions, alone or in combination, have a "mutually enforcing effect" that deprives all children in solitary confinement of basic human needs, thereby subjecting them to an unreasonable risk of harm. *G.H. v. Marstiller*, 424 F. Supp. 3d 1109, 1117 (2019) (citing *Harvard v. Inch*, 411 F. Supp. 3d 1220, 1239-40 (2019)) (recognizing

---

[17] For comparison, the version of Defendants' administrative rule and Facility Operating Procedure are included. *See* Ex. 10.

human contact, environmental stimulation, recreation, and sanitation as basic human needs).

DJJ locks children in solitary confinement for extended periods of time in stark, small, barren cells. *See* Ex. 5, ¶¶ 28, 35; Ex. 3, ¶¶ 6-7; Ex. 4, ¶ 9. These cells are cramped spaces approximately five by seven feet without much room to move around. Fla. Admin. Code R. 63N-1.00952; Ex. 11; Ex. 5, ¶ 28. The only fixtures are a toilet, sink, and concrete slab to sit or lay on. Ex. 11; Ex. 3, ¶ 7; Ex. 4, ¶ 9. DJJ regularly refuses to provide a thin mat for children until sleeping hours. Ex. 3, ¶ 8; Ex. 4, ¶ 9. DJJ refuses to turn off the lights in the cells, leaving children under fluorescent lights 24-hours a day. Ex. 3, ¶ 8; Ex. 4, ¶ 9. The cells have a large locked solid metal door with a very small window that is difficult to see through. Ex. 11; Ex. 3, ¶ 7; Ex. 4, ¶¶ 9-10. In many cells, there is no exterior window allowing children to see outside. Ex. 11; Ex. 3, ¶ 7; Ex. 4, ¶ 9.

Defendants deprive children in solitary confinement of normal social interaction and human contact. The only time children leave their cell each day is to shower for a few minutes after all children not in isolation have done so. Fla. Admin. Code R. 63G- 2.022; Ex.3, ¶ 8; Ex.4, ¶ 10. DJJ ensures that there is nothing for the children to do for the duration of their confinement. Fla. Admin. Code R. 63G-2.002; Ex. 3, ¶¶ 8, 20; Ex. 4, ¶ 10. DJJ does not permit them to attend school or receive educational instruction. Fla. Admin. Code R. 63G-2.002; Ex. 3, ¶

12

8; Ex. 4, ¶ 10. While in confinement, children have no recreation or programming and no access to phones, radios, or televisions. Fla. Admin. Code R. 63G-2.002; Ex. 3, ¶ 8; Ex. 4, ¶ 10. Personal property is removed from the cell. Ex. 4., ¶ 9; FOP 3.03. The only way children can communicate with someone is by banging on their cell door to try to attract the attention of staff, or by yelling loudly so staff or another child may hear them. Ex. 3, ¶ 10; Ex. 4, ¶ 9. Staff tells them they can get in trouble for doing so. *Id.* Staff will often communicate with a child through the solid metal door rather than opening it to talk to a child face-to-face and hear the child clearly. Ex. 3, ¶ 10; Ex. 4, ¶ 13. When children go into solitary confinement, they have no idea if, or when, they are getting out. Ex. 3, ¶ 19; Ex. 4, ¶ 10.

These deprivations of normal social interactions and environmental stimulation are exacerbated by the austere and decrepit conditions inside the cells. Many of the detention centers are old, dirty, decaying buildings suffering from age and disrepair that is magnified when a child is locked around-the-clock in a tiny cell. *See* Ex. 3, ¶¶ 5-7; Ex. 4, ¶¶ 8-9; Ex. 5, ¶ 28. The paint is peeling and the cell walls and doors are covered in graffiti. *Id.*; Ex. 11. DJJ has failed to maintain the plumbing which causes toilets to not work or to flood the cells. *See* Ex. 3, ¶¶ 6-7; Ex. 4, ¶ 9. The toilets and cells reek of human waste. *See* Ex. 3, ¶ 6; Ex. 4, ¶ 9. Children report there is human excrement on the walls. *See* Ex. 3, ¶ 6. Some cells have gnats, ants, or bugs that bite children. Ex. 4, ¶¶ 9-10. DJJ requires children to

eat alone in their cells in these conditions. *See* Ex. 3, ¶ 8; Ex. 4, ¶ 10. The

cumulative effect of these deprivations in solitary confinement presents a

substantial risk of serious harm to children in the putative class, all of whom are

vulnerable due to their continuing development. *See* Ex. 5, ¶¶ 18, 27-38.

## IV.   Defendant DJJ Fails to Have a System in Place to Provide Reasonable Modifications to Children with Disabilities Subject to Solitary Confinement

Plaintiffs bring two additional claims under the ADA and RA for children

with disabilities who have been, or will be, subject to solitary confinement (i.e., the

disability subclass). ECF No. 2 ¶¶ 131-49. These claims arise from DJJ's lack of a

functioning system to provide reasonable modifications or accommodations for

children with disabilities who are subject to solitary confinement. *See* Fla. Admin.

Code R. 63G.

There are several systemic deficiencies. DJJ does not train their staff about

reasonable modifications or accommodations for children. Ex. 6, ¶ 6.  DJJ fails to

have an ADA coordinator review, consider, and decide on providing reasonable

modifications or accommodations for children. *See* 28 C.F.R. §35.107(b). DJJ fails

to provide any information to children in secure detention about their ADA rights,

reasonable modification or accommodations, or that DJJ must follow the ADA. *See*

Ex. 12. DJJ lacks an adequate grievance procedure to investigate and resolve any

ADA complaints from children. *See* 28 C.F.R. §35.107(b); Fla. Admin. Code. R.

63G-2.002. Nor is DJJ's general grievance procedure accessible, for example, to those children with learning disabilities or who are blind. Fla. Admin. Code R. 63G-2.

These systemic failures result in DJJ subjecting these children to or retaining them in solitary confinement because of their disabilities. For example, in response to rule violations, DJJ places children with disabilities in solitary confinement who are unable to regulate or conform their behaviors due to the nature of their disabilities, ██████████████████████ *See* Ex. 4,  ¶¶ 3-5; Ex. 3, ¶¶ 14-15; Ex. 5, ¶ 34.  This results in Defendants isolating them in solitary confinement because of their disabilities, rather than modifying DJJ policy to provide accommodations such as further behavior interventions or mental health services to avoid placement in solitary confinement. DJJ's failure to have a legally compliant system to provide reasonable accommodations or modifications to their solitary confinement policy and practice results in a denial of meaningful access to programs, services, and activities available to children in the general population, such as recreation, education, cafeteria, television, and mental health treatment. Ex. 3, ¶¶ 8, 12; Ex. 4, ¶¶ 10, 14. DJJ's lack of a functioning system to provide reasonable accommodations or modifications to solitary confinement policies impacts children with disabilities in all detention facilities.

15

## V.     Defendants Have Subjected the Named Plaintiffs to Their Unconstitutional and Discriminatory Solitary Confinement Policies and Practices

Defendants have repeatedly subjected the named Plaintiffs to solitary confinement in secure detention for hours or days. Ex. 3, ¶ 5; Ex. 4, ¶ 8. G.H. is now in secure detention. Ex. 3, ¶ 7; R.L. Decl., ¶ 2. They remain under DJJ's jurisdiction based on pending juvenile delinquency cases and may be detained again at any time. *Id.* Their Declarations provide details about the conditions they experienced in solitary confinement. Ex. 3, ¶ 6-8; Ex. 4, ¶¶ 8-10.

Plaintiffs' goal is to obtain declaratory and injunctive relief, not money damages, on behalf of themselves and the putative class and subclass. Each is willing to be a class representative. Ex. 3, ¶ 21; Ex. 4, ¶¶ 2, 16.

## SUMMARY OF PLAINTIFFS' CLAIMS

To assist the Court in considering the Rule 23 requirements, Plaintiffs summarize their claims. *See* ECF No. 2 ¶¶ 117-149.

In an Eighth Amendment challenge to conditions of confinement in isolation, Plaintiffs must show that: (a) the conditions of confinement must be objectively serious or 'extreme, i.e., the prisoner must show that a condition of his confinement pose[s] an unreasonable risk of serious damage to his future health or safety, and (b) that the defendant prison officials subjectively acted with deliberate indifference with regard to the conditions at issue. *Farmer v. Brennan*, 511 U.S.

16

825, 834 (1994); *Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Thomas v. Bryant*,

614 F.3d 1288, 1304 (11th Cir. 2010); and *G.H.*, 424 F. Supp. 3d at 1114 (citation

omitted). An unreasonable risk "is not one that today's society chooses to tolerate."

*Helling*, 509 U.S. at 36.

The Eighth Amendment standard for conditions of confinement, and the

risks imposed, "requires juveniles to be treated differently from adults." *G.H.*, 424

F. Supp. 3d at 1115.

> It is, partly, an objective test from the point of view of the prisoner.
> When that prisoner is a juvenile, the standard requires this Court to
> analyze *whether the conditions pose an unreasonable risk of serious*
> *damage to future health or safety of a child.* Given the fact that the
> Supreme Court has recognized that juveniles suffer from certain
> psychological vulnerabilities when compared to adults, it would be
> disingenuous to suggest that the same conditions imposed on adults
> and children would have similar effects on them.

*Id.* (emphasis added).

Conditions of confinement "alone or in combination" may deprive those

who are incarcerated of "the minimal civilized measure of life's necessities[.]"

*Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); and *G.H.*, 424 F. Supp. 3d at 1117

(citing *Harvard*, 411 F. Supp. 3d at 1239-40) (citations omitted) (recognizing

human contact, environmental stimulation, recreation, and sanitary conditions are

among these necessities). The cumulative effects of deprivations of basic human

needs in solitary confinement subject juveniles to unreasonable risk of serious

psychological and physiological harm because of their continuing development.

*See*, *e.g.*, *G.H.*, 424 F. Supp. 3d at 1116; and *V.W. v. Conway*, 236 F. Supp. 3d 554, 583-84 (N.D.N.Y. 2017).

For a claim under the ADA and RA, a plaintiff must show: "(1) that he is a qualified individual with a disability; and (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability."[18] *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007). "[A]n ADA claim may proceed on the theory that the Defendant failed to reasonably accommodate the Plaintiffs' disability." *G.H.*, 424 F. Supp. 3d at 1120 (citations omitted).

## MEMORANDUM OF LAW

Plaintiffs satisfy the requirements of Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure for the proposed class and disability subclass. The Court should certify Counts I through IV of Plaintiffs' Complaint (ECF No. 2 ¶¶ 117-149) for class treatment.

---

[18] The Rehabilitation Act uses the same standards as the Americans with Disabilities Act; cases interpreting either are applicable and interchangeable. *Badillo v. Thorpe*, 158 F. App'x 208, 214 (11th Cir. 2005) (unpublished).

## I.    Class Certification Requirements

Four requirements must be met to certify a class: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses  of the representative  parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed.  R.  Civ.  P.  23(a). *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187-88 (11th Cir. 2003). Rule 23(a) elements are commonly referred to as "numerosity, commonality, typicality, and adequacy of representation." *Id.* The class must also satisfy at least one requirements in Rule 23(b). *Id.* While the class certification analysis may "entail some overlap with the merits of the plaintiff's underlying claim," Rule 23 does not grant courts "a license to engage in free-ranging merits inquiries at the certification stage." *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465-66 (2013). Plaintiffs meet these requirements.

## II.    Plaintiffs Have Met the Requirements of Rule 23(a)

### A.    The Size of the Class and Subclass Satisfy the Numerosity Requirement

Plaintiffs easily meet the numerosity requirement of Rule 23(a)(1). To be maintained as a class action, the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity does not have

a strict formula. The Eleventh Circuit recognizes that "generally less than

twenty-one is inadequate, more than forty adequate, with numbers between

varying according to other factors." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d

1546, 1553 (11th Cir. 1986). "A plaintiff need not show the precise number of

members in the class." *Jones v. Desantis*, 4:19cv300-RH/MJF, 2020 WL

5646124, at *3 (N.D. Fla. April 7, 2020) (citation omitted).

Even without complete discovery, Plaintiffs have demonstrated that

numerosity is satisfied for the class based on the numbers alone. According to

Defendants' confinement data, ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ *See* Ex. 2.

Joinder is "impracticable because the juveniles may by law be

incarcerated for varying lengths of time, the [detention] population is constantly

in flux, and the proposed class includes future members whose identities are

unknown." *See Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2013 WL

1821077, at *22 (M.D. Fla. Mar. 27, 2013), *report and recommendation*

*adopted as modified*, No. 8:12-CV-568-T-23MAP, 2013 WL 1810806 (M.D.

Fla. Apr. 30, 2013); *see also Gerstein v. Pugh*, 420 U.S. 103, 110 n. 11 (1975)

(noting that the transient nature of pretrial detention makes it difficult for "any given individual [to] have his constitutional claim decided"). Last year, Defendants detained 11,000 children who, on average, spent 14 days in secure detention.[19] Where, as here, policies and practices often result in the frequent movement of people in and out of the class, the fluid nature of the plaintiff class counsels in favor of certification of all present and future members. *Kilgo v. Bowman Transp. Inc.*, 789 F.2d 859, 878 (11th Cir. 1986)); *see also Hill v. Butterworth*, 170 F.R.D. 509, 514 (N.D. Fla. 1997).

Numerosity is also satisfied for the disability subclass. According to Defendant DJJ and national estimates, at least 65-75% of children in the proposed class meet the criteria for mental health disorder.[20] The number of proposed subclass members far exceeds the threshold set by the Eleventh Circuit even without the precise number of subclass members because of incomplete discovery.[21] *See Hill*, 170 F.R.D. at 513 (citation omitted) (precise

---

[19]   *See* Florida Department of Juvenile Justice Comprehensive Accountability Report, Detention Services, 2019-2020, available at: http://www.djj.state.fl.us/docs/car-reports/final-(2019-20-car)-detention.pdf?sfvrsn=2 (last visited April 12, 2021).

[20]   *See* http://www.djj.state.fl.us/services/health (last visited April 11, 2021) ("Over 65% of the youth in the Department's care have a mental illness or substance abuse issue."); *see also* Lee A. Underwood & Aryssa Washington, *Mental Illness and Juvenile Offenders*, 13 INT'L J. ENVTL. RES. PUB. HEALTH, at 1, 3 (2016).

[21]   This, and other requested discovery, is at issue in Plaintiffs' Motion to Compel Responses to First Request for Production. ECF No. 83.

number is not dispositive because a court may consider other facts such as the ease that class members may be identified and the nature of the action).

The proposed disability subclass is so numerous that joinder of all members is impracticable and promotes judicial economy by avoiding hundreds of lawsuits that would raise the same issues and seek the same relief. *Id.* at 514 ("presence of an unknown number of future class members makes joinder of all interested individuals impracticable") (citations omitted). For these reasons, numerosity is satisfied.

> 2.   **Commonality is Met Because Plaintiffs Challenge a System-Wide Policy and Practice That Affects All Class and Subclass Members**

Plaintiffs satisfy Rule 23's "commonality" requirement because their claims raise questions of fact and law that are common to all members of the proposed class and subclass. *See* Fed. R. Civ. P. 23(a)(2). For commonality, class claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution - which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011). "[W]hat matters to class certification . . . [is] the capacity of a classwide preceding to generate common answers apt to drive the resolution of the

litigation." *Wal-Mart*, 564 U.S. at 350. "Even a single [common] question will do." *Id.* at 359. Plaintiffs meet this standard.

Plaintiffs' claims involve common questions of fact and law, the answers to which will confirm that Defendants are systemically violating the constitutional and statutory rights of the named Plaintiffs and class members. For Plaintiffs' Eighth and Fourteenth Amendment claims, these include but are not limited to:

a) Whether Defendants' policy and practice of solitary confinement in secure detention exposes children to a substantial risk of serious harm;

b) Whether Defendants' policy and practice of solitary confinement deprives class members of their basic human needs; and

c) Whether Defendants are deliberately indifferent to the risk of harm caused by their solitary confinement policy and practice.

For Plaintiffs' ADA and RA claims it is:

a) Whether Defendant DJJ violates the ADA and Section 504 based on its systemic failure to provide reasonable modifications of DJJ's solitary confinement policy and practice to prevent discrimination by reason of disability.

Each of these issues satisfy commonality and are appropriate for class treatment.

### a.    Eighth and Fourteenth Amendment Claims

Plaintiffs' Eighth and Fourteenth Amendment claims challenge only one statewide policy and practice: Defendants repeated isolation of children in

23

solitary confinement for hours or days at a time, with no time limit, in locked cells without meaningful social interaction, environmental stimulation, outdoor recreation, school instruction, access to personal property, or adequate sanitation. This is a common course of conduct that applies statewide to children isolated in all detention centers. Ex. 1; Ex. 2; Fla. Admin. Code R. 63G-2.002.

Commonality is also established because Defendants' solitary confinement policy and practice causes all children in the proposed class to suffer the same injury: exposure to a substantial risk of serious harm to their future health and safety. *See* Ex. 5, ¶¶ 18-21, 38; *see also V.W.*, 236 F. Supp. 3d at 575-76 (commonality met for class of juveniles raising Eighth Amendment challenge to jail's solitary confinement policy for juveniles); *Doe v. Hommrich*, Case No. 3-16-0799, 2017 WL 660681, at *4 (M.D. Tenn. February 17, 2017) (commonality met for class of all juveniles challenging the same injury under the Eighth Amendment based on jail's policy of solitary confinement). This common risk of harm exists for all children in the class because of their continuing emotional, social, psychological, and physical development and is well established by evidence from medical, corrections, and scientific authorities. Ex. 5, ¶¶ 18, 26; *G.H.*, 424 F. Supp. 3d at 1116 (citing *Harvard*, 411 F. Supp. 3d at 1233). Children in the class with mental illness, histories of

trauma, developmental disabilities, or at risk for suicide or self-harm, suffer from the same risk of harm from Defendants' solitary confinement policy and practice as the class, though it is further amplified. Ex. 5, ¶ 24.

In solitary confinement, class members experience the same conditions and deprivations which, cumulatively, expose them to a common substantial risk of serious harm. *See G.H.*, 424 F. Supp. 3d at 1116 (citations omitted). These include: a lack of environmental stimulation; lack of normal human contact; no access to recreation and exercise; inadequate sanitation; leaving children in locked cells for hours or days with nothing to do; only briefly allowing children out of solitary confinement for a few minutes each day to shower; requiring children to eat all their meals alone in their cells next to a toilet; removal of personal property; no school instruction; and only requiring mental health services after 24-hours in isolation. Fla. Admin. Code. R. 63G-2.002; Ex. 1; Ex. 3, ¶¶ 6-8, 11; Ex. 4, ¶¶ 9-10. As this Court has recognized, the deprivations of basic human needs (e.g., human contact, environmental stimulation, recreation, and sanitation) are caused by Defendants' statewide solitary confinement policy and practice. *G.H.*, 424 F. Supp. 3d at 1114. Defendants isolate ███████ class members each year in these austere conditions. Ex. 2.

Even if some conditions in one facility are arguably slightly better than another, commonality does not require perfect uniformity, and these conditions demonstrate commonality because they are rooted in Defendants' statewide policy and practice. *See Wal-Mart*, 564 U.S. at 350.  In totality, the conditions that all class members experience in solitary confinement expose them to the same substantial risk of serious harm.

Commonality is also demonstrated because, across detention centers, Defendants do not use confinement as an "immediate, short-term, crisis management strategy for use during situations in which one or more youth's behavior imminently and substantially threatens the physical safety of others or compromises security." Ex. 6; FOP 3.03; Fla. Admin Code R. 63G-2.002(3)(a). Rather, Defendants subject



. *Id.* Defendants also

Ex. 7. This demonstrates a common question of fact. *See*, *e.g.*, *J.S.X. Through Next Friend D.S.X. v.*

*Foxhoven*, 330 F.R.D. 197, 208-09 (S.D. Iowa 2019) (commonality met for questions about whether defendant's policy and practice allows use of isolation as punishment and allows use of isolation for benign adolescent behavior, both of which create a risk of harm to detained juvenile class).

The declaratory and injunctive relief sought here, declaring the policy and practice unconstitutional and enjoining Defendants from using it, also supports a finding of commonality because the relief is the same across the class as to a common policy. *See*, *e.g.*, *Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001); *Hughes*, 2013 WL 1821077, at *23. If the Court ultimately finds on the merits that Defendants' solitary confinement policy and practice is unconstitutional, the Court could enjoin Defendants from using solitary confinement for the class in all secure detention centers.

This case turns on common issues with common answers that are "apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. To certify the class, Plaintiffs do not have to prove the merits of the common questions, such as a constitutional violation due to Defendants' deliberate indifference, only that they are capable of classwide resolution. *See*, *e.g.*, *Amgen Inc.*, 568 U.S. at 459.

Slight differences among class members with respect to the reasons why they were subject to solitary confinement, or for how long, do not undermine commonality. *See*, *e.g.*, *Prado-Steiman*, 221 F.3d at 1279 n.14. Commonality

27

does not require "that all putative class members share identical claims, and ... factual differences among the claims of the putative class members do not defeat certification." *Cooper v. Southern Co.*, 390 F.3d 695, 714 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) (citations omitted). This is precisely the type of systemic civil rights reform case supporting a finding of commonality. *See*, *e.g.*, *Jones*, 2020 WL 5646124, at *4 (N.D. Fla. April 7, 2020).

### b.    ADA and Section 504 Claims

Plaintiffs also satisfy commonality for the disability subclass claims. The common question is: whether Defendants have violated the ADA and RA by failing to have a functioning system for reasonable modifications in secure detention to prevent the denial of access to programs, services, and activities for children with disabilities who are subject to solitary confinement. This is a common question capable of subclass-wide resolution because, to answer it, the Court need only look to Defendants' policies and practices (or lack thereof) regarding modifications and accommodations when children with disabilities are placed or retained in confinement. *See*, *e.g.*, *Dunn v. Dunn*, 318 F.R.D. 652, 663 (M.D. Ala. 2016), *modified sub nom. Braggs v. Dunn*, No. 2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020).

Commonality is also met because the Plaintiffs and all subclass members have suffered the same injury: the lack of a functioning and adequate system that would ensure children with disabilities are appropriately accommodated. *Id*. Stated differently, Defendant DJJ has failed to remedy an inadequate system that has the effect of discriminating against Plaintiffs and the subclass by failing to accommodate their disabilities when they are subject to solitary confinement. *Id.*

Here, there are several systemic ADA and RA failures common to DJJ's secure detention system. DJJ does not train their staff to consider whether and how a child's rule violations could be a result of disability and what reasonable modifications should be made in response. Ex. 6, ¶ 6-7. DJJ does not involve an ADA coordinator in the decision to place or retain children with disabilities in solitary confinement to ensure they are accommodated. *See* 28 C.F.R. §35.107(b). DJJ does not inform children of their ADA rights. Ex. 12. The only arguable way for children with disabilities in secure detention to receive a reasonable modification is through the grievance process, if they somehow know it is available for this purpose, but DJJ is obligated to provide reasonable modifications to children with known disabilities regardless of whether they request them. *See Nattiel v. Fla. Dep't of Corr.*, CASE NO. 1:15-cv-00150-WTH-GRJ, 2017 WL 5774143, at *1 (N.D. Fla. Nov. 28, 2017).

Based on these systemic failures, when children engage in behaviors related to their disabilities, DJJ's response is to place or retain them in solitary confinement, rather than consider a reasonable modification of their solitary confinement policy and practice. Fla. Admin. Code R. 63G; Ex. 3, ¶¶ 5, 14-15; Ex. 4, ¶¶ 8, 14. As a result of this placement, DJJ denies these children equal access to the programs, services, and activities available to children in the general population such as recreation, education, cafeteria meals, T.V., and mental health services because of their disabilities. *See*, *e.g.*, *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Lewis v. Cain*, Civil Docket No.: 3:15-CV-318, 2021 WL 1219988, at *48-53. 55-56 (M.D. La. March 31, 2021).

Commonality is satisfied here despite any arguable factual differences between the Plaintiffs and the subclass. *Wal-Mart*, 564 U.S. at 353; *Prado–Steiman*, 221 F.3d at 1279 n. 14; *J.S.X.*, 330 F.R.D. at 208-09. For example, it makes no difference that the Plaintiffs may have been subject to or retained in confinement because of their differing disabilities. *Dunn*, 318 F.R.D. at 662-63 (ADA class claim was proper brought because it did not challenge the denial of each accommodation, but the denial of a system to ensure that prisoners were appropriately accommodated). Likewise, this common inquiry does not require the Court to examine whether hundreds of children are qualified individuals with disabilities or asked for a reasonable modification. *See*, *e.g.*, *Armstrong v.*

*Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (recognizing people in prison with different disabilities suffered the same harm from defendant's failure to accommodate their disabilities).

### 3. The Plaintiffs' Claims Are Typical of Those of the Class and the Subclass

Plaintiffs' claims are typical of those of the class and subclass. For typicality, "a class representative must possess the same interest and suffer the same injury as the class members []." *Murray*, 244 F.3d at 811. This requirement focuses on the named Plaintiffs and putative class' legal claims, rather than their factual circumstances. *Id.* ("The typicality requirement may be satisfied despite substantial factual differences [] when there is a strong similarity of legal theories.").

Here, there is no question that the Plaintiffs' claims are identically aligned with those of the class and subclass members. Their Eighth and Fourteenth Amendment claims rely on the same legal claim and theory because they are subject to the same harm: a risk to their future health and safety from Defendants' statewide solitary confinement policy and practice. *See*, *e.g.*, *Hughes*, 2013 WL 1821077, at *24; *J.S.X.*, 330 F.R.D. at 210-11; Ex. 5, ¶¶ 18-21, 27-38. The relief the Plaintiffs seek, injunctive and declaratory relief to enjoin Defendants from exposing them to a substantial risk of serious harm in solitary confinement, is identical to that sought by the putative class. ECF No. 2 at 57-58

The Plaintiffs' claims under the ADA and RA are also aligned with those of the subclass members. They challenge Defendants' failure to implement a functioning and adequate system for reasonable modifications and accommodations to prevent discrimination on the basis of disability. In the absence of such a system, they, like proposed subclass members, ███████████████████ ████████████████████████████████████████████████ ██████████████████████████████████. Plaintiffs, and the disability subclass members, seek to remedy these violations and require Defendants to have a functioning and adequate system to accommodate their disabilities, rather than subject them to solitary confinement under the same statewide policy and practice in the same way.

For typicality, it does not matter that there may be some factual differences between the exact conditions of confinement among class members or that disability subclass members may have different mental health needs. *See Hughes*, 2013 WL 1821077, at *24; *see also Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014). Defendants' policies and practices apply equally to all class and subclass members who are subject to solitary confinement. *Hughes*, 2013 WL 1821077, at *24.

### 4.   The Named Plaintiffs and Their Counsel Will Adequately Protect the Interests of the Class and Subclass

Plaintiffs will "fairly and adequately protect the interests of the class" as required under Fed. R. Civ. P. 23(a)(4). This requirement is met when: (1) there are no substantial conflicts of interest between the representatives and the class, and (2) the class representatives and their counsel will adequately prosecute the action. *Valley Drug Co.,* 350 F.3d at 1189. Adequate representation is usually presumed in civil rights actions for injunctive and declaratory relief classes because there is no monetary pie to slice. *Canupp v. Liberty Behavioral Healthcare Corp.*, Case No. 2:04-cv-260-FtM-33DNF, 2005 WL 8148817, at *6 (M.D. Fla. Mar. 29, 2005). These criteria are satisfied here.

None of the Plaintiffs have any conflicts of interest with the class; all are seeking to invalidate the same unlawful conduct. They share a common goal: an end to the unconstitutional and discriminatory treatment of juveniles in solitary confinement in DJJ secure detention. Plaintiffs seek relief that will benefit the entire class and subclass in the same manner. Plaintiffs are also capable of fairly and adequately protecting the interests of the class because they do not have any interests antagonistic to the class. Ex. 3, ¶ 21; Ex. 4, ¶¶ 2, 16. Plaintiffs, the class, and subclass members, all seek to enjoin the unlawful acts and omissions of Defendants. Any differences in disabilities or the circumstances of their confinement among class and subclass members do not equate to a "substantial

33

conflict;" their interests in the relief sought here are aligned. *See*, *e.g.*, *Association for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 464 (S.D. Fla. 2002).

Plaintiffs are represented by counsel experienced in civil rights litigation, prisoner's rights litigation, and complex class action litigation who will fairly and adequately protect the interests of the class (and subclass). *See* Ex. 13 (Declaration of Andrea Costello). They have shown the experience, resources, and commitment needed to prosecute this case. *See id.*; *see also Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1307 (N.D. Fla. 2017). Plaintiffs' counsel are attorneys from three civil rights non-profit organizations dedicated to impact litigation and advocacy in the public interest for decades: Florida Legal Services (FLS), Southern Poverty Law Center (SPLC), and Florida Justice Institute (FJI). Ex. 13. No conflicts exist between counsel, Plaintiffs, and the proposed class members that would compromise their ability to represent the class. *Id.*

Since the Rule 23(g) requirements are met, undersigned counsel should be appointed as class counsel here. Fed. R. Civ. P. 23(g). Ex. 13. Undersigned counsel has investigated and litigated this matter for three years. *Id.* Counsel is well versed in constitutional and prisoners' rights law. *Id.* Counsel also has extensive experience in handling class actions, complex federal litigation, and has sufficient

resources to vigorously prosecute this case. *Id.* They have the resources necessary to represent the class. *Id.*

### 5.   Certification is Appropriate Under Rule 23(b)(2)

Plaintiffs meet the requirements of Rule 23(b)(2), which authorizes a class action where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *See Murray*, 244 F.3d at 810 (11th Cir. 2001) (affirming 23(b)(2) certification of all individuals with developmental disabilities in a Medicaid program, notwithstanding the need for individualized eligibility hearings); *see also Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) (noting Rule 23(b)(2) is "almost automatically satisfied in actions primarily seeking injunctive relief"). Whether a class is certified under Rule 23(b)(2) depends on whether, as here, class members seek uniform relief from a practice applicable to all members. *Hughes*, 2013 WL 1821077, at *25. "The key to [a] (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted-the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart*, 564 U.S. at 360.

As recognized by the Supreme Court, this case is a prime example of a civil rights action that Rule 23(b)(2) is intended for. *See Birchfield v. Armstrong*, Case

No. 4:15-cv-00615-RH/CAS, 2017 WL 1433032, at * (N.D. Fla. March 23, 2017) (citation omitted). Here, Defendants' statewide policy and practice applies to all class members (without exception) and subjects them to conditions in solitary confinement that, cumulatively, deprive them of basic human needs and exposes them to a substantial risk of serious harm to their future health and safety due to their continuing development. "Although a presently existing risk may ultimately result in different future harm for different inmates - ranging from no harm at all to death - every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide [] policy or practice that creates a substantial risk of serious harm." *Parsons*, 754 F.3d at 678 (citations omitted).

"Subsection (b)(2) was 'intended primarily to facilitate civil rights class actions, where the class representatives typically sought broad injunctive relief against discriminatory practices.'" *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1155 (11th Cir. 1983). The Supreme Court has affirmed this type of class wide relief designed to remedy a problem in prison conditions. *Brown v. Plata*, 563 U.S. 493 (2011).

There are no conflicting interests between Plaintiffs and members of the class or subclasses because they seek the same relief against Defendants' unconstitutional and discriminatory conduct. *See Henderson v. Thomas,* 289 F.R.D. 506, 512 (M.D. Ala. 2012) (certifying 23(b)(2) class where injunctive and

declaratory relief sought to enjoin discriminatory state prison system policy segregating all HIV-positive prisoners); *Hughes*, 2013 WL 1821077, at *24 (finding (b)(2) certification appropriate where juveniles seek injunctive relief to remedy unconstitutional conditions of confinement in jail). The Court should certify this action under Rule 23(b)(2).

## CONCLUSION

For the foregoing  reasons, the Court should grant Plaintiffs' Motion for Class Certification, enter an order certifying the proposed class and subclasses under Rule 23(b)(2), and appoint the undersigned as class counsel under Fed. R. Civ. P. 23(g).

## CERTIFICATE OF WORD LIMIT

Pursuant to N.D. Local Rule 7.1(F), the undersigned counsel hereby certify that this motion contains 8,000 words.

Dated: April 30, 2021                    Respectfully submitted,

By:   ____s/ Andrea Costello____
Andrea Costello
Fla. Bar No. 0532991
Christopher M. Jones
Fla. Bar No. 994642
Rachel Ortiz
Fla. Bar No. 0083842
Florida Legal Services
122 E. Colonial Drive, Suite 100
Orlando, FL 32801
Telephone: (407) 801-0332 (direct)
andrea@floridalegal.org

christopher@floridalegal.org
rachel.ortiz@floridalegal.org


Kelly Knapp
Fla. Bar No. 1011018
Leonard J. Laurenceau
Fla. Bar No. 106987
Southern Poverty Law Center
4770 Biscayne Blvd., Suite 760
Miami, FL 33137
Telephone: (786) 347-2056
kelly.knapp@splcenter.org
leo.laurenceau@splcenter.org

Dante P. Trevisani
Fla. Bar No. 72912
Laura A. Ferro
Fla. Bar No. 1015841
Sam Thypin-Bermeo
Fla. Bar No. 1019777
Marcel A. Lilavois, Jr.
Fla. Bar No. 1016175
Kara Wallis (pro hac vice)
Florida Justice Institute, Inc.
2915 Biscayne Blvd., Ste 300-21
Miami, FL 33137
Telephone: (305) 358-2081
dtrevisani@floridajusticeinstitute.org
lferro@floridajusticeinstitute.org
sthypin-bermeo@floridajusticeinstitute.org
Mlilavois@floridajusticeinstitute.org
kwallis@floridajusticeinstitute.org

**Attorneys for Plaintiffs**