# EXHIBIT 5

(filed under seal pursuant to ECF No. 36)

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

_____

G.H., *et al*.,

    Plaintiffs,

          Case No.: 4:19-cv-431-RH/MJF

v.

JOSEFINA TAMAYO, *et al*.,

    Defendants.
_____

## EXPERT DECLARATION OF LOUIS J. KRAUS, M.D. IN SUPPORT OF CLASS CERTIFICATION

I, Louis J. Kraus, M.D., declare under penalty of perjury:

1. This declaration is submitted in support of Plaintiffs' Motion for Class Certification. If called upon to testify, I could and would do so competently as follows.

## QUALIFICATIONS

2. I am currently Professor and Chief of Child and Adolescent Psychiatry at Rush University Medical Center in Chicago, Illinois. In that capacity, I supervise and train child and adolescent psychiatry fellows in various placements, including in-patient, residential treatment, and outpatient programs for children, adolescents, and young adults. I am also currently the Psychiatric Director at the

Sonia Shankman Orthogenic School, a residential treatment program for children and adolescents in need of support for profound emotional issues; the Founding Director of the Autism Assessment, Research, Treatment and Services Center at Rush University Medical Center; and the Medical Director of the Chicago Metropolitan Easter Seals Therapeutic School, a school providing a continuum of services for children with autism. I also have a private practice where I assess and treat children and adolescents and provide therapy and psychopharmacological services.

3.     I have worked with juveniles in correctional settings for the past 30 years, including for nine years from 1990 to 1999 as the treating psychiatrist at the Illinois Maximum Security Youth Center in Joliet, Illinois. From 2003 to 2004, I was a consultant to the Civil Rights Division of the United States Department of Justice on a Civil Rights of Institutionalized Person Act (CRIPA) investigation in Maryland. I also consulted with the American Civil Liberties Union of Illinois in a case challenging conditions in the Cook County Juvenile Temporary Detention Center which resulted in system-wide restructuring of mental health services for juveniles held in pre-trial detention. I have served as a consultant on various other correctional and juvenile justice matters. I more recently worked as an expert in Palm Beach County, New York, and in several cases in Seattle, Washington.

4.     I have been appointed to serve as monitor in consent decrees involving reform in juvenile justice systems in Arizona and Illinois, both of which included reform to the use of solitary confinement against juveniles in those systems. In my role in Illinois, which is currently ongoing, I am assessing and restructuring the mental health programming of the Illinois Department of Juvenile Justice. *See R.J. v. Bishop*, No. 1:12-cv-07289 (N.D. Ill.). In the Arizona case, I assisted the Department of Justice from 2005 to 2008 in restructuring the mental health, medical services, and dental services in two state facilities. *See United States v. Arizona*, No. 2:04-cv-01926-EHC (D. Ariz.).

5.     I have also been involved in special education consulting and development of Individualized Education Programs and Plans (IEPs) for the past twenty-six years. I am currently a consultant on special education issues to over fifteen school districts in Illinois. I typically complete one educational evaluation every week, assist with developing IEPs, and attend IEP meetings. I have testified regarding special education issues in due process hearings under the Individuals with Disabilities Education Act as well as in other civil cases.

6.     I have authored a number of publications on treatment of juveniles in correctional settings. I am the primary author of the American Academy Child and Adolescent Psychiatry's (AACAP) Policy Statement on Solitary Confinement.  I assisted in the completion of the American Psychological Association policy

statement on Solitary Confinement of Juveniles,[1] I co-edited two monographs on

juvenile justice reform for the AACAP, I co-edited a book through Cambridge

University Press entitled *The Mental Health Needs of Young Offenders*, and also

edited a book through the Child and Adolescent Psychiatric Clinics of North

America entitled *Adjudicated Youth*, published in January of 2016. I wrote the

Practice Parameter for Child and Adolescent Forensic Evaluations for child and

adolescent psychiatry, which was published in the Journal of Child and Adolescent

Psychiatry.

    7.    I have served in a number of professional appointments in my field.

From June 2014 to 2015, I served as the chair-elect of the American Medical

Association's Council on Science and Public Health, and from 2015 to 2016, I

served as chair. From May 2012 to May 2015, I was the chair of the American

Psychiatric Association's Council on Children, Adolescents and Their Families,

which I had served in for 18 years. From October 2000 to October 2015, I was the

chair of the AACAP's Juvenile Justice Reform Committee, and from 2011 to 2013,

I was chair of the AACAP Assembly.

    8.    I was on the Board of Directors of the National Commission of

Correctional Health Care (NCCHC) from 1997 to 2003. I was appointed chairman

---

[1] American Psychological Association, *Position Statement on Solitary Confinement (Restricted Housing) of Juveniles* (May 2018) https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Solitary-Confinement-Restricted-Housing-of-Juveniles.pdf (last visited April 27, 2021).

of the NCCHC Committee on Juvenile Health Care from 1999 to 2003, and served as vice-chairman of the same committee in 1998.

9.      I obtained my Doctor of Medicine degree, M.D., from the Chicago Medical School in 1987 and my Bachelor of Science degree, B.S., from Syracuse University in 1983.

10.      I have included a copy of my Curriculum Vitae attached to this Declaration which includes all publications that I have authored in the past ten years.

## INVOLVEMENT IN THIS CASE

11.      I was retained by the Southern Poverty Law Center, Florida Legal Services, and the Florida Justice Institute to perform professional services in *G.H., et al. v. Tamayo, et al.* (formerly Defendant Marstiller) as an expert in litigation challenging the Florida Department of Juvenile Justices' (DJJ) use of solitary confinement for juveniles under 21 years of age in DJJ's 21 state-operated secure juvenile detention facilities. Plaintiffs have specifically retained me to assess the risk of harm to juveniles from confinement in DJJ.

12.      My opinions in this declaration are partial and preliminary based on the information available to me at this time. Based on the materials and records that I have reviewed, the interview that I conducted, and the facility inspections I conducted, I am confident in the preliminary opinions that I have formulated about

DJJ's confinement conditions, practices, and policies. However, I anticipate that these opinions will be further developed and supplemented as more information becomes available.

13.     In preparing this declaration, I reviewed documents in this case, including but not limited to: the Complaint (ECF No. 2); the Court's Order Denying the Defendants' Motion to Dismiss and, Alternatively, for More Definite Statement (ECF No. 22); various DJJ's policies and procedures for secure detention (including administrative rules, facility operating procedures and handbooks about DJJ's use of confinement, medical and mental health treatment); DJJ annual reports; comprehensive data from DJJ for the time period from January 1, 2014, to December 31, 2020, about the confinement of juveniles in secure detention and a summary of the raw data; incident reports explaining instances where DJJ used confinement; portions of the institutional files (including the mental health records) for the named Plaintiffs and other children subject to confinement in DJJ secure detention; portions of the named Plaintiffs' medical and mental health records, and special education records. I also reviewed other documents from this case such as the declarations of R.L. and G.H. I also interviewed Plaintiff R.L.

14.     In addition, on January 26-28, 2021, I participated in inspections of the following secure detention facilities: Duval Regional Juvenile Detention Center

(Duval JDC); Alachua Regional Juvenile Detention Center (Alachua JDC); and,

Marion Regional Juvenile Detention Center (Marion JDC). During these

inspections, I walked through and reviewed the following areas of each facility: the

daily living areas for children (i.e., modules or mods); the cells where they sleep

where they are also subject to confinement; stand alone cells in facility hallways

that were designated as used only for confinement; where children shower or

change clothes; classrooms; the cafeteria where children in general population eat

together; the receiving and holding areas where children are admitted into secure

detention; the medical office/clinic; the mental health office; recreation areas; and

where children attend court remotely. Defendants would not permit me, or the

other expert in attendance during these inspections, to speak to or observe any

child at each facility. When I asked if I could observe children in a classroom, I

was told something to the effect of I could "take a quick peek" through a classroom

window while children were present, but I had to move along. Defendants would

also not permit me, or the other expert in attendance, to speak to staff.

15.     In forming my opinion below, I relied on my review of the

documents, observations of the facilities, and my interview with Plaintiff R.L.[2] I

also relied on my academic and clinical experience, as well as the extensive body

---

[2] It is my understanding the Plaintiffs' attorneys made substantial efforts to obtain
parental/guardian consent so that I could conduct additional interviews. However, the Florida Department
of Juvenile Justice required that any interview I did with a child in secure detention would be recorded
and attended by a representative of Defendants. I found these requirements to be barriers that I have not

of literature regarding the psychiatric effects of solitary confinement, cognitive and behavioral development in adolescents, and juveniles in correctional settings cited in this preliminary opinion.

16.     It is my understanding that as the litigation moves forward, I will be reviewing additional documents and information regarding mental health treatment and the use of confinement in secure detention, attending additional facility inspections, and interviewing other youth who were subject to confinement. I will be providing additional services and opinions in this case based on those documents and information.

## OPINIONS AND BASES OF OPINIONS

I.     <u>The Substantial Risk of Serious Harm to Juveniles From Solitary Confinement</u>

17.     Although the term "solitary confinement" does not appear in DJJ's policies, the policy and practice of "behavioral confinement" used by DJJ constitutes "solitary confinement" as the term is commonly used by professional organizations in the field. The National Commission on Correctional Health Care defines solitary confinement as "the housing of an adult or juvenile with minimal

---

encountered in other similar litigation involving children and, as to the video recording, something that I could not agree to because it would inhibit and interfere with children's willingness to speak freely and divulge sensitive information while the entity that was incarcerating them was listening.

to rare meaningful contact with other individuals."[3] The American Academy of Child and Adolescent Psychiatry defines solitary confinement as a form of discipline or punishment that places an incarcerated individual "in a locked room or cell with minimal or no contact with people other than staff of the correctional facility."[4] DJJ's policy and practice of behavioral confinement isolates children alone, often repeatedly, in a locked cell for undetermined and extended periods of time, with little to no meaningful contact with anyone but DJJ secure detention staff primarily through the cell door. This policy and practice is solitary confinement.

18.    Solitary confinement can be dangerous for anyone, but juveniles as a group are particularly vulnerable to a risk of significant psychological effects from solitary confinement.[5] Juveniles are still developing socially, psychologically, and neurologically which makes them especially susceptible to psychological harm when they are isolated from other people. Research suggests that removing them from their regular routines, school, mental health treatment, and opportunities for interaction with peers can result in long-term lack of trust, hypervigilance, and

---

[3] Nat'l Comm'n on Corr. Health Care, *Solitary Confinement (Isolation)*, (Apr. 2016), https://www.ncchc.org/filebin/Positions/Solitary-Confinement-Isolation.pdf (last visited April 22, 2021).
[4] American Academy of Child & Adolescent Psychiatry, *Solitary Confinement of Juvenile Offenders*, (April 2012), https://www.aacap.org/aacap/policy_statements/2012/solitary_confinement_of_juvenile_offenders.aspx (last visited April 22, 2021).
[5] Andrew Clark, Juvenile Solitary Confinement as a Form of Child Abuse, The Journal of the American Academy of Psychiatry and the Law, 45 (3) 350-357 (2017).

paranoia.[6] There is no research to show that the negative impact of the developing

brain is any different in 17 year olds as compared to 18, 19, or 20 year olds.[7]

Rather, research supports that the brain continues to develop until the age of 25.[8]

19.     Solitary confinement negatively impacts juveniles by perpetuating,

worsening, or precipitating mental health concerns, including but not limited to

post-traumatic stress disorders, psychosis, anxiety disorders, major depression,

hypervigilance, agitation, general lack of trust, suicidal ideation, suicidal intent,

self-mutilation, and suicidal behavior.[9] Solitary confinement has a high likelihood

of bringing on acute symptomatology, even if the symptomatology is not already

present in the individual. For the estimated 60 percent[10] of youth in correctional

settings who already have this symptomatology, the incidence of presenting it

again after solitary confinement is much higher. Research demonstrates that almost

half of youth who committed suicide in juvenile facilities were in isolation at the

time of their death and more than 60% percent of young people who committed

---

[6] Jay N. Giedd, et al., Brain development during childhood and adolescence: a longitudinal MRI study, 2 Nature Neuroscience 861, 861-63 (1999).

[7] *Id.*

[8] American Psychological Association, Brain research advances help elucidate teen behavior, July/August 2004, available at https://www.apa.org/monitor/julaug04/brain (last visited April 29, 2021).

[9] *See supra* at note 2; and Karen M. Abram, Linda A. Teplin, et al., Posttraumatic Stress Disorder and Trauma in Youth in Juvenile Detention, 61 Archives Gen. Psychiatry 403, 403-10 (2004)

[10] Linda A. Teplin, et al., Psychiatric Disorders in Youth in Juvenile Detention, 59 Archives Gen. Psychiatry 1133, 1133-43 (2002).

suicide in detention while in confinement had a history of being held in isolation.[11]

Of the children placed in solitary confinement in secure detention centers, 40% of

suicides occurred within the first 72 hours.[12]

20.     These mental health concerns can cause long-term harm. Solitary

confinement can lead to chronic conditions like depression which, in teenagers, can

manifest as anger or as self-harm. Children who experience depression and anxiety

are at a higher risk of presenting with these diagnoses again  after their release

from solitary confinement.[13] In addition, the damage from solitary confinement

associated with low self-esteem, vegetative features, and hopelessness associated

with depression can be similarly long-standing. Depression in the general

population is generally associated with a standard 10-15% mortality rate for

suicide, and solitary confinement increases the risk of depression and suicide

substantially compared to the general population.[14]

21.     Solitary confinement of juveniles can also lead to long-term trust

issues with adults, including paranoia, anger, and hatred directed at others.[15] This

makes it difficult to create a trusting, therapeutic relationship and can lead to

---

[11] Lindsay Hayes, *Juvenile Suicide in Confinement, A National Survey, Office of Juvenile Justice Delinquency and Prevention*, (2009), at vii., https://www.ncjrs.gov/pdffiles1/ojjdp/213691.pdf  (last visited April 22, 2021).

[12] *Id.*

[13] Stuart Grassian,
Psychopathological Effects of Solitary Confinement, 140 AM. J. PSYCHIATRY 1450 (1983), available at https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=1362&context=law_journal_law_policy (last visited April 29, 2021).

[14] *See supra* at n. 11 and 13.

[15] *See supra* at n. 3.

noncompliance with treatment in the future, making it hard for people to get the help that they need to address the mental health concerns resulting from solitary confinement.

22.     Medical research on adolescent brains explains why juveniles are more vulnerable to the risk of long-term harm from solitary confinement. In the adolescent and young adult brain, the connections between the frontal lobe and the mid-brain have not fully developed.[16] The mid-brain, which is the part of the brain responsible for the flight-or-fight response, is firing away. If an adolescent is traumatized in certain ways, it can cause permanent changes in brain development and create a higher risk of developing permanent psychiatric symptoms like paranoia and anxiety.[17] This trauma in the developing brain can likely lead to changes in brain structure for these juveniles.[18] Trauma, such as what is induced by solitary confinement, has a high likelihood of causing these permanent changes.[19]

23.     Juveniles in detention are vulnerable to a risk of serious harm from solitary confinement for the additional reason that they are more likely than the general population to have diagnosed mental illness, learning disabilities, and a

---

[16] Jay N. Giedd, et al., Quantitative magnetic resonance imaging of human brain development: ages 4-18, 6 Cerebral cortex 551, 551-59 (1996); Jay N. Giedd, et al., Brain development during childhood and adolescence: a longitudinal MRI study, 2 Nature Neuroscience 861, 861-63 (1999).

[17] Child Welfare Information Gateway, Understanding the Effects of Maltreatment on Brain Development (2015), available at https://www.childwelfare.gov/pubs/issue-briefs/brain-development/ (last accessed April 29, 2021).

[18] *Id.*

[19] Nat'l Comm'n on Corr. Health Care, *Solitary Confinement (Isolation)*, supra note 2.

high incidence of trauma.[20] Research shows that over 60 percent of youth in correctional settings have an underlying major mental illness.[21] Females are identified as having an even higher incidence of mental illness and are at increased risk for victimization.[22]

24.     There is a clear medical consensus that for those juveniles with mental illness, the risk of serious harm from solitary confinement is especially great.[23] People with mental illnesses already have deficits in their brain structure or biochemistry. They already have weakened defensive mechanisms, making them less resilient than the general population. They are at a higher risk for mental health symptoms and are more susceptible to the significant trauma of social isolation. The trauma of social isolation that can occur for those with mental illnesses will be even more significant and long-lasting than for those without a mental illness.[24]

25.     In my experience, juveniles placed in solitary confinement also exhibit fear and anxiety, which may lead to increased levels of hopelessness,

---

[20] Linda A. Teplin, et al., *Psychiatric Disorders in Youth in Juvenile Detention*, 59 ARCHIVES GEN. PSYCHIATRY 1133, 1133-43 (2002); Karen M. Abram, Linda A. Teplin, et al., Posttraumatic Stress Disorder and Trauma in Youth in Juvenile Detention, 61 Archives Gen. Psychiatry 403, 403-10 (2004).

[21] Linda A. Teplin, et al., Psychiatric Disorders in Youth in Juvenile Detention, 59 Archives Gen. Psychiatry 1133, 1133-43 (2002).

[22] *Id.*

[23] American Psychological Association, *Position Statement on Solitary Confinement (Restricted Housing) of Juveniles* (May 2018) https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Solitary-Confinement-Restricted-Housing-of-Juveniles.pdf (last visited April 27, 2021).

[24] *Id.*

13

paranoia, and lack of trust in others resulting from the arbitrary nature of the use of solitary confinement as a punishment in detention. This sets up an anxiety and fear provoking situation even when the juveniles are not in solitary confinement, as they are unable to anticipate which behaviors will result in them being put in solitary confinement again. Furthermore, the open-ended solitary confinement experienced by many of the juveniles in detention exacerbates these mental health conditions as they can perceive they are subjected to seemingly endless amounts of time in isolation. Children experience time differently – a day to a child feels longer than a day to an adult – and have a greater need for social stimulation.[25]

26.    For these reasons, a number of health, medical, corrections, and professional organizations have condemned solitary confinement of children recognizing that they are particularly vulnerable to the adverse psychiatric consequences of such confinement. The American Academy of Child and Adolescent Psychiatry opposes the use of solitary confinement for juveniles in correctional facilities, recognizing the damaging impacts from solitary confinement relevant to adolescents' developmental vulnerabilities and that the majority of suicides in juvenile correctional facilities occur when the individual is isolated or in solitary confinement.[26] The National Commission on Correctional Health Care,

---

[25] *See* supra at n. 3.
[26] *See* "Solitary Confinement of Juvenile Offenders," American Academy of Child & Adolescent Psychiatry,
https://www.aacap.org/aacap/policy_statements/2012/solitary_confinement_of_juvenile_offenders.aspx#:

a major accrediting agency, takes the position that juveniles should be excluded from solitary confinement.[27] The American Medical Association has called for correctional facilities to halt the isolation of juveniles in solitary confinement for disciplinary purposes.[28] The American Psychiatric Association has supported this position statement.[29] The United Nations Rules for the Protection of Juveniles Deprived of their Liberty specifically prohibit the solitary confinement of juvenile offenders.[30] The American Psychological Association position is that solitary confinement of juveniles should be avoided.[31] The World Health Organization has recognized that the United Nations and other international treaties call for a complete ban on solitary confinement for juveniles and young people, noting the particular vulnerabilities of children, who are developing physically, mentally and

---

~:text=Solitary%20confinement%20is%20defined%20as,form%20of%20discipline%20or%20punishment.&text=They%20specifically%20prohibit%20the%20solitary%20confinement%20of%20juvenile%20offenders (last visited April 23, 2021).

[27] *See* supra at n. 3.

[28] *See* "Solitary Confinement of Juveniles in Legal Custody H-60.922," American Medical Association, https://policysearch.ama-assn.org/policyfinder/detail/solitary%20confinement?uri=%2FAMADoc%2FHOD.xml-0-5016.xml (last visited April 23, 2021).

[29] *See* "Position Statement on Solitary Confinement (Restricted Housing) of Juveniles," American Psychiatric Association, file:///home/chronos/u-0a4b003765fe23434ebd84fc104138f709349f80/MyFiles/Downloads/Position-2018-Solitary-Confinement-Restricted-Housing-of-Juveniles.pdf (last visited April 3, 2021).

[30] *See* U.N. Convention on the Rights of the Child, opened for signature Nov. 20, 1989, 1577 U.N.T.S. 3 (entered into force Sept. 2, 1990) ("CRC"); U.N. Guidelines for the Prevention of Juvenile Delinquency, G.A. Res. 45/112, Annex, 45 U.N. GAOR Supp. (No. 49A), U.N. Doc. A/45/49, at 201 (Dec. 14, 1990) ("The Riyadh Guidelines"); U.N. Rules for the Protection of Juveniles Deprived of their Liberty, G.A. Res. 45/113, Annex, 45 U.N. GAOR Supp. (No. 49A), U.N. Doc. A/45/49, ¶ 67 (Dec. 14, 1990) ("The Beijing Rules").

[31] *See* "Position Statement on Solitary Confinement (Restricted Housing) of Juveniles," American Psychiatric Association, available at: https://www.psychiatry.org/home/policy-finder?k=adolescent (last visited April2 3, 2021).

socially, and the high rates of mental illness and suicide among young people.[32]
The Council of Juvenile Correctional Administrators opposes the use of solitary
confinement for juveniles based on research that shows that placing detained youth
in isolation has "negative public safety consequences, does not reduce violence and
likely increases recidivism" and can cause permanent psychological damage and is
highly correlated with suicide.[33] In 2016, the United States Department of Justice
ended the practice of using solitary confinement for juveniles in all federal prisons
because of the growing consensus of the risk of harm for children.[34]

II    The Use of Solitary Confinement by the Florida Department of Juvenile
      Justice in Secure Detention Centers

      27.    Through policy and practice, the Florida Department of Juvenile
Justice subjects juveniles under age 21 to solitary confinement (called
"confinement" or "behavioral confinement" by DJJ), Defendants' use of solitary
confinement, including the conditions in confinement, exposes children in their
care to a risk of harm because of their continuing emotional, psychological, and
physiological development. This is a statewide policy that is authorized by

---

[32] *See* "Prisons and Health," The World Health Organization, Ch. 5 (S. Enggist, L. Moller, G. Galea, C. Udesen, eds., 2014), http://www.euro.who.int/__data/assets/pdf_file/0005/249188/Prisons-and-Health.pdf?ua=1 (last visited April 3, 2021).

[33] Council of Juvenile Correctional Administrators, *Toolkit: Reducing the Use of Isolation*, March 2015, http://dcfs.nv.gov/uploadedFiles/dcfsnvgov/content/Programs/JJS/CJCA%20Toolkit%20Reducing%20the%20use%20of%20Isolation.pdf (last visited April 24, 2021).

[34] *Report of the Attorney General's Task Force on Children Exposed to Violence*, at 178 (Dec. 12, 2012), https://www.justice.gov/defendingchildhood/cev-rpt-full.pdf (last visited April 24, 2021).

administrative rule and facility operating procedures.[35] DJJ uses confinement at all of its 21 secure detention facilities. As explained below, there are several aspects of DJJ's isolation policies and practices that, in totality, cause this risk of harm.

28.     DJJ risks trauma to children in DJJ by locking them small, barren cells. DJJ isolates children in solitary confinement in cells that are approximately seven by five feet. At some facilities, DJJ uses designated confinement cells. These designated confinement cells were still in use at the Duval JDC when I visited, but I was informed that the Marion JDC stopped using their confinement cells at some point recently. The detention centers that I inspected appeared to be old buildings that were in various states of disrepair, including non-functioning plumbing. Based on my observations during the facility inspections, all the cells where children are isolated in confinement had the same appearance. These were small cells with concrete walls, a toilet and sink, a concrete slab, and overhead lights. The cells had a metal door that locks from the outside. Often, I saw graffiti on the inside of the cell door and on the walls. The facilities that I inspected smelled like they were very recently painted, but the confinement cells were often dirty and smelled like human waste. In several cells I saw, there was toilet paper stuck to the ceiling. In general, the appearance of the cells was similar to jails and adult prisons that I have

---

[35] *See* Fla. Admin Code R. 63G-2.002(3)(a), available at http://www.djj.state.fl.us/docs/rules/63g-2.pdf?sfvrsn=2 (last visited April 26, 2021); see also FOP 3.03, available at http://www.djj.state.fl.us/docs/services/3-03-behavioral-confinementBA5F729F02A3.doc?sfvrsn=10 (last visited April 26, 2021).

been in that are stark with nothing on the walls. The cell doors had a small window which was often obscured by writing or scratches and difficult to see out of. There was very little, if any, natural light coming into these cells. Some of the cells had a black square that was meant to work like a chalkboard and some children had written on these. I did not consistently see chalk nor were there any writing utensils like a pencil or pen in the confinement cells. I find that having a child write on a chalkboard while alone in a locked cell for hours or days does not address the risk of harm from social and environmental isolation.

29.     Under DJJ policy and practice, children in solitary confinement are socially isolated and lack environmental stimulation. The only time that DJJ allows children in confinement out of their cells is to take a shower for a few minutes after the other children have finished.  DJJ does not permit these children to go to recreation. DJJ policy requires children subject to confinement to eat their three daily meals in their cells. This deprives them of normal socialization and human contact that occurs when children eat together in the facility cafeteria.

30.     DJJ solitary confinement policy and practice also deprives children in isolation of normal human contact. Named Plaintiffs R.L. and G.H. reported that while they were in confinement, ███████████████████████████ ███████. Under DJJ written policy, staff is supposed to check on the children at routine intervals, but the named Plaintiffs report that ██████████████████

18

███████████████████████████████████████████████████

██████████████████████████████████. ██████████████

██████████████████████████████████████████████. Based on

my review of information from this case, that type of behavior can result in

punishment of additional time in confinement. DJJ policy prohibits children in

confinement from attending school. The named Plaintiffs R.L. and G.H. report

████████████████████████████████████████████ This is a

problem for all children, but even more devastating for those who are required by

federal law to receive special education, including through an Individualized

Education Plan (IEP).

     31.     DJJ's solitary confinement policy does not require a mental health

evaluation or comprehensive medical examination prior to placing a child in

confinement. *See* Fla. Admin. R. 63G-2.022(3). Under DJJ policy, children who

are isolated in solitary confinement can receive some type of mental health visit "as

soon as reasonably possible" after they are in confinement beyond 24-hours. *See*

Fla. Admin. R. 63G-2.022(3)(d)(4)(a). The named Plaintiffs described ████

█████████████████████████████████████████████████

██████████████████████████ In my opinion, these "drive-by" visits are

insufficient to properly assess the child's mental health status, including to

evaluate the risk of harm to these children, especially given the prevalence of

mental health conditions and prior traumas for children in secure detention.

Detention security staff is not required to review the child's medical or mental

health history with a qualified provider prior to placing a child in confinement.

Further, it appears from DJJ policy that staff does not evaluate whether a rule

violation or behavior was a product of the juvenile's psychiatric disability or other

disability before placing the child in confinement.

32.     The confinement data about the juveniles subjected to solitary

confinement in DJJ secure detention indicates that .[36] There are also many alarming written reports from

DJJ's Central Communications Center where

.

There is no policy prohibiting DJJ from subjecting these children to solitary

confinement again even after these serious incidents or excluding these children

from isolation.

33.     Although DJJ's written policy says that behavioral confinement is

only used when a child's behavior "imminently and substantially threatens the

physical safety of others or compromises security," I reviewed information

---

[36]     *See* The Florida Department of Juvenile Justice and Juvenile Justice and Delinquency
Prevention State Advisory Group, 2019 State of Florida Three-Year Plan, at 20,
http://www.djj.state.fl.us/docs/bc-landing-page/2019-state-3-year-plan.pdf?sfvrsn=0 (last visited April 19,
2021).

showing children were placed in isolation ████████████████████████████████

████████████ [37] For example, ████████████████████████████████████████

████████████████████████ The confinement data, incident reports, and

confinement reports that I reviewed show that DJJ puts children in solitary

confinement for these reasons.

34.     In addition, a high percentage of children with mental disorders in DJJ

secure detention and, under Defendants' policy, these children will be subject to

solitary confinement. From my review of the information in this case, DJJ policy

does not require a mental health assessment or any assessment by a qualified

professional if a child's behavior is related to their disability before they are placed

in solitary confinement. In my opinion, these failures mean that DJJ policy does

not account for behaviors that are common among children with psychiatric

disorders, for example, impulsivity, inability or difficulty following rules and

directives, erratic behavior, responding inappropriately to conflict, and emotional

outbursts in reaction to stress and trauma. It results in Defendants isolating these

children in solitary confinement because of their disabilities, rather than providing

mental health interventions or further behavior interventions to keep these children

out of isolation.

---

[37] See Fla. Admin Code R. 63G-2.002(3)(a), available at http://www.djj.state.fl.us/docs/rules/63g-2.pdf?sfvrsn=2 (last accessed April 26, 2021); see also FOP 3.03, available at http://www.djj.state.fl.us/docs/services/3-03-behavioral-confinementBA5F729F02A3.doc?sfvrsn=10 (last visited April 26, 2021).

35.    In practice, DJJ uses confinement repeatedly and cumulatively. as shown in a summary of the confinement data from January 1, 2014, to December 31, 2020:

| Year | Number of Children | Number of Times Confinement Used |
|---|---|---|
| ██ | ██ | ██ |
| ██ | ██ | ██ |
| ██ | ██ | ██ |
| ██ | ██ | ██ |
| ██ | ██ | ██ |
| ██ | ██ | ██ |
| ██ | ██ | ██ |

Under DJJ's current written policy, as amended in November 2020, for each incident, DJJ is authorized to isolate children in confinement up to 48 hours. Before the November 2020 change, DJJ's written policy authorized the use of confinement for up to 72 hours per instance. However, DJJ's policy and practice allows the repeated confinement of a child with no limit, often the same child, thereby increasing the cumulative time that children spend in solitary confinement beyond the time limits stated in DJJ written policy. As reflected in the data analysis filed with Plaintiffs' Motion for Class Certification, ████████████

████████████████████████████████████████████████

████    From my interviews and record reviews, Plaintiffs R.L., G.H. and B.W. were

22

[REDACTED]

[REDACTED].

36.     The lack of any firm upper limit on a child's time in solitary confinement in secure detention results in increases in a child's anxiety, fear, and mistrust because these children have no way of predicting when or why they will be isolated in confinement. This uncertainty, and the resulting feelings, exacerbates the mental health conditions that children experience in solitary confinement is part of what can cause the onset of the harmful effects of solitary confinement for children, even where a child may not have a pre-existing mental health diagnosis.

37.     Based on my experience, scientific research, review of the documentation, and the declarations and interviews of named Plaintiffs R.L. and G.H., the [REDACTED]

[REDACTED]

[REDACTED] The experiences of named Plaintiffs G.H. and R.L. in solitary confinement are typical of the harm that occurs when children are subject to solitary confinement.

38.     It is my opinion, within a reasonable degree of medical certainty, that all juveniles in secure detention who are subject to the Defendants' policy and practice of solitary confinement, as described above, are at a substantial risk of

serious harm to their social, psychological, and emotional development. This risk of harm is common across the system based on DJJ's statewide policy and practice.

39.     Based on my 26 years of academic and professional experience, experience serving as a federal monitor of correctional facilities in Illinois and Arizona, and my review of the evidence provided thus far in this case, it is also my opinion that the use of solitary confinement in the Florida Department of Juvenile Justice is not an effective behavior management tool or behavior intervention. Research shows that solitary confinement does not impact adolescent behavior in a positive way. DJJ's use of solitary confinement at such a high rate shows a focus on punishment, rather than systems and techniques that foster a positive developmental model. To promote such a model, DJJ should have a system that focuses on helping children through education, mental health treatment, and rehabilitative services to foster children's development. From my review, it appears that DJJ is minimizing mental health concerns, including by subjecting a high percentage of children with mental illness to solitary confinement.

40.     The problems described above are systemic in nature and require systemic solutions. Defendants' secure detention system is highly centralized and governed by uniform policies. In my experience as a court appointed monitor and expert in other class action lawsuits challenging the use of solitary confinement in juvenile detention systems, efforts that are driven by courts which are directed at

administrators who oversee the entire system can bring about the needed changes

to provide relief to the class as a whole, by reducing the risk of harm faced by all

juveniles in secure detention.

Under 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing

Declaration is true and correct.

Executed on the ___30___ day of _____April_____, 2021

Louis J. Kraus, M.D.

25

## LOUIS JAMES KRAUS, M.D., DFAPA, FAACAP

Woman's Board Professor of Child and Adolescent Psychiatry
Chief, Section of Child and Adolescent Psychiatry
Rush University Medical Center

910 Skokie Boulevard, Suite 230
Northbrook, IL 60062
Office Telephone: (847) 559-0560
Cell: (847) 217-7755
Email: rkraus9@mac.com

**PERSONAL DATA:**

Louis James Kraus, MD
DOB:  12-3-1960 USA

**EDUCATION:**

| | |
|---|---|
| 1987 | M.D., University of Health Sciences, The Chicago Medical School |
| 1983 | B.S., Syracuse University |

**POSTGRADUATE TRAINING:**

| | |
|---|---|
| 7/1/92-6/30/94 | Child and Adolescent Psychiatry Fellow, The University of Chicago, Chicago, Illinois |
| 10/1/88-6/30/92 | Psychiatry Resident, Northwestern University, Chicago, Illinois |
| 7/1/91-12/31/91 | Chief Resident, Psychiatry, Northwestern University, Chicago, Illinois |
| 7/1/87-6/30/88 | Surgical Intern, Boston University, Boston, Massachusetts |

**ACADEMIC APPOINTMENTS:**

| | |
|---|---|
| July 2016 – Present | Professor of Clinical Psychiatry, Rush University Medical Center |
| July 2003 – June 2016 | Associate Professor of Clinical Psychiatry, Rush University Medical Center |
| March 2001 – 2002 | Visiting Associate Professor of Psychiatry, University of Illinois at Chicago |
| July 2001 – 2002 | Assistant Professor of Psychiatry, Northwestern University |
| November 1997 – July 2001 | Clinical Instructor, Dept. of Psychiatry, Northwestern University |
| July 1994 – August 1997 | Assistant Professor, Department of Psychiatry, University of Chicago |

1

July 1994 – August 1997          Director of Child and Adolescent Forensic Psychiatry, University of Chicago

**BOARD CERTIFICATION:**

May, 2015                        Maintenance of Certification in Child and Adolescent Psychiatry, by The American Board of Psychiatry and Neurology, Certification No. 3956

June, 1999                       Board Certified in Forensic Psychiatry, by the American Board of Psychiatry and Neurology, Certification No. 1079

October, 1995                    Board certified in Child and Adolescent Psychiatry, by The American Board of Psychiatry and Neurology, Certification No. 3956

December, 1993                   Board certified in General Psychiatry, by The American Board of Psychiatry and Neurology, Certification No. 38252

**LICENSE:**

State of Illinois     No. 036-079584     Expires: 07/31/2020
State of Florida      No. ME 83084       Expires: 01/31/2021
State of Arizona      No. 33456          Expires: 04/03/2021

**HONORS AND AWARDS:**

- 2020 Agnes Purcell McGavin Award for Distinguished Career Achievement in Child and Adolescent Psychiatry from the American Psychiatric Association (APA) and APA Foundation.
- Child and Adolescent Psychiatry, Award: "Scholarship and Perseverance in the Creation of our Practice Parameter for Child and Adolescent Forensic Evaluations", 58th Annual Meeting, Toronto, Canada, October 2011.
- Fellow, American Academy of Child and Adolescent Psychiatry (2006)
- Distinguished Fellow, American Psychiatric Association (2004)
- Woman's Board Professor of Child and Adolescent Psychiatry, Rush University Medical Center (2004)
- AMA Glaxo Welcome Emerging Leaders Development Program (1998)
- Top Doctor – 1997 - 2001
- Resident Fellowship of The American Psychoanalytic Association (1992)
- Laughlin Fellow, Northwestern University (1991)
- Magna Cum Laude, Syracuse University
- Phi Beta Kappa Honor Society
- Honors Program in Biology, Syracuse University

**PROFESSIONAL SOCIETY MEMBERSHIPS**

American Medical Association
American Academy of Child and Adolescent Psychiatry
American Academy of Psychiatry and the Law
American Psychiatric Association

Illinois State Medical Society
Illinois Council of Child and Adolescent Psychiatry
Illinois Psychiatric Association
Chicago Medical Society

**TEACHING EXPERIENCE:**

| | |
|---|---|
| May 2008 – Present | American Psychiatric Association Mentor for psychiatric residents through the Council on Children, Adolescents and Their Families |
| July 2006 – Present | Supervise Rush child and adolescent psychiatry fellows at the Sonia Shankman Orthogenic School (a residential school) |
| July 2002 – Present | Supervise general residents and child and adolescent fellows at Rush University Medical Center |
| July 2002 – Present | Developed forensic rotation at Rush University Medical Center for child and adolescent fellows allowing them to observe forensic evaluations in court, and the Cook County Juvenile Pre-Detention Facility |
| July 2002 – Present | Develop school consult didactics as well as didactics dealing with Autism; Supervise Rush University Medical Center's child and adolescent fellows in their school Autism rotation at the Chicago Metropolitan Easter Seals Therapeutic Day Schools |
| July 2002 - Present | Develop and teach the child and adolescent forensic psychiatry course for child and adolescent psychiatry fellows at University of Illinois at Chicago and Rush University Medical Center |
| July 2002 - Present | Teach and supervise medical students in clinical rotations through child and adolescent psychiatry at Rush University Medical Center |
| March 2001 – July 2002 | Supervise and lecture residents at University of Illinois |
| August 1997 – March 2001 | Teaching and lecturing to general psychiatry residents at Northwestern University |
| August 1997 – March 2001 | Supervise child and adolescent psychiatry residents and general psychiatry residents at Northwestern University |
| August 1994 – 1997 | Provide child and adolescent forensic psychiatry course offered to residents and fellows at the University of Chicago |

| August 1993 – 1997 | Supervise child and adolescent psychiatry fellows, psychiatry residents and psychology trainees at the University of Chicago |
| July 1991- July 1992 | Supervise psychiatry residents at Northwestern University |

**ELECTED POSITIONS:**

| June 2008 – Present | Chair, AACAP Delegation to AMA House of Delegates |
| July 2015 – June 2016 | Chair, AMA Council on Science and Public Health |
| July 2014 – June 2015 | Chair Elect, AMA Council on Science and Public Health |
| 2011 – 2013 | Chair, AACAP Assembly |
| 2011 – 2013 | AACAP Executive Committee |
| July 2008 – June 2016 | AMA Council on Science and Public Health |
| 2009 – 2011 | Vice-Chair, AACAP Assembly |
| 2007 – 2009 | AACAP Assembly Treasurer |
| 2007 – 2013 | AACAP Council |
| 2002 – 2004 | AACAP Assembly Representative to the Executive Committee |

**REVIEWER:**

Guest Reviewer – Journal of The American Academy of Child and Adolescent Psychiatry
Panelists –AMA Organized Medical Staff on Science and Public Health June 6, 2018
 Guest

**TRAINEES AND MENTOREES:**

| 2005 – Present | Ongoing Mentoring for AACAP and APA Mentor Programs |
| 2005 – 2007 (Jada Johnson, MD) | Chair, Psychiatry, Illinois Masonic Hospital |
| 2002 – 2004 (Shiraz Butt, MD) | Medical Director, Maryville Academy |
| 1998 – 2000 (Lucyna Puszkarska, MD) | Medical Director, River Edge Hospital |

**PROFESSIONAL SOCIETY APPOINTMENTS**

| May 2015 – Present | American Psychiatric Foundation (APF BOD), Board of Directors |
| 2014 – Present | CMS District 1, Delegate to 2014 Illinois House of Delegates |
| May 2012 – Present | Chair – Council on Children, Adolescents and Their Families, American Psychiatric Association |
| May 2012 – May 2014 | Chicago Medical Society, District 1 Councilor |
| May 2012 – May 2013 | Chicago Medical Society District 1, Alternate Delegate to Illinois 2013 House of Delegates |
| November 2010 – June 2011 | APA Task Force on Prevention of Bullying. |
| 2009 – Present | APA Political Action Committee (PAC) Board |

4

| | |
|---|---|
| October 2009 – Present | AACAP Committee on Juvenile Justice Reform |
| April 2008 – 2009 | Member APA Council on Children, Adolescents and Their Families. |
| 2008 – Present | AACAP Delegate to AMA House of Delegates |
| May 2007 – Present | Member – Council on Children, Adolescents and Their Families, American Psychiatric Association |
| September 2001 – Present | Co-chairman of the AACAP committee on Juvenile Justice Reform. |
| May 2001 – 2010 | Chairman of the American Psychiatric Association Committee on Juvenile Justice Issues |
| December 2000 – 2007 | AACAP Alternate Delegate to the AMA House of Delegates 2007 |
| June 2000 – June 2002 | President, Illinois Council of Child & Adolescent Psychiatry |
| December 1999 – December 2000 | AACAP Delegate for Young Physicians to the AMA |
| November 1999 – 2001 | Evanston Northwestern Healthcare Child Protection Committee |
| September 1999 – March 2001 | Member, Evanston Mental Health Board, Substance Abuse Task Force |
| June 1999 – 2001 | Member, AMA Advisory Board on Alcohol Intervention Project for Youth |
| January 1999 – January 2003 | Chairman, National Commission on Correctional Health Care, Committee on Juvenile Health Care |
| 1998- 2010 | Member of the American Psychiatric Association Committee on Juvenile Justice Issues |
| October 1998 – Present | Delegate, for The Illinois Council of Child and Adolescent Psychiatry to American Academy of Child and Adolescent Psychiatry (AACAP) |
| September 1998 – 2000 | Clinical Advisor, Chicago Metropolitan Child and Adolescent Comprehensive Community Services Systems Network Advisory Council |
| April 1998 – December 1998 | Vice Chairman, National Commission on Correctional Health Care, Committee on Juvenile Health Care |
| April 1998 – December 1998 | Vice Chairman, National Commission on Correctional Health Care, Task Force for Revision of the NCCHC Standards for Health Services in Juvenile Detention and Confinement Facilities |
| June 1997 – January 1999 | Chairperson of AACAP Committee for New Physicians |

| | |
|---|---|
| June 1997 – January 2003 | Board of Directors, National Commission on Correctional Health Care |
| January 1997 – July 2000 | Program Chairman, Illinois Council for Child and Adolescent Psychiatry |
| July 1995 – July 1996 | Program Chairman for Chicago Society for Adolescent Psychiatry |
| September 1994 – October 1999 | AACAP Committee on Foster and Adoptive Families |
| March 1994 – December 1996 | AACAP Alternate Delegate for Young Physicians to the AMA |

**<u>CONSULTING POSITIONS</u>**

| | |
|---|---|
| January 2013-Present | Federal Consent Decree appointment, Assessment and restructuring of the mental health programming for the Illinois Department of Juvenile Justice (IDJJ) under a Consent Decree filed with the Attorney General's Office by the American Civil Liberties Union (ACLU) of Illinois in December 2012 (RJ v. Bishop) |
| February 2006 – Present | Consultant to the ACLU |
| May 2003 – 2008 | Consultant, United States Department of Juvenile Justice, Civil Rights Division |
| March 2001 – June 2002 | Director, Child and Adolescent Forensic Psychiatry, University of Illinois at Chicago |
| 1993 – Present | Forensic testimony in Juvenile Court (abuse/neglect & delinquency), Family Court focusing on custody and expert testimony in other state and federal cases. Previously worked as an Expert for the Cook County Public Guardian's Office and DCFS. |
| September 1992-1993 | Psychiatrist Chairperson of the Physician Review Board for the City of Chicago, Department of Mental Health – 1992 |
| 1992 – Present | Expert testimony in juvenile and domestic relations courts in a variety of cases ranging from transfer hearings, abuse including Munchausen by Proxy, Child Advocacy Focusing on Custody and "Best Interest" of the Child |
| April 1990 – June 1990 | Psychiatric Consultant to Illinois Youth Center, Joliet, Illinois; General Population and the Intensive Reintegration Unit |
| January 1990 – 1992 | City of Chicago, South East Community Mental Health Center |

**ADMINISTRATIVE SERVICES:**

| | |
|---|---|
| 2011 - Present | Development of the Autism Assessment, Research, Treatment and Services (AARTS) Center at Rush University Medical Center |
| 2006 – Present | Director of the Sonia Shankman Orthogenic School and Rush University Medical Center's clinical rotation for child and adolescent psychiatry fellows at Rush |
| 2006 – Present | Director of Psychiatric Services, Sonia Shankman Orthogenic School |
| 2002 – Present | Chief of Child and Adolescent Psychiatry, Rush University Medical Center |
| 1999 – Present | Medical Director of the Chicago Metropolitan Easter Seals Therapeutic Schools |

**CLINICAL SERVICE:**

| | |
|---|---|
| 2012 - Present | Director, Autism Assessment, Research, Treatment and Services Center at Rush University Medical Center |
| July 2005 – Present | Psychiatric Director Sonia Shankman Orthogenic School at Chicago |
| June 2005 – Present | Psychiatric Consultant to New Trier, Niles North and Niles West High Schools |
| February 2000 – June 2001 | Director, Child and Adolescent and Forensic Psychiatry, University of Illinois at Chicago |
| January 1999 – present | Medical Director, Chicago Metropolitan Easter Seals Therapeutic School |
| September 1998 – Present | Psychiatric Consultant to Evanston Township High School |
| August 1997 – February 2000 | Division Head of Child/Adolescent Psychiatry, Evanston Northwestern Healthcare |
| May 1997 – June 1999 | Psychiatric Consultant to Youth Campus (A DCFS contracting agency) |
| September 1992 – May 1993 | Psychiatrist Chairperson of the Physician Review Board for the City of Chicago, Department of Mental Health – 1992 |
| July 1994 – August 1997 | Assistant Director of Child and Adolescent Inpatient Services, University of Chicago |

**MEDIA**

1. October 26, 1994, Chicago Sun Times, TV-Violence Line Elusive.
2. November 6, 1994, Chicago Tribune, "Mental health tests for kids spark debate;" Screening: Testing

would help parents, supporters say.

3. November 19, 1994, Chicago Tribune, Try Sandifer suspect as kid, experts say.  Louis Kraus testified, "Derrick Hardaway suffers from a *conduct disorder* that developed in his early adolescence because of family tensions, physical abuse and other problems."

4. February 25, 1997, Chicago Tribune, Leniency sought for teen convicted of killing Sandifer.

5. March 13, 1997, Chicago Tribune, Return girl slowly to mom, psychiatrist say.

6. March 30, 1997, Chicago Tribune, Student-Teacher contact is becoming a danger zone. Kraus was quoted to say, "The students are drawn into the relationship because they idolize their teacher and often don't see anything wrong until much later. At that point they might feel depressed and used and have trouble forming relationships."

7. March 25, 1998, Chicago Tribune, 4 pupils, teacher die in schoolyard ambush.

8. March 25, 1998, Chicago Sun Times, Kids ambush kids; Shooting stuns school.

9. March 29, 1998, Violence is linked to genetics, early abuses that set patterns

10. April 6, 1998, Chicago Tribune, Teen smokers a pack short of a carton in wisdom department.

11. June 3, 1998, Toronto, Canada, American Psychiatric Association, The Daily Bulletin, Presidential Sessions on "A Time of Violence."

12. June 1998, Chicago Parenting, "Keeping rage from turning into tragedy."

13. August 14, 1998, Chicago Sun Times, Making Sense of kids' case.

14. August 14, 1998, Chicago Tribune, Young suspects sent home. Dr. Kraus testament was paramount in the 7-year-old being allowed to go home with his family.

15. Possley, M. and Puente, T., "Young Suspects Sent Home", Chicago Tribune, August 14, 1998

16. Kotlowitz, A., "The Unprotected", The New Yorker. February 8, 1999

17. March 7, 1999, Chicago Tribune, Aftermath an ordeal for parents, kids.

18. November 11, 1999, Northwest Herald, Boy who shot clerk sentenced.

19. February 23, 2000, Tribune Allied Health, Safety nets for teens.

20. April 9, 2000, Chicago Tribute, School provides unique antidote for depression.

21. January 30, 2001, Chicago Tribune, Files in Ryan Harris case shed new light. Disclosure of the results of the psychiatric interview changed interview process of minors.

22. December 7, 2001, Psychiatric News, AACAP Kraus was quoted "We certainly disagree with the Supreme Court ruling and believe the death penalty constitutes cruel and unusual punishment."

23. July 9, 2002, Psychiatric News, AMA Vows to Prevent Future Psychologist Prescribing Laws.

24. April 4, 2003, Study Questions Youths' Ability to Understand Trial Process, *Study Implications.*

25. July 18, 2003, Psychiatric News, Psychiatrist Wins AMA Leadership Post: *Psychiatry Scores in HOD.* Kraus argued successfully in favor of an amendment to a resolution asking that the AMA support comprehensive health education for female delinquent, including information on responsible sexual behavior and the prevention of sexually transmitted diseases and HIV/AIDS." Kraus also testified, "Medicaid reaches 44 million Americans, more than Medicare or any other form of health insurance and covers Americans who are among the poorest and most disadvantaged populations in the country."

26. February 13, 2004, Chicago, Metro North Shore, Abuse of cold medicine rising.

27. Tresniowski, A.  Hewitt, B., "Escape from Hell", People Magazine. September 25, 2006

28. Reuters, "Experts say video games not an addiction in AMA Meeting", June 25, 2007

29. Neergaard, L. "Easy nondrug helps ADHD Kids", USA Today. September 3, 2007

30. Tanner, L. "Shock Treatment Sought for Autistic Man", USA Today. September 3, 2007

31. Reuters, "Antidepressant warnings scared parents, doctors", September 9, 2007

32. Fox News, "Study: Brains of ADHD Children Develop More Slowly than Brains of other Youngsters", November 13, 2007

33. Bynum, R., Stobbe, M., "Experts Dubious of Ga. 3rd- Grader Plot", Associated Press. April 2, 2008

34. October 31, 2008, The Wall Street Journal, Therapy, Antidepressants Ease Anxiety in Children.
35. Tanner, L., "Kids with ADHD on meds test better than peers", Associated Press. April 27, 2009
36. Tanner, L., "Jackson kids face hurdles coping with his death, universal trauma of losing a parent may be eased if stability can be offered", Associated Press. July 5, 2009
37. Fox News, "Psychiatrists say Blagojevich's choice to have daughters join him at court may be stressful", July 7, 2010
38. FOX – Judge Jeanine, "8-year Old Boy's Commitment to a Psychiatric Ward", February 19, 2011
39. CNN, Anderson Cooper 360, "KTH: Mass. School called 'house of horrors', May 24, 2012,
40. Fox News Chicago, "Beauty may no longer be in the eye of the beholder", May 10, 2012
41. CNN, Anderson Cooper 360, "Anderson Cooper Investigates Shocking RTC Treatment", June 4, 2012
42. Moran, M. "More research needed on SSRI's for treating Autism Disorders", Psychiatric News. Volume 47, Number 11. June 11, 2012
43. CNN, Anderson Cooper 360, "Crime and Punishment, The Sandusky Trial", June 12, 2012
44. NBC News Chicago, "How to Talk to Your Kids about Conn. Shooting", December 14, 2012
45. Niedowski, E., Tanner, L. "How to Talk to Your Kids about Conn. Shooting", Associated Press. December 15, 2012
46. CNN, Anderson Cooper 360, "Former Child Hostage Describes Captivity Underground", February 4, 2013
47. Fox News Chicago, "Violence has long term effects on children", August 12, 2013
48. England, C. "Helping young adults make the transition", Chicago Medicine Magazine, September 2013
49. Schmadeke, S., "State's youth prison system violates inmates' rights, experts say", Chicago Tribune. September 25, 2013
50. NBC News, "Black Box warning on antidepressants raised suicide attempt", July 18, 2014
51. FOX News, "How far should we go to discipline our kids", September 2014
52. FOX News, "Could a self-esteem booster turn your child into a narcissist?", March 2015
53. Al Jazeera America, "US Only Nation to Imprison Kids for Life," March 2015
54. US Today, "Doctor:  Impact-separating-families tragic June 19, 2018
55. Fox News,  "Medical experts warn that separating children from parents causes psychological damage June 20, 2018
56. March 20, 2019, Chicago Tribune, "Local autism community cheers Amy Schumer's loving disclosure that her husband has a form of autism". Kraus was quoted stating "To have someone like Amy Schumer come out and talk about this is really amazing. I think it will be wonderful for people (with autism) and perhaps generate interest in the dating population about autism"
57. AP News, "Linked by pain: 2 school massacre survivors, dad kill selves", March 25, 2019


**SCIENTIFIC ACTIVITIES**
*a)  Grants*:

| | |
|---|---|
| 2011-Present | Effects of memantine vs. placebo on motor planning and memory in children with autism spectrum disorders. $74,176 |
| 2010 | Rush Women's Board, Assessment of prevalence of Bipolar Disorder in adolescent population in a residential placement, $30,000 |
| April, 1999 | Department of Human Service, State of Illinois Grant – Bridges Program for Development of School and Home-based Therapeutic Services for Adolescents, $100,000 per year |
| March, 1998 | Evanston Northwestern Healthcare Auxiliary Grant for Development of a Community-based Adolescent Mental Health and Substance Abuse |

Program, $1,000,000

**b)  *Research***

| | |
|---|---|
| 2011 – Present | Development of Research Program at the Rush AARTS Center |
| 1984 - 1986 | Research under direction of Max Harry Weil, Ph.D., Chairman, Department of Medicine, University of Health Sciences, The Chicago Medical School, on the reversal of academia during cardiopulmonary resuscitation |
| 1999 – 2001 | Outcomes research focusing on adolescent dual diagnosis; early diagnosis and intervention in a community based treatment program. |

**c)  *Poster Presentations***

Grunewald, S., Kraus, L., Youngkin, S., Wade, K. H., Forburger, N., Owley, T., Loftin, R., Fogg, L. & Soorya, L. (May 2014). *Access to care: Familial and racial variables associated with limited service access for individuals with ASD.* Poster presented at 2014 Annual International Meeting for Autism Research (IMFAR). Atlanta, GA.

Poster Presentation:  APA Meeting, Washington, DC "Monitoring Resident Supervision in Times of Change," May 1992.


**SCHOLARSHIP**

**a)  *Books and Chapters***

1. Thomas, C.R., Kraus, L.J. "Public Policy Implications of Research on Aggression and Antisocial Behavior", The Origins of Antisocial Behavior.  Oxford University Press, 2012.
2. Galatzer-Levy, R., Kraus, L., Galatzer-Levy, J., The Scientific Basis of Child Custody Decisions. **Cambridge Press**, 2009.
3. Kessler, C., Kraus, L, The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007.
4. Geraghty, R., Kraus, L, Fink, P, "Assessing children's competence to stand trial and to waive Miranda rights: new directions for legal and medical decision-making in juvenile courts" in The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007,
5. Kraus L, Sobel, H, "Post-adjudicatory assessment of youth" in The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007.
6. Galatzer-Levy, R., Kraus, L.J., eds, The Scientific Study of Child Custody Decisions, **Wiley Press,** 1999.
7. Kraus, L, "Understanding the Relationship between Children and Caregivers" in The Scientific Basis of Child Custody Decisions, **Wiley Press**, Ed. Galatzer-Levy R. and Kraus, L 1999.
8. Leventhal, B. Kelman, J., Galatzer-Levy, R., Kraus, L., "Divorce, Custody, and Visitation in Mid-Childhood" in The Scientific Basis of Child Custody Decisions, **Wiley Press,** Ed. Galatzer-Levy R. and Kraus, L 1999.
9. Kraus, L.J., Trivedi, H.K. "Adjudicated Youth: Child and Adolescent Psychiatric Clinics of North America" in Clinics Review Articles Volume 25. **Elsevier,** 2016.


**b)  *Peer Reviewed Publications***

1. 1988 Practice Parameter for "Child and Adolescent Forensic Evaluations", Kraus, L, JAACAP, Vol 50,

No.12, Dec. 2011 pp1299-1312.

2. Geraghty, T.F., Kraus, L, "Treating the Mentally-Ill Offender: The Challenge of Creating an Effective, Safe and Just System," **The Journal of Criminal Law and Criminology**, Northwestern University School of Law 89 (1) Fall, 1998.

3. von Planta, M., Gluldipati, R., Weil, M.H., Kraus, L.J., Rackow, E., "Bicarbonate and Tromethamine (Tham) Buffers Fail to Improve Resuscitability During Porcine C.P.R.," **Federation Proceedings 46** (4), 1145, 1987

4. von Planta, M, Gudipati, R., Weil, M.H., Kraus, L.J., Rackow, E., "Effects of Tromethamine and Sodium Bicarbonate Buffers During Cardiac Resuscitation," **Journal of Clinical Pharmacology 28,** 594-599, 1987

*c) Other Publications*

1. Kraus, L., Arroyo, W. "Recommendations for Juvenile Justice Reform, Second Edition", American Academy of Child and Adolescent Psychiatry Committee on Juvenile Justice Reform. October 2005.

2. Kraus, L, Arroyo, W. Editors, "Recommendations for Juvenile Justice Reform", **Monograph**, October 2001, American Academy Child and Adolescent Psychiatry.

3. Kraus, L. "Standards for Juvenile Detention and Confinement Facilities", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.

4. Kraus, L. "Females in the Juvenile Justice System", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.

5. Kraus, L, Morris R. "Seclusion and Restraint Standards in Juvenile Corrections", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.

6. Kraus, L, "Tackling Juvenile Justice," **AACAP News**, Volume 31, Issue 2, March/April 2000, pp. 75-76.

**PRESENTATIONS:**

American Psychiatric Association, "*Mentally-Healthy Schools in Times of a Pandemic*" Speaker - Wednesday, August 19th, 2020.

Community SAFETY/ & The Future of Illinois' Youth Prisons.  Children and Family Justice Center, "Harm Instead of Healing: Imprisoning Youth with Mental Illness", March 2020.

American Psychiatric Association, "Children & Adolescents In Juvenile Detention", October 7, 2018
Harvard University Conference, "Behind Bars: Health and Human Rights in U.S. Prisons" November 28, 2017
AACAP 64th Annual Meeting, Washington, DC October 23-28, 2017
Keynote Speaker, Eugene J-M.A. Thonar, PhD, Award Presentation, Rush University Medical Center, October 14, 2014

Grand Rounds, Rush University Medical Center, "Psychiatric Malpractice: Dos and Don'ts." May 21, 2014

**Chair**, AACAP Douglas B. Hansen, MD 39th Annual Review Course in Child and Adolescent Psychiatry, *Child and Adolescent Forensic Psychiatry*, Westin Chicago River North, Chicago, IL, March 22-23, 2014.

Autism, Behavioral Challenges and Complex Medical Needs (ABC) Conference, "Making Systems Work Across the Lifespan for Children with Special Needs," *Treatment and Advocacy for the Autistic Teen as they Transition into Adulthood*, Kraus, LJ, Palos Hills, IL November 22, 2013.

Illinois State Board of Education, Kraus, LJ, **Keynote Speaker**, "The Complexity of Diagnosis and Behavior of Students Placed Residentially."  November 7, 2013.

Illinois State Board of Education, Kraus, LJ, "Juvenile Justice, Social Maladjustment and Associated Mental Health Disorder: How do we educate this difficult population and what do we do when they get out?" November 7, 2013.

7th Congress of Asian Society for Child and Adolescent Psychiatry & Allied Professions and 12th Biennial Conference of Indian Association for Child and Adolescent Mental Health; Kraus, LJ., **Chair,** "Cyberage and Child Mental Health." September 26, 2013, New Delhi, India.

12th Biennial Conference of Indian Association for Child and Adolescent Mental Health; Kraus, LJ., **Chair**, "Role in the Changing Landscape of Child and Adolescent Psychiatry and Mental Health," September 25, 2013, New Delhi, India.

12th Biennial Conference of Indian Association for Child and Adolescent Mental Health, Kraus, LJ., "DSM-V: Implications for Child and Adolescent Psychiatry," September 25, 2013, New Delhi, India.

Illinois Institute for Continuing Legal Education, IIT Chicago-Kent College of Law, "Cutting Edge Child Custody Symposium", *Professional Training and Requirements*, June 21, 2013.

Illinois Institute for Continuing Legal Education, IIT Chicago-Kent College of Law, "Cutting Edge Child Custody Symposium," *Point and Counterpoint: Adoption of Custody Evaluation Standards*, June 21, 2013.

American Psychiatric Association (APA) Annual Meeting Workshop; "A Career in Child and Adolescent Psychiatry: From a Developmental Perspective." San Francisco, CA May 22, 2013.

Office of Juvenile Justice and Delinquency Prevention in Collaboration with the National Center for Youth in Custody "The Impact of Isolation Practices in Confinement Facilities," National Webinar, April 3, 2013.

19th Judicial Circuit Child Representative/Guardian ad Litem Training, "Psychology of Child Development and Age Appropriate Visitation." College of Lake County, Grayslake, Illinois, September 12, 2012.

Abraxas Education Forums; "The Role of Child and Adolescent Psychiatry in Public and Private Special Education." Woodridge, IL March 30, 2012.

Learning Disabilities Association of America, 49th International Conference, "Dissecting a Bully: Interventions for the Bullied." February 22-25, 2012, Chicago, IL.

APA Annual Meeting, "Wayward Youth Revisited", May 17, 2011, Honolulu, Hawaii.

APA Annual Meeting, "Teen Bullying", May 17, 2011, Honolulu, Hawaii.

ISBA Chicago Regional Meeting (Effective Advocacy for Juveniles with Mental Health Needs) "Diagnosis and Treatment of Mental Health in the Juvenile Justice System", May 11, 2011.

American Academy of Child and Adolescent Psychiatry (AACAP) 57th Annual Meeting, "Variations in State Decisions on Custody" October 29, 2010, NY, NY.

AACAP 57th Annual Meeting, "Role of the Expert in Child & Adolescent Psychiatry Malpractice" October 29, 2010, NY, NY.

AACAP 57th Annual Meeting, "Advocacy for Children with Autism: How to Find the Right Services" October 29, 2010, NY, NY.

ISBA Family Law Section, Springfield, IL. "Custody Evaluations When Children Have Major Psychiatric Disorders", October15, 2010.

ISBA Family Law Section, Chicago, IL. "Custody Evaluations When Children Have Major Psychiatric Disorders", September 23, 2010.

DePaul University College of Law, "Juvenile Competency to Stand Trial and Understand Miranda", April 11, 2009.

Illinois State Bar Association (ISBA) and the Committee on Continuing Legal Education, Attorney Education in Child Custody and Visitation Matters, "Factoring a Child's Development into Custody and Visitation" November 21, 2008.

AACAP Members Forum, Practice Parameter for Child and Adolescent Forensic Evaluations, October 31, 2008.

55th Annual AACAP Meeting Chicago, "The Role of the Child Psychiatrist in Juvenile Competency" October 30, 2008.

Rush University Medical Center, Department of Pediatrics Grand Rounds, "Perspectives on Delinquency, Past and Present", August 12, 2008.

American Medical Association (AMA), "How has science impacted juvenile justice regarding competency, waiver hearings, adjudications, dispositions, and treatment (psychopharmacology)". Annual Meeting, Washington DC, July 2008.

Spring Midwest American Academy of Psychiatry and the Law (AAPL) Meeting, Chicago, IL, "Juvenile Competency to Stand Trial and Understand Miranda," Louis J. Kraus, MD, April 21, 2007.

National APA Meeting in San Diego, "Workshop on Juvenile Justice Presentation on Child Competency to Stand Trial and Understand Miranda. May 2007.

53rd Annual American Academy of Child & Adolescent Psychiatry, San Diego, CA, "The Psychiatrist's Role in Child Custody: A Mock Hearing," Louis J. Kraus, MD, October 28, 2006.

Rush University Medical Center, Department of Psychiatry Grand Rounds, "Capital Punishment for Teenagers – The Recent Supreme Court Decision Roper v Simmons: Discussion and Forensic Application of Current Neuroimaging Research on Teenagers ", April 20, 2005.

Cambridge Hospital, Department of Psychiatry Grand Rounds, "Juvenile Delinquency", September 2004

AACAP National Meeting, San Francisco – Symposium – "Addressing the Needs of Behavior Disordered Children Within the School System", San Francisco, CA, October 25, 2002.

University of Chicago – Workshop "Early Onset Bipolar Disorder", December 14, 2001.

Juvenile Justice Reform – Media Workshop, National AACAP meeting, Honolulu, Hawaii, October 2001.

Hephzibah Children's Association – Workshop "Child and Adolescent Psychiatric Diagnoses and Medications" September 28, 2001

A&E Television Broadcast on "Shattered Innocence - Fells Acres Abuse Case", August 8, 2001

15th Annual Statewide Forensic Conference, October 16-17, 2000 Loyola University Chicago, Illinois Department of Human Services

Speaking engagements at parent groups, managed care meetings, University of Chicago, the Department of Corrections and Probation

Media interviews on television, radio and in newspapers and various publications.

American Psychiatric Association – "Littleton – One Year Later, The Assessment of the Potentially Violent Child Within The School System," May 15, 2000.

Institute of Psychoanalysis, Conference on Youth and Violence, "Diagnosis and Treatment of Delinquents in a Maximum Security Youth Center," May 12, 2000

Evanston Northwestern Healthcare – Pediatric Grand Rounds, "Connections Program – Development of a Community-Based Adolescent Alcohol and Drug Treatment Program," May 2, 2000.

Evanston Northwestern Healthcare – Pediatric Grand Rounds, "ADHD, Differential Diagnosis and Treatment" April 4, 2000.

New Trier High School – Peer Helping, "Adolescent Youth Violence," March 2, 2000.

Response Center, Skokie, IL, "Adolescent School Violence," February 16, 2000.

Chicago Bar Association Matrimonial Law Committee, "Physical, Mental and Emotional Abuse in Custody Cases," February 14, 2000.

Cook County Public Guardian's Office, "Domestic Violence and How It Affects Children," January 31, 2000.

Illinois Psychological Association, "Assessment of Violence in Children and Adolescents, November 11, 1999.

New Trier Township, "School Violence - Treatment and Community Intervention," May 12, 1999.
Shand Morahan Worksite Lunch Program, "Signs of ADD/ADHD and Possible Treatment," April 21, 1999.

Evanston Northwestern Healthcare Health Watch Program, "Childhood Attention Deficit Disorder: Treatment Options," April 7, 1999.

Evanston Northwestern Healthcare, Department of Psychiatry, Professional Conferences, "School Violence," April 6, 1999.

The Warren Wright Adolescent Center, Stone Institute of Psychiatry, Northwestern Memorial Hospital, "Violence in Schools," November 6, 1998.

Institute for Women's Health, Evanston Northwestern Healthcare "Helping Kids Cope with Divorce," October 1998.

Illinois Society of Child and Adolescent Psychiatry, "Juvenile Transfer Hearings – The Psychiatric Evaluation," October 1998.

APA Meeting, Toronto, Ontario, Canada, "Treatment of Severe Delinquents in a Maximum Security Youth Center," June 1998.

Evanston Northwestern Healthcare Pediatric Lecture Series, "The Continuum of Behavior Disorders," April 1998.

Evanston Northwestern Healthcare Department of Psychiatry, Professional Conferences, "Transfer Hearings in Juvenile Court: Evaluation of Behavior Disordered Youth," January 1998.

Evanston Northwestern Healthcare Department of Psychiatry, Professional Conferences, "The Use of Attachment Theory in Custody Evaluations," January 1998.

Juvenile Justice Division of the Circuit Court of Cook County, "Psychiatric Assessments in Juvenile Justice Cases," June 1997.

Chicago Bar Association-Juvenile Law Committee, "Utilizing Psychiatric Evaluations In Juvenile Justice Cases: Transfer And Dispositional Hearings," February 1997.

Genesis Schools/Illinois Association of Counsel for Children, "Helping Incarcerated Youth Overcome Delinquency and Mental Illness," December 1996.

University of Chicago, Laboratory School Lower School Parents Association Lecture Series, "Is My Child's Behavior Normal?" November 1995.

CAUSES - Illinois Masonic Hospital, "Attachment Theory In The Use Of Bonding Evaluations," September 1995.

Illinois Probation and Court Services 1995 Annual Spring Conference, "Kids Killing Kids," March 1995.

Grand Rounds: Columbus Hospital Department of Pediatrics.  "Delinquency, Etiology and Intervention," July 1994.

Cook County Juvenile Court, Office of the Public Guardian.  "Munchausen By Proxy," July 1994.

Columbus Hospital, Department of Pediatrics Grand Rounds, "Delinquency, Risk Factors, and Interventions," July 1994.

International Correctional Education Association Conference, Chicago " Attention Deficit Hyperactivity Disorder," May 1993.

The American Psychoanalytic Association National Conference, New York, "Attachment Theory - Forensic Implications for Best Interest of the Child," December 1993.

Poster Presentation:  APA Meeting, Washington, DC "Monitoring Resident Supervision in Times of Change," May 1992.

The University of Health Sciences, The Chicago Medical School, "Effects of Tham and NaHCO3 on Acid Base Balance During CPR," 1984.

Presentation: Lake County Bar Association Seminar, "Preparing a Client for a 604.10 Evaluation and/or Mediation," April 23, 2021.