**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

G.H., et al.,

     Plaintiffs,

v.                                             CASE NO.: 4:19-cv-00431-RLF-MJF

JOSEFINA TAMAYO, in her official
capacity as Acting Secretary of the Florida
Department of Juvenile Justice, et al.,

     Defendants.

_____/

<u>**DEFENDANTS' RESPONSE IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**
**WITH INCORPORATED MEMORANDUM OF LAW**</u>

     Defendants, Josefina Tamayo, in her official capacity as Acting Secretary of the Florida Department of Juvenile Justice, and Florida Department of Juvenile Justice, (together, "DJJ"), by and through their undersigned counsel, respond in opposition to Plaintiffs' Motion for Class Certification (Doc. 111).

## I.    INTRODUCTION

     Throughout this case, Plaintiffs have been somewhat elusive in disclosing the relief they seek.  For example, their Complaint vaguely asks the Court to enjoin DJJ from "continuing unlawful acts" and to order

Defendants to develop a "plan" to eliminate the "risk of serious harm." (Doc. 2 p. 58.)  But the class representatives testified that what they really want from this case is a complete elimination of behavioral confinement. That desire is made plain by the evidence submitted with Plaintiffs' motion (Doc. 111), or more importantly, by the evidence absent from it.

Plaintiffs attempt to make the case that the very nature of *any* form of confinement is cruel and unusual punishment.  Their argument is that 1) confinement means a deprivation of social interaction; 2) social interaction is a basic human need; and 3) therefore, confinement is unconstitutional because it deprives one of a basic human need.   At its core, this argument asserts that confinement is unconstitutional "per se."

Contrary to Plaintiffs' argument, confinement is constitutional and no court has declared otherwise.  Courts do look at *how* confinement is being applied and whether it rises to the level of cruel and unusual punishment – perhaps through deplorable conditions that deprive someone of "basic human needs" or through some prolonged duration of confinement not done for legitimate security reasons.  Here, however, Plaintiffs provide no evidence of any unconstitutional use of confinement on the part of Defendants.  There is no evidence of repeated or widespread deplorable conditions of confinement.  Instead, Plaintiffs merely rely on evidence of

how often confinement was used, as if the more often this constitutional practice is done, the less constitutional it becomes.  The Court could only be persuaded by this evidence if it were to disregard binding precedent and find that confinement is intrinsically cruel and unusual and the manner by which it is applied is irrelevant.

In addition to the lack of evidentiary support described above, the motion suffers from several other fatal defects.  There can be no commonality or typicality in a practice involving individual decisions dependent on local discretion and containing tremendously wide dissimilarities.  And Plaintiffs' position would require the Court's involvement in something best left to state officials tasked with setting policy and managing agency operations.

Defendants will demonstrate to the Court that certification of a class in this case would be inappropriate and wholly unmanageable.   Since the principal failure is a lack of proof, to assist the Court in its analysis, Defendants will begin with a summary of the proof offered by both parties.

## II.    EVIDENCE BEFORE THE COURT

### A.    EVIDENCE OFFERED BY PLAINTIFFS

The evidence offered by the remaining active Plaintiffs, G.H. and R.L., on the subject of confinement consists primarily of three things.  First,

Plaintiffs provide the number of times youth have been placed in confinement at DJJ over the years.  (Doc. 111 p. 6.)  Such evidence fails to provide the Court with any idea of the number of times a youth was improperly, much less unconstitutionally, placed in confinement.

Second, Plaintiffs provide a declaration from their lawyer, Rachel Ortiz.  Out of over 3,500 incident reports, Ms. Ortiz attaches 21 reports where youth were purportedly confined to their room after so-called "minor" infractions such as not following orders to return from recreation, disrupting class or court, or creating a "paint ball" from paint peeled off the wall.  It appears none of the confinements exceeded 24 hours, except for one just over 27 hours, including sleeping time.  (Ortiz Aff. ¶¶ 4-5).  This evidence provides no details as to what Ms. Ortiz considers "minor" and whether those might support a legitimate penological interest.   Nor does the evidence provide the Court with a complete picture of the event, leaving the Court to speculate as to any potential constitutional violations and to guess whether or not the uses of behavioral confinement had penological justification.

Third, Plaintiff relies on the affidavit of Dr. Louis Kraus, who provides information on the developing minds of juveniles and their unique vulnerability to confinement.  But Dr. Kraus fails to provide any evidence as

to whether any juvenile, even one of the class representatives, might have suffered harm from their stint in DJJ confinement.  Instead he speaks in broad terms of the dangers of *any* confinement, relying on commentaries and position statements rather than empirical studies.  (Kraus Aff. ¶¶ 18-26.)  Dr. Kraus concludes that all juveniles subject to confinement are at a risk of harm but does not identify a single one who was harmed by confinement at DJJ.  (Kraus Aff. ¶ 38.)  Plaintiffs similarly have been unable to identify a single individual diagnosed by a healthcare professional as having suffered serious harm from behavioral confinement at a DJJ detention center.  (Plaintiffs' 2nd Amd. Resp. to DJJ's Second Interrog., #37A.)

## B.    EVIDENCE OFFERED BY DEFENDANTS

Rather than offering evidence in the abstract, Defendants supply evidence of confinement as it is administered by DJJ.  Defendants' policies on confinement have evolved over the years into what is now a leading model for the limited use of confinement.   (Fosler Aff. #1 "Regarding Detention Services" ¶¶ 4-5, 13-16.)  Dixie Fosler is the Assistant Secretary for Detention at DJJ, and she ascended to her position after years working in and supervising detention centers.  (*Id*. at 1-3.)  She describes in her affidavit how DJJ has changed its policies on confinement to one in which

confinements are now strictly limited.  (*Id*. at 13-16.)  Now, no youth can be placed in behavioral confinement without supervisor authorization.  (Fosler Aff. #1 ¶ 16.)  The supervisor must conduct periodic personal evaluations of the youth, and all confinements are limited to 24 hours unless there is a further review and authorization from a Regional Director.  (*Id.*)   A representative sampling done by Dr. Meghan Ogle of DJJ over a whole year's time found that the average time in confinement was less than 11 hours.  (Ogle Aff. ¶¶ 4-5.) To further decrease the use of confinement, DJJ has developed a Behavior Management System to encourage youth to attain and keep certain levels of privilege by complying with center rules and maintaining good behavior.  (Fosler Aff. #1 ¶ 21-24.)   DJJ collects an enormous amount of data regarding confinement that it analyzes to improve services to youth.  (*Id*. at 18.)   Detention Services consistently pursues new programs and initiatives to help staff serve the youth better. (*Id*. at 4-5, 18-27.)

Another representative from DJJ, Joy Bennink, is the Acting Director of Mental Health and Substance Abuse Services.  (Bennink Aff. ¶¶ 1-7.) In her declaration, Ms. Bennink describes how each youth is screened for mental health issues and provided counselling as needed.  (*Id*. at 9-12.) Any youth experiencing a mental health episode can be readily treated, and

all facilities have a licensed mental health counselor on site every day and a child psychiatrist on site weekly.  (Bennink Aff. ¶ 8; Fosler Aff. #1 ¶ 17) Importantly, contrary to the implication raised by Dr. Kraus, there has not been a suicide in a DJJ confinement room in over 20 years, and all staff at all levels take suicide precautions extremely seriously.  (Bennink Aff. ¶¶ 13-19.).

Insight into daily life at the detention centers is provided through photographs and videos.  (Fosler Aff. #1 ¶ 24, attached photographs.) Plaintiffs took hundreds of photographs during their three facility inspections but provide only photographs of toilets and doors.  Defendants, however, supply photographic evidence of their efforts to provide a positive, bright, and aesthetically pleasing environment. (*Id*.)    But, it must be remembered that these are detention centers, and the youth population has grown more dangerous in recent years.  (*Id*. at 11-12.)

Defendants provide two disturbing videos of recent fights: one from May 10, 2021, in the cafeteria at Volusia, and another from February 10, 2021, in a classroom at Palm Beach.  (Fosler Aff. #2 ¶¶ 4-9.)  Ms. Fosler attaches the related incident report and one of the confinement reports for each incident.  (Fosler Aff. #2 ¶¶ 3-9.)  When viewing these videos, the Court should be mindful of the juvenile detention officers whose task is to

keep all youth safe from violence and how difficult that might be if confinement were eliminated.  Each video shows how youth often ambush one another with violent punches, with officers doing their best to keep everyone safe.  Officers themselves are often the ones who get hurt, and one video shows an officer getting her head stomped by a youth before going into convulsions.   The current laws now limit secure detention to those who pose a higher risk to public safety, and this means that for the facility to remain orderly, there must be the locked doors of which Dr. Kraus complains.   Florida law has determined that the agency cannot use chemical weapons.  (Fosler Aff. #1 ¶ 6.)  The officers can only use hands-on techniques to try to separate the juveniles during a fight.  (*Id.* at 10.) Behavioral confinement is a critical tool officers use to try to maintain control when these situations happen.  (*Id.* at 6.)

Lastly, Defendants submit expert testimony from Richard Hough, PhD, Joseph Penn, M.D., and Ryan Labrecque, PhD.

Dr. Richard Hough is an expert in the management of detention and correctional facilities.  (Hough Aff. ¶¶ 2-5, 10.)  His affidavit attests that the policies and practices of DJJ meet or exceed all prevailing standards. (Hough Aff. ¶¶ 6-10.)  Confinement is vital to the security of a correctional system, and the manner in which DJJ implements confinement meets all

prevailing standards.  (Hough Aff. ¶¶ 4-7, 10.)  Dr. Hough sheds light on the practice of advocacy groups seeking changes in confinement by a reliance on position statements and commentary and then advertising them as authoritative studies.  (Hough Aff. ¶¶ 7-10.)  Finally, Dr. Hough describes how each decision to place someone in confinement is based on an officer's unique perspective of the situation, which is not susceptible to broad generalizations.  (Hough Aff. ¶ 10.)

Dr. Joseph Penn is a psychiatrist with years of experience treating juveniles and adults and administering mental health care programs in detention and corrections settings.  (Penn Decl. pp. 1-9.)  After reviewing the mental health records ███████████, Dr. Penn attests that it is not possible to opine that DJJ's use of behavioral confinement caused any harm █████, nor is there evidence that it causes serious harm in general. (*Id*. at. 10-16)  Each juvenile has a unique mental health picture which is not capable of broad generalities as Plaintiffs seek here.  (*Id.*)  The articles relied upon by Dr. Kraus are non peer-reviewed think pieces, and it is unreasonable to compare the isolation used in adult supermax facilities to what is essentially a "time out" as used at DJJ.  (Penn Decl. pp. 10-11.) DJJ uses appropriate mental health safeguards.  (*Id.* at 16-17.)   DJJ's physical facilities comport with those typically found nationwide.  (*Id.*)

Dr. Ryan Labrecque is a professor at the University of Central Florida who has devoted his career to the study of correctional agencies, including their use of confinement.  (Labrecque Aff. ¶¶ 3-7.)  Dr. Labrecque explains the difference between commentary and scientific analysis.  (*Id*. at 8-10, 13-24.)   There have been very few scientific studies on the effects of confinement.  (*Id*. at 11-12.)   No scientific studies have ever been done on juveniles and none for the use of short term confinement such as is done at DJJ.   (*Id*. at 25.) Dr. Labrecque explains that Dr. Kraus has formed his opinions based on commentary rather than scientific analysis; therefore, Dr. Kraus' opinions have no foundation in fact.  (*Id*. at 13-27.)  Dr. Kraus' opinions should not be accepted by the Court because the opinions could only be considered commentary.  (*Id*. at 28-30.)

## III.   LEGAL ARGUMENT

### A.   DJJ'S USE OF BEHAVIORAL CONFINEMENT IS CONSTITUTIONAL

Confinement is constitutional; no court has ever declared that it is not. *Quintanilla v. Bryson*, 730 F. App'x 738, 746 (11th Cir. 2018) (quoting *Sheley v. Dugger*, 833 F.2d 1420, 1428-29 (11th Cir. 1987)) ("Under current precedent, administrative segregation and solitary confinement do not, in and of themselves, constitute cruel and unusual punishment.") (quotation marks omitted).   Isolation done for whatever

penological reason, whether as a means of punishment for some rule infraction or as a means of protection, is constitutional.  *Sheley*, 833 F. 2d at 1428-29.

In contrast, an unconstitutional use of confinement could be established where (1) the conditions of the confinement were so harsh they deprived plaintiffs of life's basic necessities, *Rhodes v. Chapman*, 452 U.S. 337, 347-48 (1981); (2) placements in confinement had no penological justification and were thus arbitrary,  *Rhodes*, 452 U.S. at 346-50 (1981); *Bass v. Perrin*, 170 F. 3d 1312, 1316 (11th Cir. 1999); or (3) duration of confinement was so elongated that it was excessive.  *Sheley*, 833 F. 2d at 1428.

The only evidence before the Court is that DJJ pays close attention to its use of confinement through policies, training, oversight, and discipline. Plaintiffs have submitted no evidence to show otherwise.   Plaintiffs' argument that children are placed behind "locked doors" and are left alone "without meaningful social interaction" does nothing to challenge the constitutionality of confinement.  The argument only demonstrates a firm grasp of the obvious.

The Named Plaintiffs have failed to show that any of their individual confinements was comparable to situations in the three categories listed

above where courts have found confinement to be unconstitutional. Plaintiffs' argument is spent first describing the confinement done by DJJ as "isolation" and then pointing out the thousands of times it has been repeated.  This is puzzling.  The nature of isolation can surely differ in many respects, whether it is the surroundings in the cell, the duration, or the level of interaction.   DJJ has shown that its form of confinement is much milder than most – and certainly not comparable to the prolonged solitary confinement of a prisoner of war, or an adult resident of a prison secure housing unit. But, as Plaintiffs assert, and Defendants wholeheartedly agree, the common thread of any separation is a deprivation of the usual social interaction.

Whether this constitutional practice is done a hundred times or a thousand times makes no difference.  An argument similarly could be made that mechanical restraints such as handcuffs are used thousands of times during transport.  Plaintiffs might argue that "the use of handcuffs makes the children feel like criminals, are painful to their arms and wrists, and are often left on even after the risk of flight or harm is over."   And, last year alone, "thousands of children were similarly placed in handcuffs."   A constitutional practice does not become less constitutional the more times the practice is used.   There is no proof of how many times detention staff

chose not to place a youth in confinement.  Or from a different angle, there is no proof whether a decision not to place a youth in confinement led to the harm of another youth who might have been better protected if confinement had been used.

The proof offered by Plaintiffs is that the rooms are small and there is only a bed, sink, and toilet.  (Doc. 111 p. 12.)  There is a large locked door with a small window and no social interaction.  *Id*.  Defendants demand to see some evidence of deplorable conditions, not just a simple recitation of what the normal conditions of isolation look like.  Plaintiffs' evidence does not come close to proof of a constitutional violation based on conditions of confinement.    The following conditions were not enough to merit a constitutional violation: high temperatures of 86 degrees, *Chandler v. Crosby*, 379 F. 3d 1278 (11th Cir. 2004); not having a mattress, *Carabello v. Wilson*, 2017 WL 2981229 (N.D. Fla. 2017); mold and dripping vents, *Kerns v. Mathews*, 2018 WL 7021858 (N.D. Fla. 2018); being held in a very cold strip cell with no clothes but a suicide smock, *O' Connor v. Kelley*, 644 Fed. App'x 928 (11th Cir. 2016); and having no TV, radio, phone, visitation, or activities, *Roberts v. Pichardo*, 2012 WL 12109911 (11th Cir. 2012).  No strained view of the evidence could make out a lack of "basic human needs."  (Fosler Aff. #1 ¶ 24.)

Proof of being put into behavioral confinement is not proof of a lack of basic human needs, nor is proof that the confinement rooms (which are often the same as the juvenile's own room) are not spacious or pretty. Plaintiffs have not sufficiently demonstrated by argument or evidence that the length of time juveniles are put into behavioral confinement violates the Constitution.  As noted above, the average length of time youth are placed in behavioral confinement is under 11 hours.  (Ogle Aff. ¶¶ 4-5).  But proof of being put in confinement for even 31 days is not enough by itself to show deprivation of basic human needs. *Lloyd v. Bell*, 2017 WL 579942, at *3 (N.D. Fla. 2017); *see also Young v. Smith*, 2018 WL 3447179, at *15 (N.D. Ga. 2018).

Plaintiffs' expert, Dr. Kraus, attests not that the particular methods of DJJ are unsound but instead – in the most general terms – that any method of isolation causes psychological harm.  (Kraus Aff. ¶¶ 27-30.)  According to Dr. Kraus, children in DJJ's behavioral confinement are "socially isolated and lack environmental stimulation" and are deprived of "normal human contact." (*Id*. at 29.)   But this would be the same for any form of confinement, and unless the Court is prepared to generate new law by declaring confinement unconstitutional "per se", this opinion adds nothing.

Plaintiffs must show much more than the intrinsic nature of confinement or the number of times it is utilized.  They have failed to offer proof that DJJ has deprived the youth in its care of their basic human needs.  Accordingly, DJJ's use of behavioral confinement is constitutional.

## B.   DJJ's USE OF BEHAVIORAL CONFINEMENT DOES NOT VIOLATE THE ADA AND REHABILITATION ACT

The ADA provides that "no qualified individual with a disability be excluded from participation in or be denied benefits of the services, programs, or activities of a public entity."  42 U.S.C. § 12312.  Claims brought under the Rehabilitation Act, 29 U.S.C. § 794, are governed by the same standards as the ADA.  *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

To sustain a claim under either statute, Plaintiffs must show: "(1) that [they are] qualified individual[s] with a disability; (2) that [they were] either excluded from participation in or denied the benefits of a public entity's services, programs, or activities or [were] otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff[s'] disability."  *Bircoll v. Miami-Dade Cnty.,* 480 F.3d 1072, 1083 (11th Cir. 2007).

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of an

individual; (B) records of such impairment; or (C) being regarded as having such an impairment."   42 U.S.C. § 12102(2).   A medical or mental diagnosis alone is insufficient to demonstrate a disability under the ADA. *Forbes v. St. Thomas Univ., Inc.*, 768 F .Supp. 2d 1222, 1229 (S.D. Fla. 2010).   Lastly, where a plaintiff claims discrimination based upon the refusal to provide a reasonable accommodation, the plaintiff must also establish that he or she made a specific demand for an accommodation and that it was denied.  *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999).

Plaintiffs have failed to prove that even the named Plaintiffs are qualified individuals with a disability.   Further, Plaintiffs have no factual basis to support a claim that they were placed in confinement or remained in confinement because of their "disability."   In fact, Plaintiffs allege that they were placed in confinement *because of* their respective behaviors. (Doc. 2, ¶¶ 15, 16, 24)  As Defendants' expert, Dr. Penn, states,

> It is paramount to avoid overgeneralizations when describing adolescent behavior.  Within adolescents there is a tremendous and wide range of developmentally appropriate and normative behaviors that at times might include oppositional and defiant behaviors, other willful disregard for rules, limit-setting, and verbal re-direction . . . versus extreme and severe behavior . . . that might be associated with a mental disorder.

(Penn Affidavit p. 16).  Plaintiffs cannot maintain a claim under the ADA because they have failed to prove that the reason for their placement in confinement was disability-related, rather than for behavior that required Defendant to enforce policies to ensure the care, custody, and control of its facilities.  *Tuttle v. Semple*, 2018 WL 705004, at *7 (D. Conn 2018) (dismissing the case because there were no facts to suggest that the plaintiff was singled out for segregation because of his disabling mental illness rather than for his disciplinary violation).

Furthermore, there must be a *reasonable* request for accommodation that was denied.   Here, ███████████████████████████████████████████ ██████████████████████.  ( ████ Dep. pp. 54:23-56:15 and Dep. Ex. 1; ████ Dep. pp. 54:22-56:10 and Dep. Ex. 1) It is not reasonable that juveniles may behave with violent aggression and with "willful disregard for rules, limit-setting, and verbal re-direction" but do so with impunity.  Even if they had qualified disabilities, it is not the purpose of the ADA to give Plaintiffs an unfair advantage rather than simply to place them on an equal footing with the other juveniles in detention.  *Kornblau v. Dade Cnty.,* 86 F.3d 193, 194 (11th Cir.1996)

All of the juveniles, regardless of disability, are subject to behavioral confinement when necessary for Defendants to maintain the security of its

facilities.  Accordingly, because Plaintiffs have failed to offer any evidence of a single ADA/RA violation, they cannot certify a class action on this basis.

## C.   PLAINTIFFS HAVE NOT MET THEIR BURDEN TO SHOW THAT A CLASS ACTION IS WARRANTED

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citations and quotation marks omitted).  *"*In order to justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 348-49 (citations and quotation marks omitted).

Under Rule 23(a), the party seeking certification must demonstrate, first, that

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

*Wal-Mart*, 564 U.S. at 345-46.

"A district court must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class."  *Sher v. Raytheon Co.*, 419 F. App'x 887, 890 (11th Cir. 2011).  "The burden of proof to establish the propriety of class certification rests with the advocate of the class."  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009) (citations and quotation marks omitted).  "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate."  *Wal-Mart*, 564 U.S. at 349.

If the party can satisfy the four requirements from Rule 23(a), the proposed class must then satisfy at least one of the three requirements listed in Rule 23(b).  *Wal-Mart*, 564 U.S. at 349.  Plaintiffs rely on Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23.

Rule 23 "does not set forth a mere pleading standard."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citations and quotation marks omitted).  Courts are not permitted to accept the allegations in the complaint as true when considering whether to certify a class; nor are they permitted to draw all inferences in the light most favorable to plaintiffs.

*Brown v. Electrolux Home Prods*., 817 F.3d 1225, 1234 (11th Cir. 2016). "The party seeking class certification has a burden of proof, not a burden of pleading." *Id.* (citations omitted).  A class may only be certified if the moving party "affirmatively" demonstrates compliance with Rule 23 "by *proving* that the requirements are *in fact* satisfied."   *Id.* (citations omitted) (emphasis added).

The "rigorous analysis" a district court must conduct to determine whether the movants carried their burden "will frequently entail overlap with the merits of the plaintiff's underlying claim." *Id*. (quoting *Wal-Mart*, 131 S. Ct. at 2551)) (quotation marks omitted).  The district court can consider the merits where "they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*  A district court is not prohibited from deciding a question of law or fact.  *Id.*  On the contrary – if "a question of fact or law is relevant" to the determination of whether plaintiffs meet Rule 23(a)'s prerequisites, then the district court has a duty to actually decide it and not accept it as true or construe it in anyone's favor." *Id.*; *Sher*, 419 F. App'x at 891.

Where parties submit conflicting expert testimony on class certification, a district court must evaluate and weigh such evidence.  *Sher*, 419 F. App'x at 890 ("It was error for the district court to decline to declare

a proverbial, yet tentative winner.").  Plaintiffs are required to prove, at the class certification stage, "more than just a *prima facie* case, *i.e.,* more than just a pretty good case."  *Id*. (quotation marks omitted).  "Tough questions must be faced and squarely decided."  *Id.* (vacating the order certifying the class because the district court erred by "side-stepping" the "tough questions") (quotation marks omitted).

## 1.   PLAINTIFFS HAVE NOT PROVEN THE RULE 23(a) FACTORS

Plaintiffs bear "the burden of establishing every element of Rule 23, and a district court's factual findings must find support in the evidence before it."  *Vega*, 564 F.3d at 1267-68 (internal citations and quotation marks omitted).  Plaintiffs' motion should be denied because they have not submitted proof that would permit the Court to find in their favor regarding Rule 23's elements.[1]

### a.   PLAINTIFFS FAIL TO ESTABLISH NUMEROSITY

The numerosity prerequisite requires that "the class [be] so numerous *that joinder of all members* is impracticable."  *Vega*, 564 F.3d at 1266.  The

---

[1] Plaintiffs have not even proposed a class or subclass.  *See Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (stating that the proposed class must be "adequately defined and clearly ascertainable") (citations and quotation marks omitted).  Plaintiffs' omission is not only fatal to their motion but is further indication of their intent to seek the complete abolition of behavioral confinement at DJJ by leaving the only possible class limits to be all juveniles who have ever been subject to behavioral confinement.

requirement is not satisfied by speculation on the part of Plaintiffs' expert or by evidence of isolated actions by individuals. *Sabata v. Nebraska Dep't of Corr. Servs.*, 337 F.R.D. 215, 258 (D. Neb. 2020). A plaintiff "bears the burden of making *some* showing, affording the district court the means to make a supported factual finding, that the class actually certified meets the numerosity requirement." *Vega*, 564 F.3d at 1267.

In this case, Plaintiffs have submitted no proof that any juveniles other than G.H. and R.L. would assert harm from DJJ's use of behavioral confinement. Currently only two of three named Plaintiffs are active since B.W. supplies no evidence. Where is the evidence that any of the other thousands of juveniles who have been placed in behavioral confinement have a constitutional claim? Where is the evidence that joinder would be impracticable? Plaintiffs' Motion fails on this first requirement.

### b.   THE PROPOSED CLASS LACKS COMMONALITY

Any competently drafted class action complaint will raise common questions, but reciting common questions is not sufficient to obtain class certification. *Wal-Mart*, 564 U.S. at 349. What Plaintiffs must establish is that the class members "have suffered the same injury." *Id.* Mere violations of "the same provision of law" is not enough. *Id.* at 340-50. Thus, that potential class members can recite common *questions* does not

resolve the issue; instead, the query must be whether the class-wide proceeding will generate common *answers* to drive the resolution of the litigation. *Id.* at 350.

In *Wal-Mart*, the court explained that "proof of commonality necessarily overlaps" with the "contention that Wal-Mart engages in a *pattern or practice* of discrimination." 564 U.S. at 352. The "crux of the inquiry [was] the reason for a particular employment decision." *Id.* The plaintiffs wished "to sue about literally millions of employment decisions at once." *Id.* Importantly for the instant case, the *Wal-Mart* court found that without "some glue holding the alleged *reasons* for all those decisions together, it [would] be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id.*

Plaintiffs provide no glue holding together the multiple reasons juveniles might go into confinement, or the different reasons which determine the duration of confinement, or the variables in the conditions of confinement. The Court could not make generalizations on constitutionality without knowing why, for example, prior events might have made it reasonable to extend the length of an individual's confinement. Or why his

history prevented him from having sharp pencils in his room.  Or, why his verbal threats to an officer were taken more seriously.

The *Wal-Mart* case continues to be instructive regarding what policy is actually being challenged.  The court explained that the "plaintiffs needed to begin by showing the specific employment practice that is challenged," which "is all the more necessary when a class of plaintiffs is sought to be certified."  *Wal-Mart*, 564 U.S. at 357.  "Other than the bare existence of delegated discretion, respondents have identified no 'specific employment practice' – much less one that ties all their 1.5 million claims together."  *Id.* "Merely showing that Wal-Mart's policy of discretion has produced an overall sex-based disparity does not suffice."  *Id.*  Likewise, merely showing that DJJ's "policies" permitting confinement have led to an overall purported "detriment" to the juveniles does not suffice.

### i.   THE REASONS FOR EACH CONFINEMENT ARE FACTUALLY DISTINCT

The decision to confine each youth is made on an individualized, case-by-case basis.  (Fosler Aff. #1 ¶ 8-10; Hough Aff. ¶ 10(J-M)).   The constellation of variables that go into a decision to place a youth in confinement and what a certain youth experiences while in confinement make it impossible to have a class.  Each confinement would have to be

individually examined, which does not lend itself to sweeping generalities by looking at numbers alone.

For example, the Court would have to examine whether a certain juvenile was placed in confinement for a penological purpose. How could the Court appreciate the difference between cursing that might directly and immediately be considered a threat to someone and cursing that Plaintiffs might characterize as innocent "horseplay"? What is the Court to do with an offer of proof of several examples of "minor infractions" without having a trial on each to determine if there was a legitimate penological purpose in the use of confinement?

The decision to place a youth in confinement and how long to keep him or her there is made at the detention center by detention officers and their supervisors. (Fosler Aff. #1 ¶ 8-10). The variables that must be considered by the juvenile detention officer cannot be fully appreciated on paper or in hindsight. (Fosler Aff. #1 ¶ 8-10; Hough Aff. ¶ 10(J-M)). It would be impossible to communicate on paper all of the nuances in a person's voice, body language, or facial expression that go into trying to discern someone's true intentions. The Supreme Court has held that this type of discretion, exercised at a local level, must be rebutted with strong evidence of some "common mode of exercising discretion that pervades

the entire company." *Wal-Mart*, 564 U.S. at 356 (noting that local store managers had discretion over pay and promotion in gender discrimination claim); *Gittens v. Sch. Bd. of Lee Cnty.*, 2017 WL 3142038, at *9 (M.D. Fla. 2017) (stating that principals of individual schools had discretion in selecting vice principal candidates in race discrimination claim).   When decisions are made at a local level using the discretion of lower level staff, it is impossible to generate common answers that would resolve the case. *Walmart*, 564 U.S. at 355-56. ("Demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's.")  Similarly, suits where reasonableness determinations must be made in light of unique factual circumstances "are especially unsuited to class disposition" because such "determinations cannot be made *en masse.*"   *See Kerr v. W. Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989); *Shuford v. Conway*, 326 F.R.D. 321, 333-34 (N.D. Ga. 2018) (finding that "based on the record before the Court, in the absence of uniformity of the circumstances under which the restraints/use of force happened, there has been no sufficient showing that there can be a common answer to the common question" and without "some glue holding the alleged reasons for all [of the restraint/use of force] decisions together, it will be impossible to say that examination of all the class members'

claims for relief will produce a common answer to the crucial question of why was the inmate restrained") (quoting *Wal-Mart*, 564 at 352).

And finally, regarding conditions of confinement, how would the Court determine if the condition of a room is so severe as to be considered a deprivation of "life's basic necessities?"  The variables are staggering.  A person could be arbitrarily placed in confinement for a very short time and have a constitutional challenge, but that same person might then be placed in behavioral confinement for a very long time for sound reasons and have no challenge.  *Quintanilla*, 730 F. App'x at 746 (explaining that courts consider "not only the food, clothing, sanitation, medical care, and personal safety" a prisoner was afforded, "but also the length of time in isolation," which is "significant because a condition might be tolerable for a few days but intolerable over a long period") (internal citations and quotation marks omitted).  Whether DJJ's use of confinement is constitutional must be determined by the facts of each individual use of confinement, which is why Defendants contest the method of proof advanced by the Plaintiffs here as being too general.

The instant case, similar to *Kerr*, is "especially unsuited to class disposition" because the Court must determine whether each use of

confinement was constitutional in the context of each unique factual circumstance.  Thus, Plaintiffs' motion should be denied.

### ii.   THE EFFECTS OF CONFINEMENT ON EACH JUVENILE ARE DIFFERENT

Plaintiffs have submitted no evidence of actual harmful effects. Because Plaintiffs are unable to point to a particular use of confinement that was unconstitutional, Plaintiffs attempt to form a class by taking the purported discomforts from all juveniles' confinements and adding them together to somehow reach a constitutional violation.  But Plaintiffs cannot concoct a unified class that way, either individually or in the aggregate. Many of the discomforts experienced by juveniles in behavioral confinement are identical to the discomforts of simply being held in a detention center.  In any detention center they are also held behind locked doors, sleep on the exact same mat on top of the same type of concrete slab, use the toilet in their room (whose walls might have writing or paint peeled by a prior occupant), and generally have their freedom significantly restricted.   Trying to discern whether someone was upset because he is locked up in detention, as opposed to being locked up in his room in detention, amounts to unworkable hair splitting.

As Dr. Penn explains, each person has a unique mental health history and must be analyzed individually.   It would be extremely

problematic to attempt to generalize behavior as resulting from some form of mental health disorder, as opposed to a temporary stressor, which would be a normal adolescent response.  (Penn Decl. pp. 15-17.)  If the "potential harm resulting from isolation" has an "individualized nature" there is no commonality.  *See Sabata*, 337 F.R.D. at 259.   Moreover, concerns of injury based on speculation "about how policies might impact detainees, not facts supporting that such violations occur or are widespread," are insufficient to show that such impacts affect all detainees.  *Id.*

Detention staff cannot be expected to differentiate between behaviors that flow from an untreated mood disorder, for example, and behaviors that stem from normal anger after a parent did not show for visitation.  (Penn Decl. p. 15-18.)   Such obstacles to security would certainly invite a class action sometime in the future, comprised of all youth (and perhaps officers) who suffered injury because of it.

### c.    PLAINTIFFS FAIL TO ESTABLISH TYPICALITY

A party seeking class certification must also show "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  *Vega*, 564 F.3d at 1275 (quoting Fed. R. Civ. P. 23(a)(3)).  "Traditionally, commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the

named plaintiff in relation to the class.  *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001).  The typicality question is whether other class members have claims similar to the Named Plaintiffs.  *Vega*, 564 F. 3d at 1276.

The purported class representatives, G.H. and R.L., cannot establish the requisite typicality for the purported class.  Both of these youth were placed in confinement for legitimate penological purposes, both had extremely short durations, and both had adequate conditions of confinement.  (Fosler Aff. #3 & #4.)  Of ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████        (*Id.*)  Of ███████████████████████████

███████████████████████████████████████████

██████████████████████████        (*Id.*)    Neither of these could ever represent a class of individuals who were wrongfully placed in confinement, or stayed in confinement for too long, or whose confinements were in any respect contrary to constitutional precedent.

Defendants therefore contest the method of proof advanced by the Plaintiffs here as being too general and insufficient to establish typicality.

The only evidence Plaintiffs propose is the use of confinement rather than the use of unconstitutional confinement.  A class contesting the use of confinement is first of all unnecessary, and in any event bound to fail.

Moreover, Plaintiffs' claims are not typical of the entire class because even if they could prove that their confinements were unconstitutional, there is the possibility that other juveniles' confinements were constitutional.  *See Truesdell v. Thomas*, 889 F.3d 719, 726 (11th Cir. 2018) ("Even if Truesdell had requested an injunction-only class action, she would have fallen short of the Rule 23(a) prerequisites of typicality and commonality in the light of the possibility that some of [the] searches were legitimate.").

████████████   ████████████████████████████████

████████████ , and Plaintiffs have submitted no evidence of ill effects. (██  Dep. p. 17:5-10; ██. Dep. p. 38:3-16.)   They have put forth no evidence that they were deprived of basic human needs.  ████████████ cannot be typical of a class of juveniles harmed from unconstitutional confinement.

### d.   PLAINTIFFS FAIL TO SHOW THEY WILL VIGOROUSLY REPRESENT CLASS INTERESTS

The adequacy requirement of Rule 23(a)(4) requires the class representatives to "adequately protect the interests" of those they purport to

represent.  *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).  "This adequacy of representation analysis encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action."  *Id.* (citations and quotation marks omitted).

Regarding the first issue, substantial conflicts of interest exist in Plaintiffs' proposed class.  "A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class."  *Valley Drug*, 350 F.3d at 1189.  Keeping other juveniles safe is one of the main reasons juveniles are confined. (Fosler Aff. #1 ¶¶ 6, 10-11).  Plaintiffs have been conspicuously silent throughout this entire litigation regarding what DJJ considers an essential purpose of behavioral confinement – keeping other juveniles safe from physical harm.  *See Valley Drug*, 350 F.3d at 1190-91 (finding that the plaintiffs were silent on the "pivotal issue" of whether some class members appeared "to benefit from the effects of the conduct alleged to be wrongful by the named plaintiffs").  In order to defeat class certification via this element, Defendants do not have to show "actual antagonistic interest," rather, the potentiality is enough.  *Id.* at 1194.

Here, the victims ███████████████████████████ could at least "potentially" oppose the elimination of confinement.  In fact, it is possible that those victims might just testify against the Plaintiffs at trial.

## 2.   PLAINTIFFS HAVE NOT PROVEN THE RULE 23(a) FACTORS FOR THE SUBCLASS

Plaintiffs' original ADA claim was based on the allegation that they were wrongfully placed in confinement or remained in confinement because of their disability.  Because Plaintiffs are not able to factually support their initial ADA claim, they seemingly convert their claim in the Motion for Class Certification to one for the alleged failure to provide functioning systems for implementing ADA obligations.  (Doc. 115, p. 14)  This is a transparent attempt to obtain class certification for the subclass in the manner that a class was approved for settlement in *Dunn v. Dunn*, 318 F.R.D. 652, 663 (M.D. Ala. 2016), *modified sub nom. Braggs v. Dunn*, No. 2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020).

Plaintiffs' reliance on the *Dunn* case is misplaced.  In *Dunn*, the defendants consented to the certification of the class, and the parties jointly moved for approval of a class settlement.  *Id.* at 657-58.  Although the court considered whether the class certification requirements had been met, the court was presented with far more evidence to support certification than what Plaintiffs' have provided in the instant case.  For example,

[Plaintiffs] submitted evidence . . . indicating that . . . at least 100 prisoners used wheelchairs, 20 had hearing impairments, a dozen were blind, and a dozen used prostheses. All of these disabilities plainly fall within the definition of disability in the ADA.

*Id.* at 661.  Further, the basis of liability was not the constitutionality of a particular penological practice or the denial of any particular accommodations but the denial of an entire system that would have "the effect of consistently violating [the plaintiffs] rights under the ADA." *Dunn*, 318 F.R.D. at 663.  The *Dunn* court stated that the "existence or lack of a general, state-wide Department policy or procedure regarding the identification, tracking, or accommodation of disabilities necessarily affects all disabled prisoners."  *Id.* at 668.  Moreover, the court concluded that, if the plaintiffs "were an assorted group of prisoners alleging merely that defendants had failed to provide them particular accommodations (and seeking simply orders requiring that they be provided those same accommodations), class certification would not be appropriate."  *Id.* at 663.

Under consideration in this case is the constitutionality of behavioral confinement.  But the use and the effects of behavioral confinement will vary dramatically for all juveniles held in DJJ detention centers, including for those who allegedly suffer from defined mental health disabilities, and Plaintiffs herein have failed to provide evidence that there is an entire

subclass of juveniles that suffer defined mental health disabilities that substantially limit one or more of their major life activities.    Further, there would be no "one size fits all" solution to the issue unless the Court is willing to find the practice of behavioral confinement *per se* unconstitutional, for which a class is unnecessary.  As in this case, when there is no common answer to bring about a resolution in the case, class certification is not appropriate.

## 3.    PLAINTIFFS DO NOT SATISFY RULE 23(b)

Neither do Plaintiffs submit proof sufficient to satisfy Rule 23(b).  The class is not certifiable if it is based on the allegation that confinement is unconstitutional as DJJ administers confinement.  Where the class relief in question is fraught with individualized issues that dictate the member's entitlement to and the need of relief, no Rule 23(b)(1) or (b)(2) certification is appropriate. *Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 665 (M.D. Fla. 2001); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998). Here, individual issues not only pervade what each minor was reprimanded for, but also the length and type of confinement, as set out above.

## E.    CLASS CERTIFICATION IS UNNECESSARY

Finally, class certification is not necessary in this case.   Class certification is unnecessary where a favorable outcome for a single plaintiff

would necessarily provide the same relief for the entirety of the proposed class. *Madera v. Lee*, 2019 WL 1054671, at *1 (N.D. Fla. Mar. 5, 2019). A "district court should ask itself whether the need for the class exists to offset the concomitant expense and complexities associated with class action suits." *Id.* Where a plaintiff "may achieve by injunction all relief which would inure to similarly situated persons without the necessity of class certification," the complexity and expense of a class action is not necessary. *Access Now, Inc. v. Walt Disney World Co.*, 211 F.R.D. 452, 455 (M.D. Fla. 2001)). If a single juvenile asserted a claim that behavioral confinement is unconstitutional per se, a determination of that claim would apply equally to all juveniles placed in behavioral confinement. Thus, class certification is unnecessary, and Plaintiffs' motion should be denied.

## IV.   PLAINTIFFS SEEK TO HAVE THE COURT LEGISLATE

The type of relief Plaintiffs seek crosses far over the line into the authority of the legislature. *Rhodes v. Chapman*, 452 U.S. 337, 352, (1981) (stating that "courts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system . . . ."). Plaintiffs would have the Court go beyond its duty to "say what the law is," and instead "tell

the legislative branch what the law should be" and "tell the executive branch how it should better execute or carry out the laws it administers." *In re Juveniles, J.S., et al.*, No. 50-2018-CJ-09913-XXXX-WB-JA, et al., at *8 (Fla. 15th Cir. Ct. Mar. 20, 2020) (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)).  Plaintiffs want "more and better" mental health involvement, according to their subjective view of what would be "more and better." They want "different" policies that would place firm caps on the frequency and duration of confinement rather than leaving penological determinations to the judgment of DJJ leadership and the other branches of government. Dr. Kraus attests that he would like DJJ to transform its detention centers toward a "positive development model" rather than punishment. (Dr. Kraus Aff. ¶ 39.)  Some might consider these high ideals worthy of pursuit, and well-considered opinions may differ on the subject.  But the debate does not belong in Court.

## IV. CONCLUSION

Plaintiffs' motion for class certification should be denied because it fails to establish any of Rule 23's requirements and also completely fails to offer sufficient factual support for its generalized argument.

## <u>WORD COUNT CERTIFICATION</u>

This document complies with the word limits set forth in Local Rule 7.1(F), Northern District of Florida Local rules, and contains 7,950 words, which includes any headings, footnotes and quotations.

Dated: May 27, 2021          Respectfully submitted,


By: s/ Jonathan B. Trohn
**JONATHAN B. TROHN**
FL BAR #0880558
j.trohn@cttalaw.com
**HANK B. CAMPBELL**
FL BAR #434515
h.campbell@cttalaw.com
**ROBERT ARANDA**
FL BAR #988324
r.aranda@cttalaw.com
**JOHN MARC TAMAYO**
FL BAR #030910
j.tamayo@cttalaw.com
**ELLIOTT V. MITCHELL**
FL BAR #118342
e.mitchell@cttalaw.com
**JENNIFER VASQUEZ**
FL Bar #71942
j.vasquez@cttalaw.com
1701 South Florida Avenue
Lakeland, Florida 33803
(863) 686-0043 (phone)

Attorneys for Defendants