# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

G.H., a minor, by and through his parent
and legal guardian, GREGORY HENRY;
R.L., a minor, by and through her parent
and legal guardian, ANGEL CARTER;
B.W., a minor, by and through her parent
and legal guardian, LEROI LUZUNARIS;
on behalf of themselves and all persons
similarly situated,

     Plaintiffs,

v.                    CASE NO.: 4:19-cv-00431-RLF-MJF

JOSEFINA TAMAYO, in her official
capacity as Acting Secretary of the Florida
Department of Juvenile Justice; and
FLORIDA DEPARTMENT OF JUVENILE
JUSTICE, an agency of the State of Florida,

     Defendants.

_____/

## AFFIDAVIT OF DIXIE FOSLER
## REGARDING DETENTION SERVICES

STATE OF FLORIDA
COUNTY OF MARION

     PERSONALLY APPEARED before me, the undersigned authority,

DIXIE FOSLER, who, after being duly sworn upon her oath, states and

affirms as follows:

1.     My name is Dixie Fosler. I am the Assistant Secretary for Detention at the Department of Juvenile Justice. I am over the age of eighteen and have personal knowledge of the matters described below.

2.     My job involves oversight of twenty-one detention centers, three regional offices and our headquarters (HQ) office.  I work with HQ and regional staff to ensure our centers run at an optimal level and that they have everything they need to be successful in supervising and managing the youth that are in our care.

3.     I have been with FDJJ since 1986.  I was a juvenile detention officer at Alachua Regional Juvenile Detention Center (RJDC), a supervisor at Pinellas RDJC, and a Captain prior to promoting to Major at Marion RJDC. I was then Regional Director in the North Region and was appointed to Assistant Secretary in 2015.

4.     The Florida Department of Juvenile Justice (DJJ) is among the largest juvenile justice systems in the nation, if not the largest, and one that has been at the forefront of youth justice for years.  DJJ uses evidence-based practices in its work with Florida's youth.  We continually assess our own data as well as national trends to seek the best outcomes for our youth.

5.     I, and other management staff, attend seminars and webinars on confinement, review studies on confinement, and have applied for grants to

discuss confinement reduction.  We constantly review, assess, consider, and implement innovations to reduce confinement.  For example:

      a.    In 2018, we participated in the "Reducing Isolation in Youth Facilities" technical assistance project offered through the Council of Juvenile Correctional Administration.

      b.    In May of 2019, I reached out to the Annie E. Casey foundation, Juvenile Detention Alternatives Initiative (JDAI).  I requested information on states that were having success reducing juvenile confinements and was directed to the state of Massachusetts, thought to be a "best practices" state.  I spoke with officials in the juvenile system there. However, the Massachusetts system relies heavily on mechanical restraint usage, such as handcuffs.  DJJ wanted to discourage the use of handcuffs restraints on youth other than for transportation. Florida has substantially limited the use of mechanical restraints, with very few instances in the last 12 months.

      c.    I and my staff reviewed the Massachusetts materials related to the process it went through for change.  We reviewed their efforts at reducing staff turnover, modifying staff training, using Dialectical Behavior Therapy (DBT) with the youth as well as their process to change staff ideals (including changing staff titles and position descriptions) towards more

[3]

positive youth management.  We considered a number of suggestions from this information.   However, we made the decision that some of the techniques, such as DBT, were not appropriate for DJJ's detention centers because it was too intense for short-term stay detention youth and the cost of training staff would be exorbitant.

6.     Importantly, the use of confinement is necessary for the security of our detention centers.  The legislature has made the decision that chemical weapons and tasers may not be used in the juvenile system.  The short-term use of confinement is the only tool detention staff have when youth start fighting and indicate they want to continue fighting, or when youth are threatening the safety and security of the detention facility.  This tool is not used lightly or without oversight.  On the contrary, as I will explain below, the use of confinement must be thoroughly documented, reviewed, and approved by supervisors.  Staff are encouraged to use verbal techniques to alleviate the threat to the safety and security of the facility, youth, and staff, but verbal techniques are not always effective.

7.     On a daily basis staff use a multitude of factors to make decisions on what is the appropriate MOD (what we call each separate dorm, which consists of single or double rooms surrounding a dayroom/common area) placement for youth such as age, size, charge, and neighborhood or gang

affiliation.  For example, you cannot put a 200 pound 17-year-old in with a 110 pound 12-year-old, and often rivalries exist between neighborhoods or gangs that would cause immediate chaos if certain youth were housed together.  Because the 21 centers are housed across the state in various urban and rural settings, each center has its own unique challenges.  The population in each center constantly fluctuates as youth move in and out daily.  A single youth has the potential to change the tone of the entire center, and certainly of a MOD.  The staff must constantly assess all of these factors and make placement decisions based on what they learn.   A juvenile detention officer is assigned to a smaller group of juveniles from the same MOD, and that officer goes everywhere with that group.  The officers became acquainted with the individual needs of the juveniles in their group and meet those needs or seek assistance from medical, mental health, and supervisors as needed.

8.     Likewise, when considering whether to place a juvenile in behavioral confinement, the juvenile detention officers must also consider many factors.  Is this a youth that has been violent in the past?  Is this a youth that has a personal grudge that is not likely to be solved by "cooling off"?  Is this a youth that belongs to a gang or neighborhood that has a vendetta against another gang or neighborhood?  Has this youth been

making verbal threats to others, and have those threats been getting more serious?

9.     The behavior of youth is often not easy to decipher and is not easily explained by confinement numbers or statistics. Sometimes a youth will fight while we are standing right next to him, knowing full well that we will possibly send him and the other youth to confinement. In some instances, this is contrived because the youth wants to be away from everyone else anyway (perhaps because they are scared or just want alone time).

10.    Our job is to keep the youth safe and secure as their case progresses through the court system or as they await placement into a commitment program. Our officers have a very difficult job, physically and mentally. Many of our officers and superintendents have been injured themselves, some requiring multiple surgeries, when responding to codes and attempting to separate youth who are fighting.

11.    Although we continue to monitor and improve our use of confinement, the need for confinement has not decreased because our detention population continues to present dangers both to other youth and the officers. Two decades ago, youth that went into detention centers included a broader population because there were essentially no other options for youth. Through changes in the tool used to screen youth for

[6]

secure detention and innovative use of alternatives to secure detention, there are other options for youth.  More supervised release alternatives have been added to the screening option such as: home detention, evening reporting centers, intensive home detention, and intensive home detention with electronic monitoring.  This has led to a decrease in the percentage of youth that go into secure detention and a change in the population.

12.    Now most youth placed in our detention centers are the very serious, high-risk to reoffend youth, many with a history of violent offenses. With very few exceptions, DJJ no longer detains first-time offenders.  We have made strides in reducing the number of youth that come into detention by utilizing alternatives to secure detention through prevention, diversion programs, probation, and intensive probation.  These alternatives have been instrumental in ensuring DJJ only detains those youth who are a risk to public safety or a risk to abscond.  The population has been further concentrated over the past year because of COVID-19.  Judges have been limiting the youth sent to detention because of the pandemic; therefore, the youth who make it to detention typically have significant offense histories.

13.    Detention Services used to have a more rigid form of determining confinement by tying it to certain offenses, which was referred to as "mandatory confinement."  DJJ had a rigid formula for the length of time

depending on whether it was the first, second, third, etc., offense.   In 2010, a directive from the Assistant Secretary ceased the practice of mandatory confinement.  Under present rules, a youth shall be considered for removal from confinement as soon as they can return to the population and there is no threat to safety.

14.    We have continued to make a conscious effort to improve youth behavior in detention centers and to reduce the length of time youth spend in confinement.  To that end, DJJ has revised its policies over the years regarding the maximum time a youth may be kept in confinement.  These changes are found both in the administrative rule (FAC 63G-2.014) and the Facility Operation Procedure (FOP 3.03) governing confinement.

15.    Generally speaking, the maximum length of time for confinement has decreased over the years from being unlimited, then limited to 5 days (120 hours), and currently limited to 24 hours:

a.    In 2002, confinement had no written time limit but could only be extended past 72 hours after a hearing.

b.    In 2004, the length of confinement could not exceed 5 days (120 hours) unless "the release of the detainee would jeopardize the safety and security of the facility."

c.   In 2005, review by the supervisor and an administrator were added; in 2007, mental health precautions were added.

d.   In 2013, DJJ reduced the total allowable time in confinement from 120 hours to 72 hours.

e.   In 2014, confinement beyond 24 hours required permission from the Regional Director, and a copy of the approval had to be sent to the Assistant Secretary.

f.   Beginning in the summer of 2019, we began revising our procedures to yet again reduce the maximum time a youth spent in confinement.   The maximum time is currently 24 hours, after which a confinement review is required to extend beyond 24 hours.  The confinement review must be chaired by the Regional Director and must take into consideration the mental health team's recommendations.

g.   The current policy (found in both the administrative code and the FOP) is the most restrictive regarding maximum confinement length in DJJ's history.  Confinement shall not exceed 24 hours "except for those rare instances where the youth's behavior continues to imminently and substantially threaten the physical safety of others or compromises security." Permission through the confinement review process to extend beyond 24

hours is rarely, if ever, granted. Therefore, the time a youth is permitted to spend in confinement is the least amount in DDJ's history.

16.     Additionally, DJJ has revised its policies regarding upper management oversight of confinement. Supervisors now have to approve all confinements. There must be supervision of the youth in confinement every 5 minutes the first hour of confinement. Supervisors must counsel youth and conduct an in-person review at a minimum of every 3 hours to determine whether continued confinement is warranted. As described above, there must be a confinement review for confinements beyond 24 hours, which includes the Regional Director or designee.

17.     In the rare circumstance that confinement extends beyond 24 hours, the mental health team is often part of the confinement review process to make certain that no harm is coming to the youth. We have licensed mental health counselors on-site in every detention center seven days a week, and a child psychiatrist is on-site at least weekly at each detention center. Youth can request a visit from mental health staff at any time, including while in confinement, and no youth is ever denied such a request. After 24 hours of confinement, youth receive an automatic visit by a mental health counselor. Policies have also changed so that all youth are supervised and counseled while in confinement.

18.     Regarding data analysis and reporting improvements, we are constantly looking for ways to analyze data and improve services to youth. One thing we have done in the last couple of years is purchase and implement software solutions for compiling and integrating data that allows us to examine incidents, physical intervention, confinements, etc., on a state-wide basis.  This allows the superintendents at the detention centers and also management staff to have real time data on the number of Protective Action Responses (PARS), confinements, and other facility-related data.  We use the data to recognize and address outliers and identify trends – such as in confinement – allowing the superintendents to adapt their services and upper management to more effectively provide oversight, direction, correction, and training.  Now DJJ superintendents and management can view data daily from all centers around the state instantly instead of having to look up information center by center.   A headquarters team is also assigned to review video for any reports that go to the Central Communications Center.  In addition, every video that involves an incident with three or more youth is viewed and scrutinized.  All of this data is now reviewed at a high level daily.  This allows us to better serve youth and have more effective oversight of staff.

19.   In March 2020, Detention Services proposed and submitted another data collection initiative to DJJ's IT department for implementation. This initiative added a drop-down box for confinement to limit the reasons a youth can be placed in behavioral confinement to: (1) Serious Security Violation, (2) Physical Acts of Violence, or (3) Medical, which increased the capability of management to gather and review data for analysis and guidance on the appropriate reasons for placing a youth in confinement. Having to select one of these three reasons when writing the confinement report also prompts the staff to be more aware of the proper uses of behavioral confinement because they must confirm that the use of confinement falls under one of these categories.

20.   We also strive to continuously improve staff training. In 2016, we identified staff at each center as a Facility Training Coordinator. These Facility Training Coordinators focus on training Phase 1 (first four weeks) to new employees and in-service training to existing staff. DJJ recently revised Phase 1 training to spend more time in discussion about the youth Behavior Management System (to be explained below). DJJ worked with staff development to rewrite the officer training academy to further shift the focus to youth behavior and adolescent development. We have also published

focused briefing agendas monthly that are sent out for the shift supervisors to use as a guide during shift briefings.

21.    In the fall of 2018, Detention Services contracted with Adapt and Transform, LLC, to assist in the development of a standardized Behavior Management System.  At that, we also trained a percentage of staff in each center (based on the center's size) as Certified Behavior Technicians.  These technicians focus on how to extinguish poor behavior and highlight positive behavior and assist with the overall Behavior Management System in their center.  The Behavior Management System was initially developed and piloted at Orange detention and later at Hillsborough detention.  It encourages youth to attain and keep certain levels of behavior by complying with detention center rules and maintaining good behavior. Privileges can be earned throughout positive progression through the Behavior Management System.  Youth behavior cards and Behavior Management System posters are distributed and displayed in all centers and staff are trained to implement this program.

22.    Within the behavior management system, DJJ adopted the SOS campaign, which stands for "Stop, Orient, and Self Check."  This is a trauma informed care technique to get youth to recognize their triggers and refocus their energy before they escalate their behavior.

23.   Additionally, in March of 2019, a Behavior Management Specialist was hired (a newly created position in Detention Services), who oversees the maintenance of a standardized Behavior Management System in all centers.  In January of 2020, DJJ added an additional staff to assist with oversight of the Behavior Management System.

24.   Detention Services has engaged in an ongoing effort over the past decade to create a more trauma informed youth centered environment for the youth that are placed in our detention centers.  This educated trauma informed care approach includes facility upgrades, guest speakers for the youth, youth activities, behavior management activities and practices, and youth education and vocational training.   What is presented below is an extremely small snapshot of the steps taken by detention services over the last decade:

a.   Facility upgrades included the creation of soft rooms at each facility as a place for mental health counselors in creating an environment where they could safely and calmly de-escalate a youth's behavior and assist with counseling.  Facility interiors were painted using bright colors to assist with normalizing the environment.   Artists were contracted to come into facilities and work collaboratively with youth to create murals that connected positive messages with youth-inspired artwork.

Furniture at facilities was purchased that was both more comfortable, softer, and sported brighter colors. (*See Facility Photos Attached*)

b.      Other repairs or enhancements were made to areas throughout the facilities to allow the youth and staff to have more pride in their facility. DJJ has spent considerable effort in improving the living areas in the detention centers, which is an ongoing process.   Examples of improvements are side tables and small rugs for the female rooms at Duval Juvenile Detention Center, a dayroom at Duval and Palm Beach detention just for the female youth, a new movie room at Duval detention, individual soft rooms on each MOD at Dade detention to name a few.

c.      Guest speakers, volunteers, and faith-based programs regularly visit facilities including athletes, motivational speakers, and members of the community to provide youth with positive messages, hope, and the knowledge that there are those within the community that are there to support youth. Facility Superintendents reach out to the community to bring in these people so youth can have an opportunity to expand their horizons.

d.      Youth Activities were enhanced throughout the state to provide unique programming and support, after-school, and weekend activities to give youth positive activities to engage in while they are at the

facility. These activities occur inside the facility and on the outside recreation fields. Detention Services procured grants to bring activities such as yoga and arts programs into facilities. In addition, some centers started gardening projects where youth were involved in preparing, planting and harvesting fruits and vegetables that could be used in facility meals.

e.    Behavior management events are created at various facilities to reinforce positive behavior. The events are used to celebrate each youth's positive progress through the levels of the behavior management system. The behavior management system is now standardized throughout the state so no matter what center a youth is in, they will follow the same system and if a youth moves to another center, their level and card go with them.

25.    We recently have initiated a program called Trust Based Relational Intervention (TBRI). TBRI, defined by the Karen Purvis institute as "a holistic approach that is multi-disciplinary, flexible, attachment-centered, and challenging."  TBRI is an evidence-based, trauma-informed intervention that is specifically designed for children who come from hard places, which describes many of the youth that encounter the juvenile justice system."

a. Detention Services had several online meetings with local users of TBRI as well as with Texas DJJ to discuss their use and integration of TBRI into their system.

b. From there, we decided to invest in having our Behavior Specialist certified as a TBRI practitioner. This allows us to conduct training with staff without having to hire an outside provider.

c. In March 2021, Brevard detention was selected as the first site to be trained. All staff (including education, medical, mental health and food service) were trained in TBRI and the first to implement some out-of-the-box ideas. Water bottles are being distributed to youth and menus were changed to add a mid-morning snack.

d. In April 2021, all facility and regional leadership received TBRI overview training.

e. In May 2021, Leon detention staff (as described above) all received TBRI training.

f. Plans are on-going to roll out TBRI to other centers.

26. Detention Services get to know and care for the youth and try to help them in any way that we can. I am always on the look-out for new ideas, programs, techniques, and training to help the staff have better tools to

support the youth in our care.  Many initiatives are also designed simply to keep youth occupied and out of trouble.

27.    We in Detention Services take our responsibility extremely seriously to keep the youth, staff, and facilities safe and secure.  It is not just a job but becomes a central part of your life once you dedicate yourself to this profession.

27.    This information is based on my personal knowledge.


FURTHER AFFIANT SAITH NOT.

DIXIE FOSLER


SWORN TO AND SUBSCRIBED before me by means of _____ physical presence OR _____ online notarization this 24th day of _____, 2021.   She is personally known to me/has produced _____ as identification and did take an oath.

NOTARY PUBLIC: _____

(SEAL)                         Print Name: _____

My Commission Expires: 9.24.21

CHRISTI STUA
Commission # GG 145481
Expires September 24, 2021
Bonded Thru Budget Notary Services

[18]

ALACHUA REGIONAL JUVENILE DETENTION CENTER

PHOTOGRAPHS







DUVAL REGIONAL JUVENILE DETENTION CENTER

PHOTOGRAPHS

00900868-1

















MARION REGIONAL JUVENILE DETENTION CENTER

PHOTOGRAPHS

00900868-1













