# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

G.H., a minor, by and through his parent
and legal guardian, GREGORY HENRY;
R.L., a minor, by and through her parent
and legal guardian, ANGEL CARTER;
B.W., a minor, by and through her parent
and legal guardian, LEROI LUZUNARIS;
on behalf of themselves and all persons
similarly situated,

    Plaintiffs,

v.                      CASE NO.: 4:19-cv-00431-RLF-MJF

JOSEFINA TAMAYO, in her official
capacity as Acting Secretary of the Florida
Department of Juvenile Justice; and
FLORIDA DEPARTMENT OF JUVENILE
JUSTICE, an agency of the State of Florida,

    Defendants.
_____/

## AFFIDAVIT OF JOY BENNINK
## RESPONSE IN OPPOSITION TO CLASS CERTIFICATION

STATE OF FLORIDA
COUNTY OF _Escambia_

    PERSONALLY APPEARED before me, the undersigned authority, JOY BENNINK, who, after being duly sworn upon her oath, states and affirms as follows:

1. My name is Joy Bennink, LMHC, CAP, ATR, and I am over the age of 18 years.

2. I have been employed by the Florida Department of Juvenile Justice (FDJJ), since 2015.

3. I am the statewide Mental Health and Substance Abuse Services Coordinator.

4. Currently I am also filling the role of Acting Director of Mental Health and Substance Abuse Services for FDJJ.

5. I am a Licensed Mental Health Counselor, Certified Addictions Professional, and Registered Art Therapist. I am a Qualified Supervisor for Registered Mental Health Counselor Interns and Registered Clinical Social Work Interns in Florida under DOH.

6. Currently I perform the following job functions: provide coordination and oversight of mental health and substance abuse services in all areas of the Department; provide technical assistance to department staff and providers; write contract language for mental health and substance abuse services; serve as the technical expert in mental health and substance abuse services during procurement activities; participate in several state councils/workgroups; supervise OHS mental health staff activities; oversee monitoring of detention and residential commitment programs by OHS staff; and provide training at DJJ sponsored conferences and other events.

7. Before coming to FDJJ, I served as a counselor and Clinical Director for over 16 years in a variety of juvenile justice settings including prevention, probation, detention and residential commitment programs. I was the Clinical Director for an outpatient therapy clinic for several years. I also volunteered with the Guardian Ad Litem program.

8.  DJJ provides mental health services to youth while they are in detention. Each detention center has a child psychiatrist on-site weekly. Each detention center also has at least one full-time licensed mental health professional on-site weekly, and mental health clinical staff (licensed or non-licensed) are on site seven days a week.

9.  DJJ performs several mental health screenings for every youth, first prior to admission during probation screening, and again upon intake into the detention center:

   a. Before a juvenile comes into detention, they have already received the initial mental health assessment via probation and at either the Juvenile Assessment Center (at the larger centers) or the call-in center (such as at Volusia and other rural centers). Probation starts the screening process when the youth is brought into the screening unit.

   b. At this initial stage, they receive the CAT screen, which is the Community Assessment Tool. The purpose is to try to obtain information from the youth to assess all areas of his or her life, such as family, school, criminal history, relationships, substance abuse, in order to know what services to provide for the youth and where the services need to focus. The CAT is available in the EMR (electronic medical record) for the clinician to later review.

   c. The Suicide Risk Screening Instrument (SRSI) is also an initial screening that must be completed before the youth is placed in general population. It is complex because it includes input from multiple collateral sources as well as the youth. This is purposeful. We try to gather the most comprehensive screening

information of the youth as possible by getting input on the youth from different perspectives. The screen starts with probation with the arresting officer, the JPO (juvenile probation officer), and then continues on with the JAC screener, the JDO screener (juvenile detention officer), and then to the RN/mental health personnel.

d. The probation screening includes the Medical and Mental Health Clearance Form. This is something initially done to see if there is an emergent situation and the youth needs to go straight to the hospital or be evaluated for potential Baker Act prior to DJJ taking custody of the youth and before being sent to detention. This is just for the JAC/probation screening setting and occurs before the change of custody occurs from law enforcement to the probation screening unit.

e. The information gleaned in these pre-screen procedures also informs the classification of the youth and goes into the complex, continuous evaluation of deciding where to place the youth so that there are not problems like putting sex offenders with trafficking victims, gangs or co-defendants together, etc. Attempts are made to place each youth in the most appropriate dorm and room based on information available during screening.

f. The MAYSI-2 (Massachusetts Youth Screening Instrument) is completed by probation screeners, and it must be reviewed by detention screeners and mental health staff in detention. MAYSI-2 is a 15-minutes self-report screening tool for mental health and substance abuse with a suicide component and was developed for use in juvenile justice settings. The MAYSI-2 was funded by

the MacArthur Foundation: "The MAYSI-2 played a significant role in assuring that juvenile justice reform efforts increased attention to the developmental and psychological needs of young offenders."

    i. There are 5 subscales for boys and girls: Alcohol/Drug Use, Anger-Irritability, Depression-Anxiety, Somatic Complaints, and Suicide Ideation; and a 6th scale validated only for boys: Thought Disturbance. A 7th scale, Traumatic Experiences, measures lifetime trauma exposure and posttraumatic reaction and contains slightly different items for boys and girls.

    ii. Every time the youth passes through the JAC or other type of probation screening unit (so basically every time they have new charges), the youth is administered a new MAYSI screening. The MAYSI is a referral point. When a juvenile moves to detention, if the juvenile has a MAYSI hit for suicide or depression, or if MAYSI results are invalid, that hit triggers the youth being placed on suicide precautions or referred for comprehensive assessment by mental health professionals as appropriate.

    iii. Any positive screening indicators requires that the youth be given a comprehensive assessment within 31 days of being in secure detention. This is a diagnostic assessment, often referred to as the SAMH assessment or biopsychosocial assessment. However, the assessment often does not occur at a detention center since the average stay in detention is less than that.

g. The substance abuse mental health assessment (SAMH) is completed if screening information indicates a need for further assessment. This may include MAYSI hits, or if, for example, the youth was arrested on drug charges. Of course youth do not always self-report a drug problem, especially prior to adjudication.

h. If there are no MAYSI hits and other screening information does not indicate that a potential treatment need exists, then further assessment may not be warranted at the time. All youth are offered treatment services at intake by mental health staff in detention and may request services at any point in time while detained.

i. The vast majority of youth are referred for a mental health assessment, which might happen in detention depending on the youth's needs and length of stay, but also could happen in probation (if the youth leaves), or in residential (if the youth is committed), or in diversion (like drug court, etc.).

j. Youth who enter secure detention on psychotropic medication are referred and seen by the facility psychiatric services practitioner within 14 days of admission and are typically seen within one week. These youth are also enrolled into mental health treatment services (counseling) and referred for SAMH assessment.

k. Under my direction, OHS monitors have increased the monitoring activities and deficiencies assigned to juvenile detention facilities over the past two years when they fail to submit referrals to mental health staff for SAMH assessment

  resulting from MAYSI screening (or other screening information) for their youth.

 l. Rule 63N-1, F.A.C. sets forth the requirements for mental health and substance abuse services in secure detention facilities. Under the rule, Rule 63N-1.0085 provides requirements for psychiatric services in DJJ facilities or programs, including secure detention. Provision 2(e) of the Rule provides that "Psychotropic Medication shall be only one component of the therapeutic program. Additional treatment modalities such as individual, group and family therapy, behavioral therapy substance abuse counseling and psychosocial skills training shall be utilized in conjunction with the use of Psychotropic Medication." Under the direction of Dr. Tracy Shelby (Interim Director of Medical and Mental Health Services, OHS) and myself, OHS monitors have increased efforts to enforce provisions such as this so as to improve the frequency and quality of counseling services in the program area over the past three years. Updates were also made to contract language to assist with this effort.

10. The mental health staff is required to review all available information in JJIS during intake screening, including the face sheet; if drug charges are present, even if not endorsed by the youth's self-report on the MAYSI, then efforts are made to engage the youth in substance abuse treatment services.

11. Many youth in detention decline mental health treatment, at least initially. This can be for various reasons. Many youth are hesitant to talk about drug use because of their pending charges, and others just may not want to talk at the time. Boys tend to be significantly more hesitant than girls

to seek mental health treatment. Girls, in general, tend to express a desire for counseling services more frequently than boys. A lot depends on the youth's willingness to get treatment. When the judge orders treatment, it is usually to community treatment or for a specific type of psychological evaluation. Some of the juvenile court judges do not realize that detention actually has full-time mental health staff and in-depth suicide prevention processes in place.

12. Despite the plethora of mental health professionals, screenings, and round-the-clock access to services, mental health encounters in detention are largely voluntary because the youth are pre-adjudicated. Prior to being committed to a residential program, DJJ cannot "force" a detained youth to undergo therapy or otherwise engage mental health. They have a right to care, but typically are not court-ordered at that point in time. Also, because the average stay in detention is only 11 days, staff usually do not have access to the youth's complete mental health records upon entry; there is an allowance for 30 days to gather data for SAMH completion, consistent with most settings both inpatient and outpatient. Staff must rely largely on the youths' self-reporting, and often do not have time to establish the relationships necessary to secure the confidence for youth to report substance abuse history. Youth may also be instructed by their defense counsel not to report such history, and are hesitant to disclose it to mental health staff or anyone while detained prior to adjudication. Despite these challenges, the mental health staff are charged with learning about each individual youth, assessing their unique needs, monitoring their progress, and meeting their mental health needs during the short time they are in detention. To emphasize the point, the word "individualized" is repeated 84 times within the text of DJJ's Rule 63N-1, F.A.C. OHS has made conscious

efforts to increase our provider's proactive efforts at youth engagement in treatment over the past four years or so in the detention program area.

13. Regarding suicide precautions, all staff members at all levels take suicide precautions very seriously. We have such a conservative take on suicide screening that almost all youth are placed on suicide precautions upon admission. To emphasize the point, the word "suicide" is repeated with the text of Rule 63N-1, F.A.C. 387 times.

14. There are two levels of supervision for youth on suicide precautions, including Precautionary Observation and Secure Observation. While on suicide precautions, daily mental health supportive services are required.

15. The first is Precautionary Observation that includes two sub-categories.

       a. Constant Supervision is the most common level wherein youth are permitted to move freely but must be maintained within constant sight and sound monitoring by detention officers.

       b. One-to-one supervision is reserved for more severe or acutely suicidal youth, when a staff person stays within 5 feet of the youth at all times.

16. The second is Secure Observation (in room). In some detention centers, it's in their own rooms, which are all designed for suicide prevention, and in others they are in the hallway, with one staff watching two rooms, or in other small centers they might be in a room near the front where they can be observed. This level of supervision may be required when a youth is on suicide precautions and also requires behavioral confinement (i.e., expresses suicide ideation after assaulting another person). This level of supervision may also be appropriate for youth who are denied admission under the Baker Act. Usually in every detention center, there are a few kids

who simply prefer to stay in their room. Secure observation is not the go-to; it's used much less than constant supervision.

17. The Health Status checklist form requires the youth to be searched and any method of potential self-harm be removed prior to placement in a Secure Observation Room. And there is also a medical Q & A. Per the rule, there has to be constant sight and sound monitoring; video monitoring alone doesn't suffice. The rule also has specifics for the room itself. A lot of centers use suicide smocks. Each center has monthly suicide mock drills.

18. There has not been a suicide-related death of a DJJ youth in confinement for 20 years. In the past decade, one suicide has occurred in a detention center – in 2018 at Manatee Regional Juvenile Detention Center. Of course, any time this occurs it is devastating to all detention staff and to all mental health and medical staff. However, a thorough review of the incident was conducted by the Office of the Inspector General, and any necessary staff discipline administered.

19. The DJJ Mental Health Administrative Rule was promulgated in 2014 – before that there was no rule, and a Mental Health and Substance Abuse Services Manual was used. The manual was very dense. Before the rule, providers could and did request waivers to various provisions, so for that reason among others, the rule was created. Now the rule has the backing of the legislature and the providers have to appeal to the legislature for any deviations. Certain rule provisions, specifically suicide prevention processes and requirements, were written in direct response to the Hayes/DOJ survey and other national juvenile justice reform efforts at that time. This was prior to my employment with DJJ and was explained to me by the author of Rule 63N-1, F.A.C. prior to her retirement.

20. The mental health services are monitored annually by DJJ's Office of Monitoring and Quality Improvement (MQI). There are 5 standards for detention, and each center has a QI report each year setting forth whether it meets those standards. The reports are pretty extensive. Standard #3 is mental health.

21. In addition to annual monitoring by the Office of Monitoring and Quality Improvement teams, each detention center is monitored quarterly by DJJ's Office of Health Services for medical and mental health services provision. The monitoring team has 3 registered nurses and 3 Licensed Mental Health Professionals, each assigned regionally. They normally go on-site to each detention center; since COVID they have met virtually via Microsoft Teams, by email, etc. as necessary to complete quarterly monitoring via desk review and go on site when no COVID-19 positive cases are known to be present. The reports highlight all deficiencies in detail and how they are to be corrected. The deficiencies include mistakes in documentation, policy, processes and Rule provisions. Deficiencies are reviewed in accordance with FDJJ Policy 2000 until closed by OHS.

22. The Office of Health Services has the reputation for being strict. Those who work for OHS are all licensed and have high standards for the health services employees.

23. The mental health services are also monitored from outside of the Office of Health Services by DJJ's Office of Monitoring and Quality Improvement (MQI). There are 5 standards for detention, and each center has a QI report each year setting forth whether it meets those standards. The reports are pretty extensive. Standard #3 is mental health and Standard #4 is medical.

24. This information is based on my personal knowledge.

FURTHER AFFIANT SAITH NOT.

_____
JOY BENNINK

SWORN TO AND SUBSCRIBED before me by means of ✓ physical presence OR _____ online notarization this 25 day of MAY, 2021. She is (personally known to me)/has produced _____ as identification and did take an oath.

NOTARY PUBLIC: _____

(SEAL)      Print Name Deborah A. Young

My Commission Expires: Sept 28, 2021

DEBORAH A. YOUNG
MY COMMISSION # GG 109474
EXPIRES: September 28, 2021
Bonded Thru Notary Public Underwriters