**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

G.H., a minor, by and through his parent
and legal guardian, GREGORY HENRY;
R.L., a minor, by and through her parent
and legal guardian, ANGEL CARTER;
B.W., a minor, by and through her parent
and legal guardian, LEROI LUZUNARIS;
on behalf of themselves and all persons
similarly situated,

      Plaintiffs,

v.                      CASE NO.: 4:19-cv-00431-RLF-MJF

JOSEFINA TAMAYO, in her official
capacity as Acting Secretary of the Florida
Department of Juvenile Justice; and
FLORIDA DEPARTMENT OF JUVENILE
JUSTICE, an agency of the State of Florida,

      Defendants.
_____/

**AFFIDAVIT OF DR. RICHARD M. HOUGH, SR.**

STATE OF FLORIDA
COUNTY OF SANTA ROSA

      PERSONALLY APPEARED before me, the undersigned authority,

DR. RICHARD M. HOUGH, SR. who, after being duly sworn upon his oath,

states and affirms as follows:

1.      My name is Dr. Richard M. Hough, Sr.  My current CV and fee policy is attached as Exhibit "A."   I was retained by the law firm of Campbell, Trohn, Tamayo & Aranda, P.A., to review Florida Department of Juvenile Justice's ("DJJ") policies, procedures, practices and training in place regarding juveniles placed into short-term DJJ's detention facilities statewide who may also be placed in temporary behavioral confinement.

2.      My analysis to date is based upon the records and documents provided to me, together with the current practices and professional standards of juvenile detention facilities.  My qualifications to conduct case analysis, draw conclusions, and render expert opinions are based upon my knowledge of juvenile detention, jail, and corrections practices, combined with my education, training, experience and ongoing study and teaching of juvenile justice and corrections issues and practices to practitioners, academy recruits, and university students over several decades.  I have previously served as director of two juvenile detention centers and two county jail systems tasked with detaining juvenile inmates. I have been trained and served as a quality assurance assessor for the inspection of juvenile detention centers.  I have presented and published on juvenile detention and juvenile justice topics.  I have specifically taught the topics of inmate management and special confinement techniques.  I have served

as a director of a corrections academy in the State of Florida and am a member of the Council of Juvenile Correctional Administrators ("CJCA").   I have taught juvenile inmate management concepts and techniques to juvenile detention and corrections academy recruits in Florida for more than 35 years.

3. During the past four years, I have been retained or consulted on cases and testified at depositions, hearings, and trials at the state and federal court levels for both Plaintiff and Defendant clients.  The cases in which I have testified are noted on my CV.

4. I have reviewed the documents referenced on Exhibit "A" attached hereto.

5. I am familiar with the DJJ detention facility system statewide.  DJJ is among the largest juvenile justice systems in the nation and made a transition from a social service to a justice system organization in the early 1990s with the reality of violent crime committed by juveniles in Florida. Detention Services, as a component of the Florida Department of Juvenile Justice, is carried out at 21 centers around the state who maintain custody of youth pursuant to court order or law enforcement custody. FDJJ has demonstrated through statistical studies and tracking that behavioral confinement practices have evolved over time in Detention. The use of

behavioral confinement is the norm across the United States in detention settings, especially relatively short-term use such as that utilized at the FDJJ.   I have specifically reviewed the behavioral confinement of the named Plaintiffs. Each confinement was used based on violation of facility rules, was time-limited, and fell within Detention Services policies in place.

6. Since the creation of the National Institute of Corrections ("NIC") in the 1970s, agencies have had resources available that reflect the most common practices in the management of offenders and inmates, pre-adjudication and post-adjudication, adult and juvenile. The balance and challenge for agencies and officers alike is to maintain safety and order in a facility while respecting the rights of the incarcerated.  As a practical matter, the management of juvenile inmates is a challenging task.

7. Plaintiffs and Plaintiffs' expert(s) assert that experts and scientific studies and numerous authorities support limiting solitary confinement for juveniles.   In my opinion, none of the purported experts, advocates, studies, or articles are authoritative, peer-reviewed publications, but instead are papers or commentary by attorneys and advocacy groups that do not reflect any meaningful evidence or information relating to DJJ's behavioral confinement.   The attempt to compare the information in such pieces and the purported basis for same (longer duration adults, super max solitary

confinement type settings) with DJJ's system of behavioral confinement (short-term, temporary separation for de-escalation purposes) is meaningless.  Similarly, the citation to the accrediting program of the American Correctional Association, a private, non-profit group selling accreditation through its fee structure by non-mandatory paper review services with national standards for juvenile detention is meaningless. While the ACA has developed substantial performance-based standards for its use in various correctional settings, it does not promulgate such standards for juvenile detention facilities, although it did produce a manual titled "Standards for Juvenile Detention Facilities, 3rd Addition" that was published 31 years ago in 1990 and has never been updated since. Approximately five percent (5%) of juvenile detention facilities in the United States actually show ACA accreditation.  As noted by the U.S. Supreme Court, "while the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question."  The Court also said it would be "absurd to suggest that the federal courts should subvert their judgment as to alleged 8th Amendment violations to the ACA whenever it has relevant standards.  Additionally, the ACA's limited inspections are not binding as factual findings on the

Magistrate or on this Court.  While compliance with ACA's standards may be a relevant consideration, it is not per se evidence of constitutionality." The attempt to substitute for national and constitutional standards an impromptu, improvised standard of claimed best practices by professional advocates and critics, as opposed to standards based upon the professional judgment of correctional and detention professionals and administrators, is problematic. The correctional professionals' judgment receives under the governing constitutional law a strong presumption of correctness, and judicial intervention under the 14th Amendment is permitted only in extraordinary circumstances.

8. Short-term detention and long-term residential facility placement are not the same.  A variety of purported studies and advocacy organizations' publications discuss the negative effects on youth correlated with, arising from, or subsequent to incarceration in general.  It is important to be able to examine these positions without arbitrarily comparing longer-term incarceration with short-term detention.  The studies and publications often conflate all instances of juveniles being incarcerated as having been damaging to those juveniles, similar to Plaintiffs' arguments in this case, and the position is often articulated that numerous authorities support eliminating juvenile detention in general and solitary confinement in

particular. However, such claims as to related short-term court-ordered detention and short-term behavioral confinement are not empirically supported.

9. Plaintiffs and Plaintiffs' expert(s) assert harms from behavioral confinement and the deprivation of social contact such confinement brings. These assertions sidestep the lifetime of social learning, family and peer dynamics, and events leading up to an individual person's brief stay in detention or behavioral confinement and, again, conflates or ignores the fact that almost all research has focused on long-term residential placement, not short-term detention centers, and long-term solitary confinement versus short-term behavioral confinement.

## **OPINIONS**

10.     Through my experience as a juvenile justice and correctional administrator, experience as a corrections academy director, more than 35 years of teaching correctional and law enforcement procedures to academy recruits, in-service officers, and college and university students, my personal experience of conducting and supervising conduct of juvenile detention, corrections, and law enforcement business, my ongoing research analysis of such practices, and based upon a reasonable degree of juvenile detention and criminal justice certainty, I am of the opinion that:

A. The conditions of short-term detention of juveniles within DJJ are reasonable and proper under the prevailing practices of juvenile detention and corrections.

B. Juveniles are delivered into the custody of DJJ pursuant to court order or probable cause that result in the brief stay of a juvenile in a DJJ facility under the supervision of trained staff.

C. There were no noted deficiencies in the policies, procedures, or practices of DJJ or its staff, who are guided and trained in contemporary practices in the field of juvenile detention.

D. Detention staff properly rely on medical staff and mental health professionals for medical and mental health issues and no information reviewed suggests the deficiency or unavailability of medical or mental health staff to detention staff and the juveniles in their care.

E. The conditions of detention of juveniles at DJJ are reasonable and proper under the prevailing practices of juvenile justice, and I have seen no evidence of actual or threat of eminent serious harm. Juveniles who arrive at short-term juvenile detention facilities have motivations and lives that are complex and often unknown to staff, even after assessments, admission, and ongoing contact.

Troubled individuals are not inclined to share details of their lives even when asked direct questions.  DJJ uses acceptable detention and correctional management methods which are constrained by statute, administrative code, case law, policy, training, supervision by higher authority, report review, and the proper conduct of the officer who wield the authority to care for incarcerated juveniles. Officers assigned to detention duties have received appropriate and proper training in juvenile supervision.

F.  The conflation or misrepresentation of research or opinion articles addressing longer-term residential facilities with those of short-term detention facilities is unsupported empirically.

G. I have reviewed no material nor seen any evidence that reflects a departure from the accepted professional standards as to the conduct and operation of detention facilities within DJJ.  DJJ's use of behavioral confinement, both in policy and practice, is necessary for the safety and security of its detention centers and their staff and juveniles.  While substantial effort is made to avoid behavioral confinement by way of verbal de-escalation and other behavioral management approaches, the use of confinement is one of the few tools available to DJJ when juveniles are not

controllable by other means and are fighting or threatening the safety and security of the detention facility, its staff, and the other juveniles.   In this "time-out" setting, juveniles are continually observed for signs of stability and improvement or deterioration, including ten (10) minute checks… the average duration of behavioral confinement is less than eleven (11) hours for these juveniles whose average duration in detention is approximately fourteen (14) days.   When juveniles engage in aggressive and insulting behavior, educational or facility disruption, and other threats to the safety and security of the detention facility, it is accepted practice nationwide to use behavioral confinement or other variations to limit risk and manage the previously unsafe and possibly dangerous juveniles posing imminent risk of harm and safety to him or herself and others.

H. Advocacy groups asserting a best-practices approach where national standards and constitutional minimums are met and often exceeded are not compelling to impose or substitute the judgment of such groups for those of professional correctional administrators.   Indefinite and generalized references to best-practices without any guiding or meaningful standards or

measures cannot substitute or supersede professional correctional administration or applicable constitutional standards.

I.  The behavior and eventual life success or challenges of juveniles are not the province of DJJ detention facilities, whose task is to prevent to the extent possible substantial risk of serious harm for the atypical group of youth delivered to them by virtue of probable cause.  The parents or guardians of a detainee, and the detainee him or herself, are responsible for molding and guiding of values and behaviors.

J.  Individuals, not least juveniles in a challenging congregate setting, assault one another with no identifiable warnings. This is the basis of what is called the "elbow test," when someone even at the elbow of a police officer or detention officer will assault another person they have an issue with – or assault the officer. In the 2019-20 study of behavioral confinement at DJJ, the vast majority were for fighting, and averaged 11 or fewer hours in confinement. The history of humankind and the empirical examination of researchers across a multitude of disciplines stand as evidence of this reality in society as well as in locked facilities. The necessary, if infrequent and temporary, use of restrictive housing as

[11]

behavioral confinement is warranted to support behavior management, enforce facility rules, and safeguard juveniles and staff. Even with DJJ's clear behavior guidelines for juvenile inmates, violations occur. The agency of the individual humans makes this inevitable. Responsible detention and corrections authorities must manage such human dynamics effectively and in constitutionally permissible ways.

K. The evolution of behavioral confinement in DJJ detention centers has been steady, and enlightened by the still-developing approaches to guiding adolescent conduct.

L. The varied ages of the detention center physical plants are not correlated with treatment and policies of a given facility. Professional and well-trained staff operate in buildings of all types in hospitals, schools, corrections facilities, and all manner of public, private, and non-profit concerns.

M. Nationally, there has not been a move to eliminate the use of restrictive housing by the actual correctional administrators and juvenile justice agencies tasked with the responsibility of maintain safe and secure temporary housing of juveniles in the juvenile justice system. Behavioral confinement is at times necessary and

may be the only option to carry out the care, custody, and control of inmates, whether juvenile or adult.

N. Each circumstance necessitating consideration of behavioral confinement includes a multitude of factors that must be assessed in order alleviate any threat to the safety and security of a detention facility, juveniles, and staff. Detention staff are constantly weighing the many factors including age, maturity, gang affiliation, personality, size, history of violence, timidity or temerity, and more in order to make an often split second decision as to how best to control a disruptive situation, while determining when confinement can be productive or counter-productive, and recognizing that over-generalization of circumstances warranting behavioral confinement can be self-defeating.   Such a case-by-case determination is not susceptible to uniform treatment, standards, limits or even decision making by the courts in an attempted universal, class-action basis.   Rather, separate and specific analysis of each juvenile and each circumstance is needed.

11.     This information is based on my personal knowledge.


        FURTHER AFFIANT SAYETH NOT.

_Richard M. Hough, Sr._

RICHARD M. HOUGH, SR.


SWORN TO AND SUBSCRIBED before me by means of __V__

physical presence OR _____ online notarization this 27th day of

____MAY____, 2021. He is personally known to me/has produced

____FLDL____ as identification and did take an oath.

ANGELA MARIE SCHNELLE
Notary Public, State of Florida
My Commission Expires Mar 12, 2023
Commission # GG 310723
Bonded Through National Notary Assn.

(SEAL)

NOTARY PUBLIC: _Angela Mau Schnelle_

Print Name: _Angela Marie Schnelk_

My Commission Expires: _3/12/23_

**EXHIBIT "A'**

**<u>DOCUMENTS REVIEWED BY DR. RICHARD M. HOUGH, SR.</u>**

1.    Plaintiff's Class Action Complaint

2.    Defendant's Motion to Dismiss etc.

3.    PL's. Response in Opposition to Defendant's. MTD

4.    FAC Sec. 63H1
      FAC Sec. 63H2
      FAC Sec. 63M-2
      FAC Sec. 63N-1
      FAC Sec. 63G-2

5.    DJJ Face Sheets for 

       DJJ Face Sheet
      DJJ Face Sheet
      DJJ Face Sheet

6.    Confinement reports for 

      ■ Confinement Reports

      ■ Confinement Reports

      ■ Confinement Reports

7.    Confinement chart – PowerPoint

8.    PAR Reports

      ■ PAR Reports

      ■ PAR Reports

9.    2019 FOP's

10.   2006 Detention Manual

11.   ██ Medical History (From initial DJJ File)

12.   ██ Medical History (From initial DJJ File)

13.   Dixie Fosler Timeline on changes to Confinement

14.   Documents from Hughes File:

Hough Expert Supplemental Report      10-22-2013
Hough Expert Report                   02-14-2013
Hough Expert Preliminary Report       08-24-2012
Hough Deposition transcript           10-28-2013
Hough Deposition transcript           09-14-2012
Hough Deposition transcript           02-16-2013

15.   Detention Statewide 2020 Annual Training Plan

16.   JDO Academy Daily Schedule

17.   Confidentiality Order (now signed)

18.   HIPAA Order (now signed)

19.   Copies of PL's Supplemental Responses to Defendant's
      Second Request for Production
      David Muhammad CV

20.   Documents provided to Labrecque by DJJ

Sources in Complaint
Confinement Briefing Comparison of DJJ and
        National Standards
Confinement Briefing Sheet
Descriptive Statistics
Final Confinement and Behavioral Incidents

Draft Confinement Types
Sample and Population Comparison
Inter-Rater Reliability (IRR Results)
Juvenile Suicide in Confinement Hayes (2009)
Hayes (2009) Critique
Table of Contents – Solitary Confinement in FL Juvenile
      Facilities Lawsuit Resources (2-17-2021)
Review of Solitary Confinement Literature (6-16-2020)

21.  Court's Order Denying Defendant's Motion to Dismiss

22.  Marstiller's Verified Answers to PL's 1st Interrogatories

23.  DJJ's Verified Answers to PL's 1st Interrogatories

24.  █ Updated DJJ Face Sheet   2-15-2021

25.  █ Updated DJJ Face Sheet    2-15-2021

26.  █ Updated DJJ Face Sheet    2-15-2021

27.  █ Medical File

28.  Defendant's Answer and Affirmative Defenses

29.  Exhibit A to Defendant's Answer

30.  FOP 2015

31.  FOP 2016

32.  FOP 2017

33.  FOP 2018

34.  FOP 2019

35.  FOP 2020

36.  Kraus Expert Declaration (PL Expert)

37.   Volusia cafeteria video and Palm Beach classroom video

38.   Detention Facility Center photographs taken by Plaintiffs' counsel
      Alachua (228 photos), Duval (340 photos), and Marion (450 photos)

[4]